## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

MICHAEL ZANZARELLA, *et al.*,

    *Plaintiffs*,

        v.

THE UNITED STATES OF AMERICA,

    *Defendant*.

Case No. 24-239L

Judge David A. Tapp

## UNITED STATES' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY

ADAM R.F. GUSTAFSON
Acting Assistant Attorney General
Environment and Natural Resources
Division
United States Department of Justice

EMILY A. DAVIS
Trial Attorney
Natural Resources Section
Environment and Natural Resources
Division
Tel: (202) 350-0482
Facsimile: (202) 616-6587
emily.davis@usdoj.gov

*Attorney for Defendant United States*

July 14, 2025

# Table of Contents

I.   BACKGROUND ............................................................................................ 4

    A.   Statutory Background ..................................................................... 4

    B.   Factual Background ........................................................................ 5

II.  STANDARD OF REVIEW ...................................................................... 7

III. ARGUMENT ............................................................................................... 9

    A.   Plaintiffs Have the Burden of Proof on All Elements of their Fifth
        Amendment Takings Claim .......................................................... 9

    B.   Group A: Plaintiffs Have No Ownership of the Railroad Corridor Because
        the Railroad Acquired the Corridor Lands in Fee by the Group A Deeds, as
        a Matter of New York Law. ........................................................... 11

    C.   The Railroad Acquired a Fee Simple Interest in the Lands within the
        Beacon Line Corridor by the Plaintiffs' Group 5 Source Deeds. ......... 15

        i.    The "Group 5" Deeds Granted the Fee to the Railroad. ......... 15

        ii.   Incorporation of the GRA in the "Group 5" Deeds Does Not Reduce
            a Fee Simple Grant to an Easement. ...................................... 16

    D.   Group B: Trail Use Fits Squarely Within the Scope of the Railroad's
        Easement Acquired in the Group B Deeds Under New York Law. ......... 22

        i.    Like the *Romanoff Equities* plaintiff, Plaintiffs show no evidence of
            substantial burden as understood by the original grantor. ......... 25

        ii.   "Successors and assigns" is plainly not critical or relevant to the
            *Romanoff Equities* analysis. ................................................. 28

    E.   Group C: Even if this Court Decides that the Railroad Owns an Easement in
        the Corridor, the Group C Plaintiffs Do Not Own the Underlying Land to
        the Centerline. .............................................................................. 29

    F.   Group D: Plaintiffs Fail to Meet Their Burden for the Group D Plaintiffs
        Adjacent to the Maybrook Trail, as a Pure Matter of Law. ................. 34

        i.    Plaintiffs Have Not Carried Their Burden of Proving Causation for
            Group A Claims. ................................................................. 35

        ii.   Plaintiffs Have Not Carried Their Burden of Proving Just
            Compensation for Group D Claims. ...................................... 36

G.    Plaintiffs Have Failed to Establish Liability for a Taking Because Plaintiffs Do Not Prove that MNR Would Have Abandoned the Rail Line Absent the NITU. ............................................................................................................... 38

     i.    MNR's Discontinuance of Service is Not Proof of Abandonment Under Caqueline. ..................................................................................... 39

     ii.    MNR is Expressly Not Foreclosing Future Rail Service. ......................... 40

IV.  Conclusion ..................................................................................................................... 42

## Tables of Authorities

**Cases**

*233rd St. P'ship, L.P. v. United States*,
No. 23-1358, 2025 U.S. Claims LEXIS 1155 (Fed. Cl. May 7, 2025 ) ................................... 14

*Adamkiewicz v. Lansing*,
288 A.D.2d 531, 732 N.Y.S.2d 135 (3rd Dept. 2001) ............................................ 19

*Am. Pelagic Fishing Co. v. United States*,
379 F.3d 1363 (Fed. Cir. 2004) ....................................................................... 11

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........................................................................................ 9

*Baros v. Texas Mexican Ry. Co.*,
400 F.3d 228 (5th Cir. 2005) ........................................................................ 43

*Bashaw v. Clark*,
267 A.D.2d 681 (N.Y. App. Div. 1999) ........................................................... 34

*Bevirt v. United States*,
No. 24-622, 2025 U.S. Claims LEXIS 1640 (Fed. Cl. June 24, 2025) ............................. 10, 11

*Butler v. United States*,
139 Fed. Cl. 617 (2018) ............................................................................ 9, 18

*Camp Bearberry, LLC v. Khanna*,
234 A.D.3d 1158 (N.Y. App. Div. 2025) ......................................................... 15

*Caquelin v. United States*,
959 F.3d 1360 (Fed. Cir. 2020) ........................................................... 12, 39, 43, 46

*Castillo v. United States*,
952 F.3d 1311 (Fed. Cir. 2020) ...................................................................... 14

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ............................................................................ 9, 10, 41

*Chi. Coating Co. v. United States*,
131 Fed. Cl. 503 (2017) ........................................................................... 11, 34

*Chi. Coating Co., LLC v. United States*,
892 F.3d 1164 (Fed. Cir. 2018) ................................................................... 4, 45

*Cienega Gardens v. United States*,
331 F.3d 1319 (Fed. Cir. 2003) ..................................................................... 10

*Citizens Against Rails-to-Trails v. STB*,
267 F.3d 1144 (D.C. Cir. 2001) ...................................................................... 5

*Corning v. Lehigh V. R. Co.*,
14 A.D.2d 156 (App. Div. 4th Dept. 1961) ................................................... 15, 17

*Cowan v. Carnevale,*
    752 N.Y.S.2d 737 (App. Div. 3rd Dept. 2002) ................................................. 22

*Craig v. Wells,*
    11 N.Y. 315 (1854) ................................................................................. 22

*Dairyland Power Coop. v. United States,*
    16 F.3d 1197 (Fed. Cir. 1994) ................................................................ 10

*Dana Corp. v. United States,*
    174 F.3d 1344 (Fed. Cir. 1999) ............................................................. 10

*Envt'l. Props., Inc. v. SPM Tech, Inc.,*
    851 N.Y.S.2d 276 (App. Div. 2nd Dept.) ............................................... 35

*Goos v. Interstate Commerce Comm'n,*
    911 F.2d 1283 (8th Cir. 1990) ................................................................. 5

*Grantwood Village v. Mo. Pac. R.R. Co.,*
    95 F.3d 654 (8th Cir. 1996) ................................................................... 44

*Hearst v. N.Y. C. & H. R. R. Co.,*
    148 N.Y.S. 586 (App. Div. 1st Dept. 1914) ........................................... 30

*Holland v. McClusky,*
    105 N.Y.S.3d 737 (App. Div. 4th Dept. 2019) ....................................... 17

*In re Acquisition of Real Prop. by Warrensburg Hydro Power Ltd. Pshp.,*
    263 A.D.2d 822 (App. Div. 3rd Dept. 1999) .......................................... 32

*Laham v. Chambi,*
    299 A.D.2d 151, 753 N.Y.S.2d 34 (1st Dept. 2002) .............................. 19

*Lewis v. Young,*
    705 N.E.2d 649, 92 N.Y.2d 443, 682 N.Y.S.2d 657 (N.Y. 1998) .......... 26

*Loveridge v. United States,*
    174 Fed. Cl. 379 (2024) ........................................................ 13, 38, 39, 40, 46

*M. Maropakis Carpentry, Inc. v. United States,*
    84 Fed. Cl. 182 (2008) .......................................................................... 41

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) ................................................................................ 9

*McClurg Family Farm, LLC v. United States,*
    115 Fed. Cl. 1 (2014) ............................................................................ 33

*Missionary Society of the Salesian Congregation v. Evrotas,*
    175 N.E. 523 (N.Y. 1931) ...................................................................... 28

*Mott v. Mott,*
    68 N.Y. 246 (1877) ................................................................................ 34

iv

*Nat'l Ass'n of Reversionary Prop. Owners v. STB,*
    158 F.3d 135 (D.D.C. 1998) ........................................................................... 45

*O&W Lines, Inc. v. St. John,*
    228 N.E.2d 370 (1967) .................................................................................... 24

*Otay Mesa Prop., L.P. v. United States,*
    779 F.3d 1315 (Fed. Cir. 2015) ................................................................. 13, 42

*Potts v. United States,*
    126 F. Supp. 10 (Ct. Cl. 1954) ...................................................................... 13

*Precision Pine & Timber Inc. v. United States,*
    596 F.3d 817 (Fed. Cir. 2010) ....................................................................... 42

*Preseault v. ICC,*
    494 U.S. 1 (1990) ..................................................................................... 44, 45

*Preseault v. United States,*
    100 F.3d 1525 (Fed. Cir. 1996) ......................................................... 11, 12, 25

*Rogers v. United States,*
    814 F.3d 1299 (Fed. Cir. 2015) ..................................................................... 14

*Romanoff Equities, Inc. v. United States,*
    119 Fed. Cl. 76 (2014) ..................................................... 26, 27, 29, 30, 31

*Romanoff Equities, Inc. v. United States,*
    815 F.3d 809 (Fed. Cir. 2016) .......................................... 2, 27, 28, 29

*Sauer West, LLC v. United States,*
    168 Fed. Cl. 49 (2023), appeal filed, No. 24-1114 (Fed. Cir. 2023) ........................................ 44

*St. Bernard Par. Gov't v. United States,*
    887 F.3d 1354 (Fed. Cir. 2018) ..................................................................... 12

*Sullivan v Markowitz,*
    239 A.D.2d 404 (App. Div. 2nd Dept. 1997) ............................................... 35

*Sweats Fashions, Inc. v. Pannill Knitting Co.,*
    833 F.2d 1560 (Fed. Cir. 1987) ..................................................................... 41

*United States v. Va. Elec. & Power Co.,*
    365 U.S. 624 (1961) ...................................................................................... 13

*Wilcox v. Reals,*
    178 A.D.2d 885 (App. Div. 3rd Dept. 1991) ................................................. 32

*Wis. Cent. Ltd. v. STB,*
    112 F.3d 881 (7th Cir. 1997) ........................................................................ 44

**Rules**

RCFC 5.4(a)(5) ........................................................................................................................ 1

RCFC 56(a) ............................................................................................................................ 7

RCFC 56(c)(1) ....................................................................................................................... 8

RCFC 56(c)(1)(A) ................................................................................................................. 8

**Statutes**

16 U.S.C. § 1247(d) .......................................................................................................... 1, 5

16 U.S.C. §§ 1241 ................................................................................................................ 4

49 U.S.C. §10901 ................................................................................................................ 8

N.Y. Real Prop. Law § 240(3) ........................................................................................... 14

N.Y. Real Prop. Law § 245 ............................................................................................... 15

N.Y. Real Prop. Law § 258 ............................................................................................... 33

N.Y. Real Prop. Law § 78A.07 (2025) .............................................................................. 20

**Other Authorities**

N.Y. Law Ch.140 (1850) .......................................................................................... 5, 19, 20

**Regulations**

49 C.F.R. § 1152.24(e) ........................................................................................................ 7

49 C.F.R. § 1152.29 ............................................................................................................. 4

49 C.F.R. § 1152.29(a) ........................................................................................................ 4

49 C.F.R. §1152.29(d)(1) .................................................................................................... 4

49 C.F.R. § 1152.29(e)(2) .................................................................................................. 41

### Index of Exhibits to Defendant's Cross-Motion for Partial Summary Judgment

| Exhibit No. | Description |
| --- | --- |
| 1 | Table 1 of Conveyances: Group A - Deeds conveying fee to the Railroad. |
| 2 | Table 2 of Conveyances: Group B - Deeds conveying a broad, general easement to the Railroad. |
| 3 | Table 3 of Conveyances: Group C - Modern deeds that describe the land conveyed to rebut the centerline presumption. |
| 4 | Table 4: Properties adjacent to the Maybrook Trail. |
| 5 | Table 5: Summary of Plaintiffs' Group category and the United States' Group categories, by Plaintiff. |
| 6 | Declaration of Susan Sarch on Behalf of Metro-North Commuter Railroad Company, dated June 12, 2025. |
| 7 | New York Empire State Trail: Final Report - August 2021, NY_EST_0000001-18. |
| 8 | Brown 212-95 USZANZ0000003-5 |
| 9 | Brown 250-328 USZANZ0000006-8 |
| 10 | Rankin 171-205 USZANZ0000113-117 |
| 11 | Rapelje 404-276 USZANZ0000118-119 |
| 12 | Scofield 190-162 USZANZ0000120-121 |
| 13 | Storm 213-378 USZANZ0000126-129 |
| 14 | Townsend 94-157 USZANZ0000143-144 |
| 15 | DMA Appraisal Report of William Antalek (Claim #6) with non reps PLFEXP000162-305 |
| 16 | DMA Appraisal Report of Arlene G. Durk (Claim #31) with non reps PLFEXP000722-849 |
| 17 | Declaration of Matthew Krauser, Newmark Valuation & Advisory, dated July 14, 2025. |
| 18 | De Carpio, John A. & Annette (Claim 22) - Deed 2001-542 PLF000431-433 |
| 19 | Dixon, Bradley L & Tori L. (Claim 27) - Deed 2001-8741 PLF000484-486 |

20          Giacalone, Joe & Sarah (Claim 40) - Deed 2016-3681 PLF000610-613

**UNITED STATES' CROSS-MOTION FOR SUMMARY JUDGMENT
AND OPPOSITION TO PLAINTIFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT ON LIABILITY**

Plaintiffs allege that the operation of Section 8(d) of the National Trails System Act ("Trails Act"), 16 U.S.C. § 1247(d), resulted in a Fifth Amendment taking of their interests in the Beacon Line railroad corridor, located in Dutchess and Putnam Counties in the Hudson Valley Region of New York State.  First Am. Compl. ¶¶ 2-95 (Dkt. No. 8-2).  Plaintiffs' claims are premised on the allegations that they are or were the owners of land adjacent to a railroad corridor, that Metro North Commuter Railroad Company ("MNR") holds only an easement in the subject corridor, and that they are the fee owners of the land subject to that easement.  *Id*. ¶¶ 97-100.

On May 27, 2025, Plaintiffs filed a Partial Motion for Summary Judgment on Liability claiming (1) that each Plaintiff has an ownership interest in the corridor, (2) that all the source deeds conveying an interest in the Beacon Line corridor to the original railroad conveyed only an easement in the corridor, (3) that the Plaintiffs own the land underlying the right-of-way to its centerline, and (4) that the Surface Transportation Board's ("STB") issuance of the Notice of Interim Trail Use ("NITU") caused a taking, even in the absence of a trail use agreement.

The United States opposes Plaintiffs' Motion for Partial Summary Judgment and cross-moves for summary judgment pursuant to Rules 5.4(a)(5) and 56 of the Rules of the Court of Federal Claims ("RCFC").  The United States moves on matters of law, and this Court should grant summary judgment in favor of the United States as to Plaintiffs' claims on the following grounds. *See* Defendant's Ex. 5.

First, the United States moves for summary judgment on Plaintiffs' claims premised on the original source deeds conveying a fee interest in the corridor to the original railroad, or the "Group A" deeds. *See infra* at Section III.B.  The threshold issue in all Fifth Amendment takings

cases is whether the plaintiffs have established an ownership interest in the railroad corridor.  To meet their burden on that threshold issue, each plaintiff must establish that (1) the original Railroad acquired only an easement instead of a fee simple interest in the subject corridor, and (2) it is the fee owner of the land burdened by that easement.  Plaintiffs cannot meet their burden on this threshold issue because the Railroad acquired a fee simple interest in the corridor pursuant to fifteen Group A source deeds.  In other words, 27 Plaintiffs do not own an interest in the subject corridor.

Second, the United States moves for summary judgment on Plaintiffs' claims premised on the original source deeds conveying a broad, general easement to the Railroad under New York law, or the "Group B" deeds.  *See infra* at Section III.D.  Even if the Railroad had acquired only an easement under certain source deeds in this case—which, the United States does not dispute—Plaintiffs would still have the burden of proving that the Railroad's easement does not permit trail use.  However, Plaintiffs cannot meet this burden.  In *Romanoff Equities, Inc. v. United States*, 815 F.3d 809 (Fed. Cir. 2016), the Federal Circuit interpreted the scope of a broad, general easement granted to a railroad as a matter of New York State law—the same kind of broad, general easements granted in the Group B deeds.  *Romanoff Equities* is clear: trail use fits squarely within the scope of an easement that permits the Railroad to use the corridor for railroad purposes and "for any other purposes" as it may choose.  As discussed *infra,* Plaintiffs attempt to relitigate *Romanoff Equities* is not only inappropriate, but also without merit.  The Court should decide as a settled matter of New York law that there is no taking where trail use fits within the easement granted to the Railroad.

Third, the United States moves for summary judgment as to the Group C Plaintiffs, that have not met their burden of showing they own the land underlying the right-of-way to the

centerline of the corridor, as a matter of New York law. *See infra* at Section III.E.  Plaintiffs contend they are entitled to a presumption of ownership of the fee simple to the Beacon Line's centerline, by operations of the *centerline presumption* under New York law.  However, because the deeds conveying the interest to these Group C Plaintiffs expressly exclude the Beacon Line corridor, the United States rebuts this centerline presumption under New York law for 80 of Plaintiffs' claims.  Accordingly, the Court should decide that Plaintiffs have not met their burden of establishing an ownership interest in the railroad corridor, and therefore cannot claim a taking.

Fourth, the United States also moves for summary judgment as to the Plaintiffs that own property adjacent to the pre-existing Maybrook Trail, or the "Group D" Plaintiffs. *See infra* at Section III.F.  In 2020, MNR completed construction of the Maybrook Trail—a 23-mile pedestrian walking and biking trail within the subject Beacon Line railroad corridor.  Thus, before the STB issued NITU, people have been walking and biking along that public rail-to-trail ("RTT") in the subject corridor.  Because the Maybrook Trailway pre-exists the subject NITU, Plaintiffs have not, and cannot, prove the necessary elements of causation because it is impossible for Plaintiffs to have their land back unencumbered by a trail during the NITU period.  Plaintiffs also have failed to prove just compensation—an essential element of their takings claim—because their appraiser's opinion of valuation expressly excluded consideration of the Maybrook Trail.  Either way, Plaintiffs' failure to meet their burden of proof entitles the United States to summary judgment as to these Group D Plaintiffs.

For the reasons set forth below, the United States respectfully requests that the Court grant Defendant's Cross Motion for Partial Summary Judgment and deny Plaintiffs' Motion for Partial Summary Judgment.

**MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT**

## I.    BACKGROUND

### A.  Statutory Background

Plaintiffs allege a Fifth Amendment taking of their claimed property rights in the subject railroad corridor by operation of the National Trails System Act (the "Trails Act"), as amended by the National Trails System Act Amendments of 1983, 16 U.S.C. §§ 1241, et seq. Under the Trails Act, a railroad may initiate proceedings to obtain authorization to abandon service on a rail line that is under the regulatory jurisdiction of the STB. See 49 C.F.R. § 1152.29, 1152.50. A third party, including a "state, political subdivision, or a qualified private organization," may then petition the STB to use the rail line "for interim trail use and railbanking pursuant to 16 U.S.C. § 1247(d)." 49 U.S.C. § 1152; *Chi. Coating Co., LLC v. United States*, 892 F.3d 1164, 1167 (Fed. Cir. 2018).

The railbanking process works as follows.  When a rail carrier applies to abandon a rail line or exempt it from the abandonment process, a "state, political subdivision, or qualified private organization" may file a comment indicating an interest "in acquiring or using a right-of-way of a rail line . . . for interim trail use and rail banking."  49 C.F.R. § 1152.29(a).  If the prospective trail sponsor "is prepared to assume full responsibility for management of such rights-of-way and for any legal liability arising out of such transfer or use," 16 U.S.C. § 1247(d), and the rail carrier "agrees to negotiate an interim trail use/rail banking agreement, then the Board will issue a [NITU] to the railroad and to the interim trail sponsor for the portion of the right-of-way as to which both parties are willing to negotiate," 49 C.F.R. § 1152.29(d)(1).  The NITU provides a 180-day period for negotiation (which can be extended), during which time the rail carrier may "discontinue service, cancel any applicable tariffs, and salvage track and materials" after thirty days.  *Id.*

4

If the railroad and prospective trail group reach an agreement, the parties notify the STB and the corridor is then railbanked and remains under STB jurisdiction. *Id.* If the parties do not reach an agreement, the railroad has one year to decide whether to consummate abandonment of the line. *Id.* §§ 1152.29(d)(1), (e)(2); *see also Citizens Against Rails-to-Trails v. STB*, 267 F.3d 1144, 1149-53 (D.C. Cir. 2001); *Goos v. Interstate Commerce Comm'n*, 911 F.2d 1283, 1286 (8th Cir. 1990).

B. Factual Background

The railroad corridor at issue in this case is a 41.1-mile stretch known as the "Beacon Line." The Beacon Line consists of railroad segments acquired by different railroad companies over the years.

But prior to those acquisitions, the New York state legislature passed the "General Railroad Act" ("GRA" or, "Act") in 1850.[1] The GRA governed many aspects of railroads at the time—the formation of railroad companies, the construction and maintenance of rail corridors and tracks, passenger service, and land acquisition. *See* N.Y. Law ch. 140 (1850), Pls. Exhibit 8. Section 13 of the GRA provided that the railroad could acquire title to real estate through voluntary purchase with a grantor, otherwise the railroad may also acquire title through the condemnation proceedings prescribed in the Act. *Id.* at 8.

Later, around 1868, the Dutchess and Columbia Railroad acquired the western portion of the Beacon Line, running from Beacon, New York to Hopewell Junction, New York. *See* Pls. Exhibit 13. About one year later, the New York and Hartford Railroad acquired the Eastern portion of the corridor, running from Hopewell Junction, New York to the New

---

[1] As Plaintiffs note, the GRA was formally titled "An Act to authorize the formation of railroad corporations, and to regulate the same." *See* N.Y. Law ch. 140 (1850), Pls. Exhibit 8.

York/Connecticut border at Brewster, New York. *See* Pls. Ex. 10. Many railroad mergers and land purchases later, the Beacon Line was eventually purchased by MNR in 1995 from the Maybrook Railroad Company ("MRC"). *See* Pls. Ex. 13, 15.

In 2020, MNR designed and constructed of the Maybrook Trail (or, "Trail")—a 23-mile shared-use pedestrian and bicycle path within a portion of the Beacon Line corridor, running from Brewster, Putnam County to the hamlet of Hopewell Junction, Dutchess County. *See* Figure 1 below; *see also* Declaration of Susan Sarch, dated June 12, 2025 at ¶ 6 (Defendant's Ex. 6). The Maybrook Trail is a portion of the larger New York State-sponsored Empire State Trail, which has the goal of creating a network of 750-miles of bicycling and pedestrian trails spanning New York State. *see* Empire State Trail Final Report, August 2021 (Defendant' Ex. 7) at 1-3. The Maybrook Trail runs parallel to a set of railroad tracks over 23-miles of the total 41.1-mile Beacon Line; it was built along the two-track portion of the corridor. Decl. of Susan Sarch at ¶ 4 (Defendant's Ex. 6). The Trail has been open to the public for use as a pedestrian and bicycle trail since construction was completed in 2020. *Id.* at ¶ 6.

MNR constructed the Maybrook Trail without STB involvement or approval—indeed, without *any* federal action—because there is still one set of railroad tracks present on the Beacon Line that is not impacted by the Trail. *Id.* at ¶ 13-15. Common carrier freight service would



Figure 1: The Maybrook Trail within the Beacon Line corridor in Putnam County, New York. *See* Maybrook Trail North, N.Y.S. EMPIRE STATE TRAIL, https://empiretrail.ny.gov/new-york-city-poughkeepsie/pawling-hopewell-junction (last visited July 13, 2025).

6

therefore be uninterrupted on the Beacon Line, in the event freight service is requested. *Id.* at ¶ 15. MNR constructed a trail on that portion of the corridor without STB approval because doing so does not frustrate its common carrier obligations on the Beacon Line. *Id.*

On January 20, 2023, MNR filed a Petition for Exemption from 49 U.S.C. §10901 to the STB. Dkt. No 30-22 (Plaintiffs' Ex. 22). MNR did so "to acquire the Housatonic Railroad's ("HRRC") residual common carrier rights and obligations, including the right to reinstitute rail service in the future, over a rail line commonly known as the "Beacon Line." *Id.* at 4. On January 10, 2024, the STB issued a Notice of Exemption regarding an approximately 41.1-mile rail line pursuant to 49 C.F.R. § 1152.24(e). Dkt. No 30-27 (Plaintiffs' Ex. 27). On January 23, 2024, MNR requested a NITU or authorization for abandonment pursuant to the Trails Act. Pls. Ex. 6. On February 8, 2024, the STB issued a Corrected Decision and Notice of Interim Trail Use or Abandonment, and prescribed the NITU period for negotiation of a railbanking and interim trail use agreement to expire on February 8, 2025. Dkt. No 30-7 (Plaintiffs' Ex.7). MNR filed a request for an extension of the time until February 8, 2026, to file a notice with the STB implementing interim trail use on the Beacon Line. Pls. Dkt. No 30-158 (Plaintiffs' Ex. 158). MNR is required to notify the STB if a railbanking and interim trail use agreement has been reached. As of the date of this filing, no such notice has been filed on the docket in the proceedings pending before the STB.

## II. STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). A genuine dispute is one that could permit a reasonable jury to enter a verdict in the non-moving party's favor, and a material fact is one that could affect the outcome of the suit. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A movant may support its assertion that a fact

cannot be genuinely disputed by "citing to particular parts of materials in the record, including depositions, documents, . . . affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials."  RCFC 56(c)(1)(A).

The party moving for summary judgment bears the initial burden of establishing the absence of a genuine dispute of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Once the moving party meets its initial burden, the non-moving party must support its assertion that a fact is genuinely disputed by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  RCFC 56(c)(1).  In evaluating motions for summary judgment, courts must view any inferences drawn from the underlying facts in the light most favorable to the non-moving party and may not engage in credibility determinations or weigh the evidence.  *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587-88 (1986).

Cases involving "questions of law are particularly appropriate for summary judgment." *Butler v. United States*, 139 Fed. Cl. 617, 625 (2018) (citing *Dana Corp. v. United States*, 174 F.3d 1344, 1347 (Fed. Cir. 1999)).

Granting a summary judgment motion is proper "against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case and for which that party bears the burden of proof at trial." *Celotex Corp.* 477 U.S. at 322. "A nonmoving party's failure of proof concerning the existence of an element essential to its case on which the nonmoving party will bear the burden of proof at trial necessarily renders all other facts immaterial and entitles the moving party to summary judgment as a matter of law." *Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994).

## III. ARGUMENT

A. <u>Plaintiffs Have the Burden of Proof on All Elements of their Fifth Amendment Takings Claim</u>

Plaintiffs have the burden of proof on all elements of their Fifth Amendment takings claims. *See e.g., Bevirt v. United States*, No. 24-622, 2025 U.S. Claims LEXIS 1640, at *6 (Fed. Cl. June 24, 2025). The threshold element in all takings cases is proof that the plaintiff had an ownership interest in the private property allegedly taken on the date of that taking. *See Cienega Gardens v. United States*, 331 F.3d 1319, 1328 (Fed. Cir. 2003) ("For any Fifth Amendment takings claim, the complaining party must show it owned a distinct property interest at the time it was allegedly taken . . .."). If Plaintiffs "fail[] to demonstrate the existence of a legally cognizable property interest, the courts [sic] task is at an end." *Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004).

As applied in the context of a takings claim brought under the Trails Act, this threshold element requires a plaintiff to prove that they have an ownership interest in the railroad corridor that is the subject of their claim. This inquiry begins with a determination of who owns the land within the corridor, or, whether the railroad acquired only an easement or obtained a fee simple estate. *Preseault v. United States*, 100 F.3d 1525, 1533 (Fed. Cir. 1996). If the railroad owns the corridor in fee, then the court may finish the liability inquiry because plaintiffs have no cognizable interest in the corridor. *See e.g., Bevirt*, No. 24-622, 2025 U.S. Claims LEXIS 1640, at *16; *Chi. Coating Co. v. United States*, 131 Fed. Cl. 503, 508, 513-14 (2017) (granting United States' motion for summary judgment on Trails Act takings claims after concluding the railroad acquired fee simple title by deed). However, if the railroad was only granted an easement, then the court turns to the second step: whether "the terms of the easement [are] limited for railroad purposes, or did they include future use as a public recreational trail." *Preseault*, 100 F.3d at

1533 (Fed. Cir. 1996).  In other words, whether the scope of the easement allows for railbanking (preservation of the corridor for future rail use) and trail use.  If so, then plaintiffs cannot establish liability.

If a plaintiff establishes an ownership interest in the land within the corridor, the next element of their claim is causation: did a government action cause a taking and, if so, what interest was taken?  In a Fifth Amendment takings litigation, it is well established that the plaintiff bears the burden of proof to establish that the government action caused a taking.  *St. Bernard Par. Gov't v. United States*, 887 F.3d 1354, 1362 (Fed. Cir. 2018). The plaintiff must "show that in the ordinary course of events, absent government action, [they] would not have suffered the [alleged] injury." *Id.*  As applied in the context of a claim brought under the Trails Act, the element of causation was explained by the Federal Circuit in *Caquelin v. United States*, 959 F.3d 1360 (Fed. Cir. 2020).  Under *Caquelin*, "a NITU does not effect a taking if, even in the absence of a NITU, the railroad would not have abandoned its line (a necessary prerequisite for termination of the easement under state law) during the period of the NITU: in such a case, the *NITU takes nothing from the landowner that the landowner would have had in the absence of the NITU*." *Id.* at 1363 (emphasis added); *see also Preseault*, 100 F.3d at 1533 (even if the railroad's easement was broad enough to encompass a trail, a court must determine whether the easement "terminated prior to the alleged taking so that the property owner at the time held a fee simple by the easement," or, whether the easement was abandoned).  Per the logic of *Caquelin*, there can be no taking if the Plaintiffs would never have their land back unencumbered by a trail during the NITU period.

Finally, if a plaintiff meets their burden of proof on both title and causation so as to establish liability, the plaintiff also has the burden of proving just compensation for the property

interest that was held to have been taken. *Otay Mesa Prop., L.P. v. United States*, 779 F.3d 1315, 1323 (Fed. Cir. 2015). In cases alleging a partial taking (here, an easement under the Trails Act), the "conventional" way courts determine compensation is by examining what the market value of the property was both before and after (with and without) the government easement. *United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 632 (1961); *see also Potts v. United States*, 126 F. Supp. 10 (Ct. Cl. 1954) ("In the case of a taking, the measure of just compensation is the difference in the market value of the property taken before and after the taking."). Further, the proof of just compensation must account for the real-world conditions both before and after the taking of an easement by operation of the Trails Act. *See Loveridge v. United States*, 174 Fed. Cl. 379, 389-90 (2024).

### B. Group A: Plaintiffs Have No Ownership of the Railroad Corridor Because the Railroad Acquired the Corridor Lands in Fee by the Group A Deeds, as a Matter of New York Law.

The United States moves for summary judgment as to the Plaintiffs' claims that are premised on the "Group A" source deeds, each of which conveyed fee to the railroad.[2] The court should grant summary judgment for the United States because these Plaintiffs have not met their burden of proving that they have an ownership interest in the Beacon Line corridor.

As a threshold matter, state law governs "property rights of the parties in a rails-to-trails case." *Castillo v. United States*, 952 F.3d 1311, 1319 (Fed. Cir. 2020); *see also Rogers v. United States*, 814 F.3d 1299, 1305-06 (Fed. Cir. 2015) ("We analyze the property rights of the parties in a rails-to-trails case under the relevant state law." (citation omitted)). Here, New York law governs the interpretation of deeds conveying an interest in land.

---

[2] *See* Defendant's Exhibit 1, for a chart identifying the Group A deeds, the language from the source deed that conveys fee to the original railroad, and the Plaintiffs that each Group A deed applies to.

Under New York law, "every instrument creating, transferring, assigning or surrendering an estate or interest in real property must be construed according to the intent of the parties, so far as such intent can be gathered from the whole instrument, and is consistent with the rules of law." N.Y. Real Prop. Law § 240(3).  Courts in New York will interpret the interest conveyed according to the plain language within the four corners of the deed.  *233rd St. P'ship, L.P. v. United States*, No. 23-1358, 2025 U.S. Claims LEXIS 1155, at *6 (Fed. Cl. May 7, 2025 ) ("Under this legal regime, a property deed's four corners are determinative, unless there is some textual ambiguity in the deed itself.") (citing *Camp Bearberry, LLC v. Khanna*, 234 A.D.3d 1158 (N.Y. App. Div. 2025)). Further, a "grant or devise of real property passes all the estate or interest of the grantor or testator *unless the intent to pass a less estate or interest appears by the express terms of such grant . . .*" N.Y. Real Prop. Law § 245 (emphasis added).

Importantly, New York law does not apply a different legal standard to railroads.  Instead, a railroad company may acquire a corridor or right-of-way in fee. *See, e.g.*, *Corning v. Lehigh V. R. Co.*, 14 A.D.2d 156, 159 (App. Div. 4th Dept. 1961) (concluding that, in the absence of limiting language, the right-of-way was conveyed in fee to the railroad company). Under New York law, the Group A deeds all convey fee to the railroad because of the plain language of the grant, and because of the absence of express language limiting the estate granted.

One exemplary Group A deed instrument is the Rapelje; John, Emily, Lawrence, Anna, Adrian, Josephine Deed, Book 404 Page 276:

> Grantors "hereby grant and release unto said party of the second part its successors and assigns forever, all that certain parcel of land situate lying and being in the town of East Fishkill, County of Dutchess, State of New York…containing an area of three and three tenths acres more or less.  *Together with the appurtenances and all the estate and rights of the parties the first part in and two said premises*. To have and to hold the above granted premises unto the said party of the second part its successors, heirs, and assigns forever... *The parties of the first part seized of the said premises in fee simple and have good right to convey the same...* The parties

are the first part will execute or procure any further necessary assurance of the title to said premises... and the parties of the first part will forever warrant the title to said premises"

*See* Rapelje; John, Emily, Lawrence, Anna, Adrian, Josephine Deed, 404-276, Defendant's Ex. 10 (emphasis added). Here, the deed unambiguously and expressly conveys the fee simple interest held by the party of the first part. The plain language of this deed is clear. But further, there is no other limiting language that indicates an intent to grant anything short of fee simple to the railroad.[3]  Therefore, under New York law, the Rankin, Robert G and Laura Deed conveyed the corridor to the railroad in fee.  This source deed applies to three of Plaintiffs' claims, *see* Defendant's Ex. 1, and those Plaintiffs in turn have no ownership interest in the corridor.

Another applicable and exemplary Group A deed is the Brown, George and Rachel Deed, Book 212, Page 95:

> Party of the first part have bargained *sold and quit claimed and by these presents do bargain sell and quit claim unto the party of the second part All those three pieces of land situate in the town of Fishkill, County of Dutchess, State of New York*...To have and to hold *the said lands and premises with the hereditaments and appurtenances thereto belonging and all the estate, title, claims and interest of the parties of the first part* therein to said party of the second part *its successors and assigns forever*...

*See* Brown, George and Rachel Deed, 212.95 (Defendant's Ex. 8) (emphasis added).  As with the Rankin deed, the plain language in the Brown deed conveys *all the estate* of the party of the first part and identifies the specific property to be conveyed, thus reflecting an intent to convey fee simple to the railroad.  This is bolstered by the absence of other language limiting the interest conveyed or the grantor's use of the land. This source deed applies to one of

---

[3] As noted by Plaintiffs, "[i]ndeed, if there were no limitation whatsoever on the grant, then it would be a fee simple that was granted and not an easement." Pls. Motion at 28.

Plaintiffs' claims, *see* Defendant's Ex. 1.  In turn, Plaintiffs have not met their burden of proving they have an ownership interest in the corridor as to that claim, as a matter of law.

The Group A deeds are all comparable the source deed at issue in *Corning v. Lehigh*, which the court determined to convey fee to the railroad, notwithstanding the absence of the words "fee simple":

> It is undisputed that the language of the agreement is language which, if incorporated in a deed, would have been sufficient to convey to the railroad company a fee simple. Valentine agreed 'to grant and convey . . . by a good and sufficient deed, all the land' etc. These are the appropriate terms for the conveyance of a fee. There is no reference in the agreement to a railroad easement.

*Corning,* 14 A.D.2d 156, 159 (App. Div. 4th Dept. 1961).  Indeed, if the intent of the grantor was to limit the conveyance to an easement, that intent would be expressed in the grant. *Id.*; *see also Holland v. McClusky*, 105 N.Y.S.3d 737, 739 (App. Div. 4th Dept. 2019) (concluding that, because of the clear limiting language in the source deed, the grantor conveyed an easement to the railroad).  However, the Group A source deeds all contain evidence of a grant in fee: the express grant of the land described in each deed, consideration paid, the conveyance of "all estate and title" held by the grantor, and importantly, the absence of language limiting the conveyance to an easement. *See* Defendant's Ex. 1 (summarizing the operative language in the Group A deeds).

Accordingly, this Court should conclude as a matter of law that the Group A deeds conveyed fee to the original railroad under New York law. In turn, the Plaintiffs claims premised on the Group A deeds fail because Plaintiffs do not own an interest in the corridor.

C.  The Railroad Acquired a Fee Simple Interest in the Lands within the Beacon Line Corridor by the Plaintiffs' Group 5 Source Deeds.

As set forth above, the threshold element of establishing an ownership interest in the subject railroad corridor typically begins by interpreting the original deeds to the railroad ("source deeds") under applicable state law to determine whether those deeds conveyed a fees simple interest to the railroad or a lesser interest, such as an easement.  Here, the identification of those source deeds is not in dispute.  The interpretation of those deeds is therefore a question of law suitable for resolution at summary judgment.  *See e.g., Butler v. United States*, 139 Fed. at 625 (noting that questions of law are particularly suitable for summary judgment).

The source deeds identified in Plaintiffs' Motion as the "Group 5" deeds clearly conveyed a fee simple interest to the grantor railroad company under New York law.  Plaintiffs' contention that these "Group 5" deeds conveyed only easement ignores that plain language and is inconsistent with New York law.  The Court should conclude that the "Group 5" source deeds conveyed fee simple title to the railroad and, on that basis, grant the United States' motion for summary judgment as to the claims that are dependent on those deeds. *See* Defendant's Ex. 5.

*i.      The "Group 5" Deeds Granted the Fee to the Railroad.*

As stated above, New York courts will interpret a deed based on the plain language within the four corners of the instrument.  Under New York law, the Group 5 deeds all convey fee to the railroad because of: the plain language of the grant, the absence of express language limiting the estate granted, and in some instances valuable consideration paid.[4]

---

[4] The consideration stated in the Group A deeds varies, but variations in the amount do not control or alter the interpretation of the deeds under New York law. "The adequacy of consideration is not the proper subject of judicial scrutiny when some benefit was received." *Laham v. Chambi*, 299 A.D.2d 151, 753 N.Y.S.2d 34 (1st Dept. 2002). Further, "the adequacy of the consideration paid for the transfer of title to real property is irrelevant to the validity of the deed." *Adamkiewicz v. Lansing*, 288 A.D.2d 531, 732 N.Y.S.2d 135 (3rd Dept. 2001).

For example, the Tabor Deed, Book 149, Page 75, states:

The said parties of the first part *in consideration of the sum of $2400 to them duly paid by the said railroad company* have sold and by these presents do grant and convey to the said Boston & Hartford Railroad Company their successors and assigns all that piece or *parcel of land situate in the Town of Beekman and County of Dutchess and State of New York... containing 11.13-100 acres with the appurtenances and all the Estate, Title and Interest therein of said party of the first part* subject nevertheless to all the duties and liabilities imposed on the parties of the second part by the General Railroad Act of the State of New York...

Tabor 149-75, PLF000210, Dkt. No. 30-141 (Plaintiffs' Ex. 141) (emphasis added). As with the other Group A source deeds discussed above, the plain language in the Tabor deed conveys "all the estate" of the grantor. Combined with the absence of other express language limiting the interest conveyed or the grantee's use of the land and valuable consideration paid, this reflects an intent to convey fee simple.

Another example, is the Hayt Deed at Book 47, Page 139:

*In consideration for the sum of $600* . . .have sold and by these presents does grant and convey to the said Boston Hartford and Erie railroad company their successors and assigns *All that piece or parcel of land situate in the town of Patterson, County of Putnam, and State of New York . . . containing one acre and ninety-four one hundredths (1.94) of an acre more or less . . . With the appurtenances and all the estate title and interest therein of said parties of the first part* subject nonetheless to the duties and liabilities imposed on said party of the second part by the conditions and provisions of the general railroad act of the state of New York and the amendments thereto… he will forever warrant and defend against any person whomsoever lawfully claiming the same . . .

*See* Hayt Deed, 47-139, PLF000085, Dkt. No. 30-133 (Plaintiffs' Ex. 133) (emphasis added).

> ii.     *Incorporation of the GRA in the "Group 5" Deeds Does Not Reduce a Fee Simple Grant to an Easement.*

Plaintiffs erroneously contend that "[a]ll applicable source conveyances conveyed easements under New York law." Pls.' Motion at 12.  But this ignores the plain language in the granting clauses of the Group 5 deeds. This approach is inconsistent with New York law, and

the assertion that these deeds conveyed only an easement is not supported by applicable law or the plain and unambiguous language of these deeds.

To begin with, New York follows the general approach to give superiority to the interest conveyed in the deed's granting clause. *See* 11 Powell on Real Property § 78A.07 (2025) ("The granting clause is the most important element of the deed, indicating what is being conveyed and how."). As to the "Group 5" deeds, Plaintiffs bypass the plain language of the deed to manufacture ambiguity, pointing to references of the General Railroad Act of 1850 ("GRA"). Pls. Motion at 21-22. However, because New York law (1) gives weight to the plain language of the granting clause, and (2) provisions of the GRA are broader than condemnation proceedings, such mention of the GRA cannot reduce a clear grant of fee simple to an easement.

First, Plaintiffs' Group 5 deeds argument ignores the plain language of the granting clause, which conveys fee to the railroad. Plaintiffs even acknowledge that this kind language in the granting clause is commonly understood to convey fee. Pls. Motion at 21.[5] But conveniently, in Plaintiffs' discussion of the Group 5 deeds, Plaintiffs omit this broad language indicating a fee conveyance in their quote of the Rogers Deed. Pls. Motion at 22. The complete granting clause in the Rogers Deed, Book 149, Page 59 states:

> [T]he said parties of the first part . . . do *grant and convey to the said Boston Hartford and Erie RR their successors and assigns All that piece parcel of land situate in the town of East Fishkill, County of Dutchess, State of New York . . . containing 41/100 acres of land be the same more or less . . . with the appurtenances and all the estate, title and interest therein of said party of the first part* subject nevertheless to all the duties and liabilities imposed on said party of the second part by the provisions and conditions of the General Railroad Act of the State of New York.

---

[5] In a discussion of the Boyce Deed, Plaintiffs note that granting "'all' of the land to the grantee, 'their successors and assigns, forever' is typically associated with a fee simple grant." Pls. Motion at 21.

*See* Rogers Deed, 149/59, Pls. Ex. 138; PLF000195 (emphasis added). As Plaintiffs note, the "successors and assigns," and "all the estate, title, and interest therein of said party of the first part," is language of a fee conveyance.

Comparing the language of a condemnation proceeding pursuant to the General Railroad Act against one of the Group 5 voluntary deeds is instructive.  In this case, the United States concedes that, in some cases, Railroad acquired their interest in the corridor via condemnation proceedings, as described in Plaintiffs' discussion of their "Group 1" deeds. *See* Defendant's Ex. 5.  The language of the condemnation proceedings is exemplified by the Baldwin V2-120 deed:

> [P]ursuant to the act of the legislature of the state of New York passed April 2nd 1850 entitled 'An Act to Authorize the Formation of Railroad Corporations and to Regulate the Same' . . . the line . . . on which the said company is authorized to erect . . . their railroad and appurtenances that the following described real estate is required for the purpose of constructing or operating their said roadway . . . *the said petitioners have not acquired by gift or purchase said real estate* so required to be taken or injuriously affected by reason of inability to agree upon a price to be paid for the same.

*See* Baldwin V2-120, PLF001353 - PLF001357, Dkt. No 30-108 (Plaintiffs' Ex. 108) (emphasis added).  That deed by condemnation clearly reflects that the land has "not [been] acquired by gift or purchase," and that the acquisition is directly pursuant to the GRA.  Contrast this acquisition to a voluntary deed conveying fee to the railroad:

> The said parties of the first part in *consideration of the sum of $1300 to them duly paid by the said railroad company have sold and by these presents do grant and convey to the said Boston & Hartford Railroad Company their successors and assigns All that piece or parcel of land situate in the town of Patterson, County of Putnam, State of New York . . . containing two one hundredths of an acre more or less with the appurtenances and all the estate title and interest therein of said parties of the first part* . . . subject neverless to the General Railroad Act of the State of New York.

*See* Rogers 47-138, PLF000193-194, Dkt. No. 30-137 (Plaintiffs' Ex. 137) (emphasis added).  Comparing the two conveyances, it cannot be that a condemnation and a voluntary deed referencing GRA regulations are functionally equivalent.

However, Plaintiffs' interpretation of their Group 5 deeds would be equivalent to an instrument conveying: fee simple title to the railroad, but also that the railroad is limited to using the corridor for railroad purposes only.  This is also an illogical interpretation and not supported in New York, because "[s]imply, under those circumstances, the easement serves no purpose because the owner may use either estate freely."  *Cowan v. Carnevale*, 752 N.Y.S.2d 737, 740 (App. Div. 3rd Dept. 2002).  Such an interpretation renders the plain language of the grant superfluous, which cannot be a manifestation of the grantor's intent.  *See e.g., Craig v. Wells*, 11 N.Y. 315, 322 (1854).

Second, mere reference to the overall General Railroad Act of 1850 (of, the "Act") does not, as Plaintiffs argue, "demonstrate[] a clear intention to limit the conveyance to only such rights as a railroad may acquire under the GRA—an easement." Pls. Motion at 22. The GRA is a broad and comprehensive Act, passed by the New York legislature to "authorize the formation of railroad corporations, and to regulate the same." General Railroad Act of 1850, Chp. 140. Dkt. No. 30-8 at 4 (Plaintiffs' Ex. 8).  Importantly, § 13 of the GRA provides that, if title to real estate cannot be acquired by the railroad through voluntary purchase, then the railroad may acquire title through the "special proceedings" prescribed in the Act.  *Id.* at 8.  In other words, the railroad may acquire the corridor through voluntary land purchase (as evidenced by the Group 5 deeds themselves), or through condemnation proceedings.  But the Act contains *many* other provisions governing railroads far beyond condemnation proceedings—it is called the "General" Railroad Act because of the broad regulations on railroad companies.

19

For example, Sections 1-12 of the Act include many provisions detailing the railroad's board of directors, the articles of association, purchasing stock, liabilities of stockholders, and payment of construction laborers. *Id.* at 4-8. Sections 14-17 outline the process for presenting and serving a petition describing the real estate that the railroad company seeks to acquire. *Id.* at 8-11. Sections 22-23 provide for the creation of maps showing the route of the railroad, the process for changing the route in the maps, and how the maps and survey should be filed at the county clerk's office. *Id.* at 13-14. Section 24 describes what happens when the railroad tracks cross another right-of-way. *Id.* at 14. Sections 27-28 provide that the company may not lay down iron rail less than "fifty-six pounds to the lineal yard," that the right-of-way does not exceed "six rods in width," that the company can cut "standing trees that may be in danger of falling," and that the railroad may not erect a bridge over navigable streams or lakes. *Id.* at 14-16. The GRA also permits the railroad company to "take and convey persons and property on their railroad by the power or force of steam or of animals, or by any mechanical power, and to receive compensation therefor." *Id.* at 17. Section 30 requires railroad employees to "wear upon his hat or cap a badge, which shall indicate his office," *Id.* at 17; while § 39 requires that "a bell shall be placed on each locomotive engine, and be rung at the distance of at least eighty rods from the place where the railroad shall cross any traveled public road or street." *Id.* at 24.

In all, the fifty-two sections of the GRA regulate the formation of railroad companies, the construction of the corridor, the maintenance of the corridor, and the operation of the passenger and freight rail service. *See* General Railroad Act of 1850, Dkt. No. 30-8 (Plaintiffs' Ex. 8). Thus, Plaintiffs incorrectly argue that mere incorporation of the entire Act automatically invokes the particular limitations on the estate associated with condemnation proceedings.

Without any more evidence that the grantor intended that outcome, Plaintiffs' interpretation is unreliable.

Finally, Plaintiffs cite to *O&W Lines, Inc. v. St. John*, 228 N.E.2d 370 (1967), to support the idea that mentioning the GRA alters the interest conveyed into an easement. But *O&W Lines* is misapplied. That court noted that, "expressly incorporated by reference into this indenture is the Railroad Act of 1850, which provides that, *following an appraisal and judgment of condemnation*, '[the [railroad] company shall be entitled to enter upon, take possession of, and use the said land for the purposes of its incorporation, during the continuance of its corporate existence, by virtue of this or any other act; . . ." *Id.* at 371 (emphasis added). Therefore, any incorporated "duties and liabilities" of condemnation proceedings provided for by the GRA must follow a *judgement of condemnation*. But here, and as described above, there plainly is no judgment of condemnation. The corridor is being granted to the railroad in a voluntary conveyance of land, as evidenced by the very source deeds in question, and as provided for by § 13 of the GRA.

In all, Plaintiffs' interpretation of the "Group 5" source deeds is flawed and inconsistent with New York law. As set forth in the Sections below, the United States adopts a separate framework and naming convention in its Cross Motion for Partial Summary Judgment.[6]

---

[6] The United States declines to adopt the Plaintiffs' naming convention because Plaintiffs have incorrectly premised their Motion on the argument that all source deeds conveyed only an easement to the Railroad, and because there are other overlapping issues with Plaintiffs' claims. Exhibit 5 to this Cross Motion identifies, for each claimant, the Plaintiffs' Group category, and the United States' Group category (or categories, where there are overlapping issues with the source deeds, the centerline presumption, and the Maybrook Trail).

D.    Group B: Trail Use Fits Squarely Within the Scope of the Railroad's Easement Acquired in the Group B Deeds Under New York Law.

If the Railroad obtained an easement rather than the fee by any of the applicable source deeds, the court then must determine whether the terms of the easement are limited to railroad purposes  or whether the easements are broad enough to allow for railbanking (preservation of the corridor for future railroad use) and trail use.  *Preseault*, 100 F.3d at 1550.  This part of the liability inquiry applies the "Group B" deeds.[7,8]   As set forth below, the United States does not dispute that the Group B deeds conveyed an easement to the original railroad.  However, they conveyed a broad, general easement under New York law that does not limit the railroad's use of the corridor to railroad use only.  Rather, these easements are broad enough to allow for other uses, including trail use.  As such, to the extent that the Trails Act allows the use of this corridor as a trail (in the event that a trail use agreement is reached), that use does not exceed the scope of these particular easements, and therefore, does not constitute a taking of any property rights retained by the original grantor and now held by Plaintiffs.  Thus, the United States moves for summary judgment as to the claims that are based on the Group B source deeds, and the Court should conclude that these claims fail because trail use falls squarely within the scope of the easement.

"Under New York law, the court's inquiry into a general easement must focus on what uses were contemplated when the easement was granted."  *Romanoff Equities, Inc. v. United*

---

[7] For a chart containing the Group B deeds, the operative language granting a broad easement, and the claimants they apply to, *see* Defendant's Ex. 2.

[8] The Group B deeds in the United States' Motion correlate with the "Group 3" deeds in the Plaintiffs' Motion.  However, as described above, the United States declines to adopt the Plaintiffs' naming convention.

*States*, 119 Fed. Cl. 76, 81 (2014) (citing *Lewis v. Young*, 705 N.E.2d 649, 651, 92 N.Y.2d 443, 682 N.Y.S.2d 657 (N.Y. 1998)).  To determine what uses were contemplated, the court should look to the plain language of the easement itself.  *Id.* at 83.

The Bolce Deed at Book 142, Page 518-520[9] is exemplary of the Group C deeds, and states:

> Said parties of the first part . . . have sold and by these presents do grant and convey to the said Dutchess and Columbia railroad company their successors and assigns *for the purpose of constructing and operating thereon a freight and passenger railroad as aforesaid and for such other uses and purposes as the company may choose to apply said land* . . . With the appurtenances and all the estate title and interest therein of said parties of the first part . . .
>
> *See* Bolce Deed, 142.518-520, PLF000052-54, Dkt. No. 30-125 (Plaintiffs' Ex. 125)

(emphasis added).  The United States does not dispute that the granting clause in the Bolce Deed conveys an easement for railroad purposes, "and for such other uses and purposes as the company may choose to apply said land."  *Id.*  That plain language is clear—the railroad is permitted to the use corridor for railroad purposes, and for other purposes that it may choose.  So, if the railroad company chooses to use the corridor to run utility wires or fiber optic cables, to store equipment or machinery, or to construct and maintain a trail, those activities would be permitted under the broad, general easement.  All Group C deeds include this additional language expanding the scope of the easement.  *See* Defendant's Ex. 2.

The Federal Circuit already interpreted the scope of such a broad and general easement under New York law in *Romanoff Equities, Inc. v. United States*, 815 F.3d 809 (Fed. Cir. 2016). In that case, the plaintiff challenged the conversion of the corridor into the "High Line," an

---

[9] The Bolce Deed at 142.518-520 applies to four of the Plaintiffs' claims, *see* Defendant's Ex. 2 at 1.

elevated linear trail and park in New York City along the west side of Manhattan. *Id.* at 810. The relevant portion of the deed in that case stated:

> . . . does hereby grant and convey unto the Railroad Company, its successors and assigns forever, the permanent and perpetual rights and easements to construct, maintain and operate, without interference or right of interference, its railroad and appurtenances within those portions of the parcels of land herein described included between an upper plane and a lower plane drawn at the respective elevations herein provided for as to each such parcel, *together with the exclusive use of the portion of the parcels of land herein described included between said plane for railroad purposes and for such other purposes as the Railroad Company, its successors and assigns, may from time to time or at any time or times desire to make use of the same*, subject only to the permanent rights and easement herein specifically reserved to the [Grantor], its successors and assigns, in the portions of said parcels of land included between the said respective planes.

*Romanoff Equities, Inc. v. United States*, 119 Fed. Cl. 76, 79 (2014) (emphasis added).

On summary judgment, the Court of Federal Claims held that the High Line did not result in a taking because the scope of the easement granted to the original railroad was not limited to railroad purposes and was broad enough in scope to allow for the use of that easement as a trail under the Trails Act. *Romanoff Equities,* 815 F.3d at 811. The Federal Circuit affirmed that decision, "in light of the sweeping breadth of the easement grant." *Id.* at 812. That Court noted that, under New York law, such a broad easement "must be construed to include any reasonable use to which the land may be devoted." *Id.* at 814 (citing *Missionary Society of the Salesian Congregation v. Evrotas*, 175 N.E. 523, 524 (N.Y. 1931)). The Court determined that use of the corridor as a recreational trail was one such reasonable and lawful use.

The broad easements granted in the Group B deeds should be compared to other deeds that convey a narrower easement to the Railroad, as described in Plaintiffs' discussion of their Group 2 deeds. For example, the White Deed (142/579) conveys the land to the Railroad "for the purpose of constructing and operating thereon a Freight-and-Passenger Railroad."

PLF000224, Dkt. No. 30-120 (Plaintiffs' Ex. 120). As Plaintiffs note, this is a clear limited grant of land for railroad purposes only, and the plain language reflects the grantor's intent. This deed, plus other Plaintiffs' Group 2 deeds, demonstrate that if the grantor intended to limit the easement to railroad purposes only, they would have expressed that intent in the deed. However, no such language exists in the Group B deeds.

In affirming the Court of Federal Claims, the Federal Circuit noted that interpreting the language narrowly "would result in the pertinent clause permitting the use of the property 'for railroad purposes and such other railroad purposes,' an interpretation that would be nonsensical." *Id.* at 813. Still, Plaintiffs in this case argue for such an interpretation and cast *Romanoff Equities* as distinguishable from the present case for two reasons.[10] The United States responds below.

>    i.    Like the Romanoff Equities *plaintiff, Plaintiffs show no evidence of substantial burden as understood by the original grantor.*

First, Plaintiffs argue that *Romanoff Equities* doesn't apply because an easement for trail use imposes a significant burden on the servient estate. In support, Plaintiffs state that their opinion prepared by their retained expert witness, a real estate appraiser, will show that the

---

[10] Plaintiffs deal with *Romanoff Equities* by arguing that it is distinguishable from the present case. Pls. Motion at 26. But in so doing, Plaintiffs are offering evidence that their properties are burdened and damaged by the imposition of a trail easement, citing an alleged loss of security and privacy. Pls. Motion at 27-29. Functionally, this argument amounts to relitigating the merits of the *Romanoff Equities* decision.
But this Court does not need to revisit the court's decision in *Romanoff Equities.* The Court of Federal Claims clearly understood the legal standard for deed interpretation in New York: "Under New York law, the court's inquiry into a general easement must focus on what uses were contemplated when the easement was granted." *Romanoff Equities, Inc.*, 119 Fed. Cl. at 81. Even understanding that, when interpreting a deed, the scope of the easement must not significantly impose the burden on the servient estate, the Court still held that a recreational trail fit comfortably within the operative "such other purposes" language. That court was clear on the breadth of the easement: "Such terms clearly and unambiguously contemplate that the easement may be used for purposes beyond the railroad purposes for which it was initially used." *Romanoff Equities, Inc.*, 119 Fed. Cl. at 81. In all, this Court need not second-guess Federal Circuit precedent.

"imposition of a recreational trail, in fact, damage[s] their existing parcel." Pls. Motion at 26. Plaintiffs state that, unlike the *Romanoff Equities* plaintiff, they will provide evidence that a "recreational trail use place[s] a new and significant burden on the servient estates." Setting aside the obvious problem Plaintiffs have with respect to the properties along the pre-existing Maybrook Trail,[11] the expert opinion of Mr. Nordine provides no evidence to support the relevant inquiry, because Plaintiffs mistake the relevant inquiry from the outset. Simply, this argument asks and answers the wrong question.

The relevant inquiry is the grantor's intent with respect to the clause, "*and for such other uses and purposes as the company may choose*," at the time of the conveyance. As described above, this analysis is based on interpretation of the language contained within the four corners of the deed under applicable New York law. The rights conveyed to the grantor and retained by the grantee are determined by that plain and unambiguous language. So, the issue is whether those other uses and purposes would "materially increase the burden of the servient estate[] or impose new and additional burdens on the servient estate[] from that which was originally allowed." *Romanoff Equities, Inc. v. United States*, 119 Fed. Cl. 76, 81 (2014). In other words, the relevant inquiry is whether trail use materially increases the burden on the servient estate, beyond use as a railroad corridor "and for such other uses and purposes as the company may choose," at the time of the conveyance (which, for the applicable Group C deeds, is the late 1800's).[12]

---

[11] As discussed *infra* Section III.F, Plaintiffs cannot show that the STB's NITU causes "damage" to the Group D claimants' properties when, in fact, there is already a recreational trail in the Beacon Line corridor that has been open to be public for years.

[12] In the late nineteenth century, an operating railroad imposed a great burden on the servient estate. *See e.g., Hearst v. N.Y. C. & H. R. R. Co.*, 148 N.Y.S. 586, 592 (App. Div. 1st Dept. 1914) (observing the "noise from steam locomotives, their straining and puffing, bells and

Mr. Nordine is a real estate appraiser.  The damage report he developed for this case provides no evidence for the inquiry into the grantor's intent at the time of the grant.  First, Mr. Nordine's 'damage report" is a study "to measure whether location adjacent to a rail trail had a benefit, no effect, or was a detriment to value," as a result from the STB's NITU issued on February 8, 2024.  *E.g.,* Defendant's Ex.15 at PLFEXP000222.  The damage report attempts to calculate the difference in market value associated with unused railroad tracks on one hand, and people walking on a trail on the other. But here, that information is not relevant to the question of law before the Court.  The proper inquiry is not the alleged financial burden on the property owner today from a trail; it is about the rights conveyed to the original railroad in the deed.  In presenting the damage report now, Plaintiffs skip over the threshold issue and pre-suppose that these easements are narrow and limited to railroad purposes only, and that trail use is outside the scope of the railroad's easement.  That premise is incorrect.  As set forth above, the easements at issue in this case are broad in scope and allow the Railroad and its successors and assigns to use the easement for both railroad use "and for such other uses and purposes as the company may choose,"  So, Mr. Nordine's report is irrelevant here.[13]

---

whistles, the switching and bumping of cars, by unnecessary and preventable smoke from the engines, and by offensive odors from cars of live stock," in a nuisance action). So, it is nonsensical that the grantor would consider a recreational trail to be such a material increase in burden, such that it would fall beyond the scope of "such other uses and purposes as the company may choose."

[13] Plaintiffs argument about financial burden also does not make sense when considering the facts of *Romanoff Equities*. There, the High Line park is built on an elevated railroad track on the west side of Manhattan. *Romanoff Equities*, *Inc. v. United States*, 119 Fed. Cl. at 79. There is no doubt that construction of this public park in would greatly impact the buildings beneath it financially, given the value of real estate and airspace in Manhattan. Still, the court understood that the relevant inquiry is what rights were conveyed to the railroad—any alleged financial burden on the grantor's successor is irrelevant.

    *ii.*    *"Successors and assigns" is plainly not critical or relevant to the* Romanoff Equities *analysis.*

Plaintiffs also attempt to distinguish *Romanoff Equities* by arguing that the "successors and assigns" language was critical to the court's analysis, and is absent in the present case. This is not only a contrived argument, but incorrect for at least three reasons.

First, the "successors and assigns" language is simply not critical to the analysis. The issue in *Romanoff Equities* was the scope of the easement as understood by the granting clause language. At no point did the Federal Circuit analyze the scope of the easement based on the "successors and assigns" language—the fact that "successors and assigns" can be found in the opinion, as Plaintiffs observe, means that the Court simply cited to the deed in question.

Second, New York law does not require these words of inheritance for an easement on the servient estate to be binding. "The absence of a reference in the deed to the grantor's 'successors and assigns' does not preclude the finding in the title abstract that an easement was conveyed." *In re Acquisition of Real Prop. by Warrensburg Hydro Power Ltd. Pshp.*, 263 A.D.2d 822, 824 (App. Div. 3rd Dept. 1999). *See also Wilcox v. Reals*, 178 A.D.2d 885, 886 (App. Div. 3rd Dept. 1991) ("words of inheritance are not necessary to create an easement"). Thus, the "successors and assigns" language in a deed is boilerplate in New York,[14] and it does not follow that the absence of those words indicate an intent to limit the conveyance to only the party of the second part.

Finally, even if that is not true, many of Plaintiffs "Group 3" deeds include the "successors and assigns" language, which Plaintiffs omit from their argument. *See* Defendant's

---

[14] *See* N.Y. Real Prop. Law § 258, providing a lawful short form of deeds. The forms provided in that section includes the word "assigns." However, the law expressly notes that, "the use of the following forms of instruments for the conveyance and mortgage of real property is lawful, but this section does not prevent or invalidate the use of other forms."

Ex. 2. Of the eight "Group 3" source deeds, five contain the "successors and assigns" language (the Bolce 142.518-520, Brinckerhoff 142.515, Dudley 142.521, Glenham Co 142.630, and Brinckerhoff 142.586 Deeds). *Id.*

For these reasons, the Court should conclude that the Group C deeds conveyed a broad, general easement to the railroad in the corridor, and that trail use of that easement fits within the scope of the easement as a matter of law. The Court should therefore grant summary judgment in favor of the United States as to Plaintiffs' claims that are premised on the Group C deeds.

E.  Group C: Even if this Court Decides that the Railroad Owns an Easement in the Corridor, the Group C Plaintiffs Do Not Own the Underlying Land to the Centerline.

The United States also moves for summary judgment as to the Group C claims on the basis that Plaintiffs' deed instruments do not convey an ownership interest to the Plaintiffs in the underlying corridor. *See generally McClurg Family Farm, LLC v. United States*, 115 Fed. Cl. 1, 17-18 (2014) (dismissing takings claims where plaintiffs failed to meet their burden of proving an ownership interest in the railroad corridor adjacent to their property). For this group, Plaintiffs contend they are entitled to a presumption of ownership of the fee simple to the Beacon Line's centerline. Pls. Motion at 30. However, the United States rebuts this *centerline presumption* under New York law for 80 of Plaintiffs' claims.[15] Accordingly, and as set forth below, Plaintiffs have not met that burden for these Group C Plaintiffs.

If the Court determines that the applicable source deeds conveyed only an easement to the Railroad, then Plaintiffs have the burden of proving that they are the fee owners of the servient estate. *See, e.g., Chi. Coating*, 131 Fed. Cl. at 513-14. In New York, it is generally

---

[15] For a chart that includes the Group D Plaintiffs, plus the description of land that rebuts the centerline presumption, see Defendant's Ex. 3.

presumed that the grantor intended to convey fee in a right of way as a part of the conveyance of the abutting land; this is the "centerline presumption." *See Mott v. Mott*, 68 N.Y. 246, 252 (1877). It presumes that when land in a conveyance is bounded by a street, highway, or road, that conveyance passes title to the centerline of that right-of-way, unless the instrument reflects an intent to limit the grant to the edge of the right-of-way. *Bashaw v. Clark¸* 267 A.D.2d 681, 685 (N.Y. App. Div. 1999).

Importantly, the centerline presumption is not an unqualified grant of ownership to the centerline—it is tool for interpreting deeds and determining the grantor's intent. "[T]he intent of the parties [is] gathered from the description of the premises read in connection with the other parts of the deed, . . . This is the recognized rule of interpretation, and it is a question of interpretation and intent." *Id.* at 253. Therefore, the presumption can be rebutted with a contrary showing of the grantor's intent. "Within the well-settled rules of interpretation, the land might pass to the center, if not controlled or affected by other parts of the same instrument. . . . [T]he presumption may be overthrown by other clauses inconsistent with, and repugnant to, such intent." *Id.* at 254.

Plaintiffs rely on the general rule to contend that they "own the underlying fee in the former railroad corridor." Pls.' Mot. at 30. To support the claim that Plaintiffs own to the centerline of the Beacon Line, Plaintiffs merely point to Exhibits 29-107, stating that those "documents demonstrate that Plaintiffs' land is adjacent to the Line." *Id.* at 30. But Plaintiffs do not mention that the instruments related to the Group C Plaintiffs indicate that the grantor intended to limit the conveyance to the exterior of the Beacon Line corridor, as evidenced by metes and bounds descriptions or attached maps of the land, thereby rebutting the presumption.

One way to determine the grantor's intent in New York is "the description of the premises [conveyed] read in connection with the other parts of the deed." *Envt'l. Props., Inc. v. SPM Tech, Inc.*, 851 N.Y.S.2d 276, 277 (App. Div. 2nd Dept.) (citing *Sullivan v Markowitz*, 239 A.D.2d at 405). A metes and bounds description of the land within the instrument is sufficient to rebut the centerline presumption because it is a prima facie showing of the grantor's intent. *Id.* Here, the some of the modern deeds (i.e., the deeds by which Plaintiffs acquired their adjacent properties) applicable to the Group C Plaintiffs contain metes and bounds descriptions that expressly describe the land conveyed as bordering the lands of the railroad, thereby excluding the land beneath the corridor to the centerline by operation of New York law. The modern deed applicable to the Coyote Two, LLC property is exemplary:

> . . . thence running along lands now or formerly Hull (Liber 1635 pg 646); South 37-33-10 East 238.41 feet to a point; thence along lands now or formerly Texaco South 36-55-21 West 120.65 feet to a point; *thence along lands now or formerly Consolidated Rail Corp., on a curve to the left having a radius of 1004.87 feet for a distance of 93.10 feet to a point*; thence along lands now or formerly Hancock the following: North 18-00-56 West 103.27 feet, North 16-32·59 West 26.05 feet North 01-00-35 West 34.62 feet, and North 27-02-33 West 69.79 feet to a point; thence along the southerly line of Old Glenham Road North 67-57-26 East 93.70 feet to the point or place of BEGINNING.

PLF000423, Dkt. No. 30-47 (Plaintiffs' Ex. 47a) (emphasis added). This metes and bounds description identifies that the property granted to the Plaintiff *runs along* the lands of Consolidated Rail Corp. (a predecessor to MNR), and therefore not within the corridor. Other modern deeds exclude the corridor even more explicitly by identifying the cardinal direction of the corridor's boundary, as in the Vincent and Mary Gaglioti property:

> . . . thence N 26° 25' W 489.37 feet *to a point in a wire fence marking the southerly boundary of the lands of the New York, New Haven and Hartford railroad; thence along the last mentioned boundary line N 59° 42' E 236.76 feet to a stake set in the junction of wire fences*: thence along a wire fence marking the west line of lands formerly of Mulford, now of Nelson and others 5 16° 07' E 524.38 feet to a point in the north line of the New York State Highway Route #82; thence along the north

31

line of the New York State Highway Route #82  71° 24' w 143 71 feet to the point or place of beginning . . .

PLF000576, Dkt. No. 30-48 (Plaintiffs' Ex. 48a) (emphasis added). The deed conveying the Richard E. Monroe Trust property also expressly excludes the corridor by identifying the exterior boundary of the Railroad:

> . . . thence along the Southerly line of said Highway N 70° 38 E 25,00 feet; thence along the Westerly line of now or formerly Chiavelli S 19°23 E 405,00 feet, thence along the Southerly line of lands now or formerly said Chiavelli and now or formerly or Ruppert N 70° 38 E 188.24 feet thence along the westerly line of Michaels, the party of the second part hereto, S 19° 23 E 405.59 feet *to the Northerly exterior line of the Dutchess and Columbia Railroad, thence along the Northerly exterior line and distant 49. 50 feet at right angles and parallel to the monumented center line of said railroad S 67° 38 W 213,54 feet*, thence leaving said line and along the Easterly line of now or formerly said K. Oscar Carlson N 19~23 W 821.75 feet to the point of beginning. . . .

PLF000789, Dkt. No. 30-77 (Plaintiffs' Ex. 77a) (emphasis added).  In addition to the metes and bounds descriptions, maps attached to the deeds may also rebut the centerline presumption because they expressly exclude the land underlying the corridor.  For example, the deed instrument conveying the land to Plaintiff 334 Fishkill Ave., LLC conveys the area described as "Lot No. 2 on . . . Map No. 10981A." PLF000245, (Plaintiffs' Ex. 30a). That attached map depicts the following:



The boundary of Lot 2 is clearly shown as not extending to the centerline of the Beacon Line corridor (identified towards the south, or bottom of the figure above). Other Group C Plaintiffs have similar descriptions and depictions of the land conveyed that exclude the corridor. *See* Defendant's Ex. 3.

Thus, the modern deeds conveying property to the Group C Plaintiffs do not allow them to invoke the centerline presumption because it is rebutted under New York law. With this prima facie showing of the grantor's intent to exclude the corridor, the centerline presumption is rebutted as to the Group C Plaintiffs. Accordingly, the Court should conclude that Plaintiffs have not met their burden of proving that they have an ownership interest in the Beacon Line corridor by virtue of their acquisition of land adjacent to that corridor. Even if the Court concludes that the applicable source deeds conveyed only an easement, Plaintiffs' failure to

33

establish an ownership interest in the railroad corridor itself requires the Court to grant the United

States' motion for summary judgment.

F.   Group D: Plaintiffs Fail to Meet Their Burden for the Group D Plaintiffs Adjacent to the
     Maybrook Trail, as a Pure Matter of Law.

The "Group D" Plaintiffs all own property adjacent to segments of the railroad corridor

in which the Maybrook Trail was constructed prior to the STB's issuance of the NITU.[16]

Aside from a single oblique mention, Plaintiffs fail to discuss the existence of the Maybrook

Trail in their Motion for Partial Summary Judgment at all.[17] *See Loveridge*, 174 Fed. Cl. 379,

389-90 (2024) (noting the importance of disclosure of a scenic rail during the liability phase of

a takings claim). The United States moves for summary judgment as to the Group D Plaintiffs

because Plaintiffs fail to meet their burden of proving  (1) causation, and (2) just compensation.

The Group D Plaintiffs state that they own property adjacent to the Beacon Line railroad

corridor.  The segment of the Beacon Line corridor adjacent to these Plaintiffs' properties

includes the pre-existing 23-mile Maybrook Trail, which runs parallel to the railroad tracks. *See*

Defendant's Ex. 4.  Beginning in 2020, the Maybrook Trail was opened and people began use

this portion of the Beacon Line corridor as a pedestrian path for walking and biking, with regional

connectivity to the larger Empire State Trail. Therefore, the real-world conditions of this case

are comparable to *Loveridge v. United States*, wherein a "scenic rail was in operation on the

---

[16] *See* Defendant's Exhibit 4 for a chart identifying the Group D Plaintiffs and containing
photographs or images of the Maybrook Trail on the railroad corridor corresponding to each
claimant.

[17] Plaintiffs state: "Plaintiffs fully anticipate that the NITU process will result in the Line
becoming a part of the Empire State Trail upon execution of a trail use agreement—indeed, the
trail is already constructed upon some of the Line—and the STB filings provide no indication
to the contrary . . ." Pls.' Motion at 32.

same rail corridor prior to and after the issuance of the NITU." *Id.* at 390. In both cases, people can access the railroad corridor for recreational purposes prior to and after the issuance of the NITU. While the *Loveridge* court did not have an opportunity to address the issue of liability at trial, it noted that, "the existence of [the scenic rail] may have altered the liability outcome." *Id.* Here, the existence of the Maybrook Trail is relevant and dispositive, as a matter of law, for the Group D claims for at least two reasons.

<em>i.</em> <em>Plaintiffs Have Not Carried Their Burden of Proving Causation for Group A Claims.</em>

First, Plaintiffs have not met their burden as to causation. Under *Caquelin*, "a NITU does not effect a taking if, even in the absence of a NITU, the railroad would not have abandoned its line (a necessary prerequisite for termination of the easement under state law) during the period of the NITU: in such a case, the *NITU takes nothing from the landowner that the landowner would have had in the absence of the NITU*." *Id.* at 1363 (emphasis added). Per the logic of *Caquelin*, there can be no taking if the Plaintiffs would never have their land back unencumbered by a trail but for the NITU.

Here, that logic applies because it is an impossibility that the STB's NITU has taken something from the Group D landowners—the public was using the segment of this corridor where the Maybrook Trail is located prior to the NITU, and that pre-existing use of the railroad corridor for walking and biking would have continued even in the absence of the NITU. Further, Plaintiffs cannot prove that MNR would have abandoned this 23-mile portion of the Beacon Line that is co-extensive with MNR's Maybrook Trail either during the NITU period either during the NITU period (if no trail use agreement is reached and the claims must be analyzed as temporary takings) or but for the NITU (if a trail use agreement is reached and the claims are

35

analyzed as permanent takings).[18]    The construction of and continued maintenance of the Maybrook Trail is inconsistent with an intent to abandon MNR's property rights in this corridor. *See Loveridge*, 174 Fed. Cl. at 389 ("While the [railroad] has not operated freight rail traffic since 2007, its continued support for [the scenic rail] contradicts the idea of abandonment."). Therefore, the Group D Plaintiffs have not, and cannot, meet the *Caquelin* causation requirements as a matter of law.

ii.    *Plaintiffs Have Not Carried Their Burden of Proving Just Compensation for Group D Claims.*

Even assuming that Plaintiffs could meet their burden of proving causation for the Group D claims given the pre-existing Maybrook Trail, the Group D claims would still fail because Plaintiffs have not and cannot met their burden of proof on the element of just compensation because their expert reports fail to account for this pre-existing trail.

Generally, a party may demonstrate "an absence of evidence to support [its opponent's] case," on a motion for summary judgment. *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1563 (Fed. Cir. 1987) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986)). "Plaintiff's failure of proof concerning an element essential to its case on which it will bear the burden of proof at trial necessarily renders all other facts immaterial and entitles the Defendant to summary judgment." *M. Maropakis Carpentry, Inc. v. United States*, 84 Fed. Cl. 182, 206 (2008) (citing *Celotex Corp.,* 477 U.S. at 323).

Here, Plaintiffs have not met their burden to prove just compensation because Plaintiffs have not provided *any* evidence sufficient to determine just compensation for the Group D

---

[18] *See* Section III.G.ii, discussing the evidence showing that MNR is expressly not electing to abandon the Beacon Line during the NITU period.

claimants with reasonable certainty.  Fact and expert discovery in this case is closed.  *See* ECF No. 30.  Plaintiffs' expert witness appraiser, Mr. Luke Nordine of Dave Matthews Associates, produced appraisal reports for the Group D properties that fail to account for the physical existence of the Maybrook Trail.  *See e.g.* Defendant's Exhibits 15, 16.  While Mr. Nordine acknowledged that this pre-existing Maybrook Trail exists, he was expressly instructed *not* to consider it in the "Before" scenario of his appraisal reports.  In the two representative appraisal reports that are applicable to all twenty-three Group D Plaintiffs, Mr. Nordine writes that, "A trail has been constructed; however, per legal instruction from the client, the appraisal requires the Hypothetical Condition in the Before scenario, the prior railroad easement has terminated and the unencumbered land has reverted back to the adjacent land owner who then owns the unencumbered fee estate interest." *See e.g.,* Appraisal Report, Michael Zanzarella, et. al. v . The United States of America Claim #6 William Antalek at 22, PLFEXP000184 (Defendant's Ex. 15).

Thus, the expert reports prepared by Mr. Nordine at Plaintiffs' instruction answer the wrong question.  Plaintiffs have not produced any expert reports that provide an opinion of market value that incorporates the existence of the Maybrook Trail in the "Before" scenario.  Instead, Plaintiffs' expert reports are based on a counter-factual Hypothetical Condition that the land within the corridor is unencumbered by the pre-existing Maybrook Trail.  Stated differently, any evidence of just compensation Plaintiffs will present ignores—per legal instruction—the physical presence of the pre-existing Maybrook Trail and the undisputed fact that the public has been walking and biking on this railroad corridor for years.  This is inadequate, irrelevant, and unreliable evidence; Plaintiffs have not attempted to detangle the influence that Maybrook Trail has on the market value of their claimed ownership interests in Beacon Line corridor at all.  And

because just compensation is an essential element of a Fifth Amendment takings claim, Plaintiffs fail to carry their burden. *See Otay Mesa Prop., L.P. v. United States*, 779 F.3d 1315, 1323 (Fed. Cir. 2015) ("To carry its burden, the landowner must show actual damages 'with reasonable certainty'") (quoting *Precision Pine & Timber Inc. v. United States*, 596 F.3d 817, 833 (Fed. Cir. 2010)). This failure of proof as to just compensation provides an independent basis for granting summary judgment in favor of the United States as to the Group D claims.

For these reasons, the United States moves for summary judgment as to the Group D claims because Plaintiffs have failed to meet their burden of proof as to both (1) the *Caquelin* causation requirements and (2) just compensation. Thus, this Court should grant summary judgment in favor of the United States as to the following Group D claimants as a matter of law.

G. Plaintiffs Have Failed to Establish Liability for a Taking Because Plaintiffs Do Not Prove
   that MNR Would Have Abandoned the Rail Line Absent the NITU.

The United States moves for summary judgment on the basis that, as a matter of law, Plaintiffs have failed to prove that MNR would have abandoned the rail line absent the NITU. Simply put, Plaintiffs have failed to prove causation under the proper legal framework.

Here, Plaintiffs cannot meet the causation test required by *Caquelin* to establish their alleged taking—or, demonstrating that the railway would have consummated abandonment during the NITU period absent the NITU. *Caquelin*, 959 F.3d at 1363. Causation exists only if the railroad's continuation of an easement is "legally mandated." *Caquelin*, 959 F.3d at 1371; *see also Baros v. Texas Mexican Ry. Co.*, 400 F.3d 228, 236 (5th Cir. 2005) ("[T]he decision actually to abandon a line rests with the carrier; it is only upon actual consummation of the abandonment that the STB's jurisdiction ceases."). To assess whether the railroad would have abandoned absent the NITU, the court looks at events occurring before, during, and after the

NITU was issued. *Sauer West, LLC v. United States*, 168 Fed. Cl. 49, 60 (2023), appeal filed, No. 24-1114 (Fed. Cir. 2023).

> i.    *MNR's Discontinuance of Service is Not Proof of Abandonment Under* Caqueline.

MNR's discontinuance of service is not equivalent to abandonment of the rail line (for purposes of the STB's regulatory jurisdiction) or abandonment of MNR's property rights (under applicable New York law). Discontinuance of service is legally distinct from abandonment of a line, and the question of whether a rail carrier has abandoned a rail line is controlled by federal law. *Grantwood Village v. Mo. Pac. R.R. Co.*, 95 F.3d 654, 657-59 (8th Cir. 1996); *see also Wis. Cent. Ltd. v. STB*, 112 F.3d 881, 887 (7th Cir. 1997) (quoting *Preseault v. ICC*, 494 U.S. 1, 5 n.3 (1990)) (courts have long acknowledged that "[t]here is an important distinction . . . between 'abandonment' of a rail line and 'discontinuance of service'"). Until a railroad receives abandonment authority from the STB and consummates abandonment—which has not happened here—the rail line remains in the interstate rail system. A "discontinued" line is one no longer in use for active rail service but that may be reactivated if appropriate, as it remains part of the interstate rail system. *Id.*; see *Preseault*, 494 U.S. at 5-6 n.3. A discontinued line is not abandoned under federal law. *Id.* Further, discontinuance of service does not affect a rail line owner's property rights in a corridor. "A discontinuance allows a rail carrier to 'cease operating a line for an indefinite period while preserving the rail corridor for possible reactivation of service,' while abandonment removes the line from the national rail system and terminates the railroad's common carrier obligations for the line." *Chi. Coating Co., LLC v. United States*, 892 F.3d 1164, 1166 (Fed. Cir. 2018).

Relatedly, "[t]he word 'abandon' has a precise meaning in rail regulations. An abandoned rail corridor is one that is both no longer used for rail service and is removed from the national

transportation system." *Nat'l Ass'n of Reversionary Prop. Owners v. STB*, 158 F.3d 135, 137 n.1 (D.D.C. 1998) (citing *Preseault*, 494 U.S. at 5-6 n.3 (1990)).

ii.       *MNR is Expressly Not Foreclosing Future Rail Service.*

Additional evidence, not referenced by Plaintiffs, demonstrates that MNR would not have abandoned the rail line even in the absence of the NITU.  Plaintiffs incorrectly point only to the Verified Notice of Exemption of Abandonment as evidence of an "affirmative intent to abandon."  Pls. Motion at 33.  However, in light of all the evidence to the contrary, there is no dispute that service on the Beacon Line has only been discontinued, and that MNR has not elected to consummate abandonment of that line.

First, the Declaration of Susan Sarch on Behalf of Metro-North Commuter Railroad Company establishes that MNR has no intent to abandon: "MNR sought the extension, as stated in its request to the STB, because MNR *is committed at this time to the preservation of the corridor for future restoration of rail service* and it is continuing to negotiate with possible trail sponsors"  Decl. of Susan Sarch, at ¶ 19, Defendant's Ex. 6 (emphasis added).   Ms. Sarch's Declaration continues:

> MNR uses the existing rail yard near Hopewell Junction and portions of the Beacon Line property for storage of equipment and materials used in MNR's provision of commuter rail service on its active rail lines; however, MNR does not use the Beacon Line for any other purposes except for fiber optic communication (there is a fiber optic cable spanning the entire Beacon Line). As required by STB regulations, MNR is holding the Line for possible future reactivation of rail service.

*Id.* at ¶ 20.  The Declaration shows that MNR did not file its Exemption Petition with the STB for the purpose of abandoning its property interests in this railroad corridor. Instead, MNR sought to retain its property rights for storage of equipment in service to

the active rail lines, for fiber optic cable communication, and for possible future reactivation of rail service.

Second, unlike the railroad in *Caquelin*, where there was evidence that the railroad there actually started removing tracks. *Caquelin*, 959 F.3d at 1373. Here, there is no evidence that MNR has removed any tracks—MNR did not even remove any tracks for construction of the Maybrook Trail. *Id.* at ¶ 15.

Third, as previously stated *supra*, Section III.F, the construction and continued maintenance of the Maybrook Trail directly contradicts an intent to abandon. The court in *Loveridge* agreed that, "[w]hile the [railroad] has not operated freight rail traffic since 2007, its continued support for [the scenic rail] contradicts the idea of abandonment." 174 Fed. Cl. at 389.

Further, the parties agree that a long period of discontinued service predated the NITU, yet MNR chose not to pursue abandonment during this period of discontinued service. *See* 49 C.F.R. § 1152.29(e)(2).

In all, MNR's actual actions and express statements plainly contradict an intent to abandon.  Plaintiffs can only identify the Exemption Petition as evidence of an intent to abandon.  However, against this weight of evidence to the contrary (including MNR's own statements), there is no genuine issue of fact as to whether, but for the government's action, MNR would have abandoned this rail line.

Accordingly, the Court should conclude as a matter of law that Plaintiffs have not met their burden of proving liability for a taking because Plaintiffs cannot prove that MNR would have abandoned the rail line absent the NITU.

## IV.  CONCLUSION

For the reasons set forth above, the United States respectively requests that the Court grant the United States' cross-motion for summary judgment and deny Plaintiffs' motion for partial summary judgment.

Dated:  July 14, 2025.

Respectfully submitted,

ADAM R.F. GUSTAFSON
ACTING ASSISTANT ATTORNEY GENERAL
United States Department of Justice
Environment and Natural Resources Division

*s/ Emily A. Davis*
EMILY A. DAVIS
Trial Attorney
Natural Resources Section
Environment and Natural Resources Division
Tel: (202) 350-0482
Facsimile: (202) 616-6587
emily.davis@usdoj.gov