# In the United States Court of Federal Claims

No. 24-239
Filed: December 15, 2025

---

**MICHAEL ZANZARELLA, et al.,**

               *Plaintiffs,*

**v.**

**THE UNITED STATES,**

               *Defendant.*

---

*Steven M. Wald*, with *Michael J. Smith*, *Thomas S. Stewart*, and *Reed W. Ripley*, Stewart, Wald & Smith, LLC, St. Louis, MO, for Plaintiffs.

*Emily A. Davis*, Environment and Natural Resources Division, Natural Resources Section, with *Adam R.F. Gustafson*, Acting Assistant Attorney General, U.S. Department of Justice, Washington, D.C., for Defendant.

## MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**

Plaintiffs seek compensation for the United States' uncompensated taking related to their New York properties. They now move for partial summary judgment as to liability. (Pls.' Mot., ECF No. 38). Plaintiffs ask the Court to find that: (1) all source conveyances granted easements to the Railroad; (2) recreational trail use exceeds the scope of those easements; (3) Plaintiffs regained fee simple ownership of the land underlying the Railroad corridor based on their adjacency to the rail line; and (4) the issuance of the Notice of Interim Trail Use ("NITU") effected a taking. (*Id.*). The United States objects in part and cross-moves for partial summary judgment. (Def.'s Mot., ECF No. 43). The United States variously argues the Plaintiffs cannot show: (1) that they have an ownership interest in the rail corridor; (2) causation or a right to just compensation due to the existence of an existing recreational trail; and (3) that the Railroad would have abandoned the rail line absent the NITU. (*Id.*).

The Court finds that Plaintiffs' source documents conveyed a combination of both easements and fees simple. The Court also finds that while the pre-existing recreational trail does not affect causation, it may nevertheless impact just compensation—an issue overlooked by the Plaintiffs. To that end, the United States has taken a portion of Plaintiffs' property for public use, but several claims remain unresolved. Therefore, summary judgment is **GRANTED-IN-PART** and **DENIED-IN-PART** for both Parties.

## I.    Background

This rails-to-trails case concerns a 41.1-mile section of rail line running from the Connecticut/New York State Line (Milepost 71.2) to Beacon, New York (Milepost 0.0) traversing Dutchess and Putnam Counties (the "Line"). (Compl. at ¶ 3, ECF No. 1; Pls.' Mot. at 1).



Maps of the Beacon Rail Line (Beacon Line Highlighted in Orange)

(Pls.' Mot., Ex. 6 at 7, ECF No. 38-6). The Line was previously owned by the Maybrook Railroad Company ("MRC"), which in 1992 acquired 157 miles of railroad that included this segment. (*See* Pls.' Mot., Ex. 13 ("*Danbury Terminal R.R. Co. and Maybrook Properties, Inc.- Acquisition and Operation Exemption- Consolidated Rail Corp.*, ICC Docket No. FD 32180 (Sub-No. 1) (served Dec. 29, 1992), *available at* 1992 WL 383337"), ECF No. 13). In 1995, ownership of the Line transferred to the Metro-North Commuter Railroad Company ("MNR"). (Pls.' Mot. at 5 (citing Pls.' Ex. 15, ECF No. 38-15)).

Under the Trails Act, a railroad may initiate abandonment proceedings of a rail line before the Surface Transportation Board ("STB"). 49 U.S.C. § 10903; *see* 16 U.S.C. § 10502. It is not uncommon for a railroad to abandon all or some portion of its line. The Trails Act permits intervention by qualified private organizations or public agencies to railbank the corridor before abandonment is consummated by agreeing to serve as a trail operator in the interim. 16 U.S.C. § 1247(d). The railbanking intervention process enables a railroad to negotiate with the intervening

entity, which then assumes financial and managerial responsibility for the corridor by operating it as a recreational trail. 28 A.L.R. Fed. 3d Art. 6 (citing *Preseault v. ICC*, 494 U.S. 1, 6–7, (1990) ("*Preseault I*")). To allow for this process, the STB may issue a NITU. 49 C.F.R. § 1152.29. If the railroad and trail sponsor agree, then the parties notify the STB, the corridor is railbanked, the STB retains jurisdiction, and "interim trail use is thereby authorized." *Preseault I*, 494 U.S. at 7 n.5 (1990); *see also* 16 U.S.C. § 1247(d); 49 C.F.R. § 1152.29(h). If an agreement is not reached, the railroad may exercise its STB-granted authority to abandon the line. 49 C.F.R. § 1152.29(d)(1), (e)(2); *see Citizens Against Rails-to-Trails v. STB*, 267 F.3d 1144, 1150–53 (D.C. Cir. 2001).

In December 2023, MNR filed a Verified Notice of Exemption of Abandonment ("Abandonment Application") with the STB. (Pls.' Mot., Ex. 26, ECF No. 38-26). MNR also requested a NITU with MNR as the trail sponsor, (*id.*, Ex. 6, ECF No. 38-6), which the STB issued on February 8, 2024, (*id.*, Ex. 7, ECF No. 38-7). Per the NITU, MNR was required to notify the STB of a trail use agreement prior to its expiration on February 8, 2025. (*Id.*, Ex. 7 at 3). MNR filed for and was granted an Extension of the Interim Trail Use Negotiation period, which is now set to expire on February 8, 2026. (*Id.*, Ex. 158, ECF No. 38-158).

## II.  Analysis

### A.  Standard of Review

The Parties each move for summary judgment. The Court may "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). The moving party bears the burden of demonstrating the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Facts are material if they "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine factual dispute exists when "the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Id.*

While "inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion[,]" *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962), summary judgment may still be granted when the party opposing the motion submits evidence that "is merely colorable . . . or is not significantly probative." *Anderson*, 477 U.S. at 249–50 (internal citations omitted). However, the moving party "need not produce evidence showing the absence of a genuine issue of material fact but rather may discharge its burden by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Dairyland Power Co-op. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citing *Celotex Corp.*, 477 U.S. at 325). Courts may only grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita, Elec. Indus. Co., Ltd. v. United States*, 475 U.S. 574, 587 (1986) (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). A trial court is permitted, in its discretion, to deny even a well-supported motion for summary judgment if the case would benefit from a full hearing. *Lowery v. United States*, 167 Fed. Cl. 28, 37 (2023) (citing *United States v. Certain Real & Personal Prop. Belonging to Hayes*, 943 F.2d 1292 (11th Cir. 1991)).

   B.  *Discussion*

In Trails Act cases, a taking occurs when "government action destroys state-defined property rights[,]" either "by converting a railway easement to a recreational trail, if trail use is outside the scope of the original railway easement[,]" or by compelling the continuation of a railroad-purposes easement to accommodate negotiations for a trail-use agreement, even if the negotiations are ultimately unsuccessful. *Ladd v. United States*, 630 F.3d 1015, 1019, 1025 (Fed. Cir. 2010); *see also Caquelin v. United States*, 959 F.3d 1360, 1367 (Fed. Cir. 2020). The determinative issues for takings liability are: (1) whether the railroad acquired full ownership of the land (fee simple) or merely easements; (2) if only easements were acquired, whether those easements were limited to railroad use or also permitted future use as public recreational trails; and (3) whether any such easement permitting recreational trail use expired before the alleged taking, leaving the landowners with full, unencumbered ownership at that time. *Galt Auto. Warehouse, Inc. v. United States*, ___ Fed. Cl. ___, 2025 WL 3012202, *2 (Fed. Cl. October 28, 2025) ("*Galt Auto.*") (citing *Preseault v. ICC*, 100 F.3d 1525, 1550 (Fed. Cir. 1996)); *see also Ellamae Phillips Co. v. United States*, 564 F.3d 1367, 1373 (Fed. Cir. 2009) (outlining the determinative issues for takings liability). Importantly, property rights are determined by the operation of state law. *Castillo v. Diaz*, 952 F.3d 1311, 1319 (Fed. Cir. 2020).

This analysis becomes more complicated when a trail use agreement has not been reached. The Federal Circuit has held that in cases where no trail-use agreement is reached, but the NITU compels the railroad to delay its abandonment, the issuance of a NITU may effect a temporary physical taking. *Ladd*, 630 F.3d at 1023–24. To show causation when no trail use agreement exists, it must be clear that the railroad "had every intent to abandon the railroad lines during the period of time that the NITU was in effect and was prevented from doing so by the existence of the NITU." *Memmer v. United States*, 50 F.4th 136, 145 (Fed. Cir. 2022). To evaluate the railroad's intent, the Court may look to a variety of circumstances, including: the railroad's initiation of abandonment proceedings, its refusal to extend the NITU, the timing of its abandonment relative to the NITU's expiration, the scope of authority granted under the NITU, and whether the railroad undertook physical acts consistent with abandonment, such as removing track infrastructure, etc. *See Galt Auto.*, 2025 WL 3012202, at *3 (citing *Sauer West LLC v. United States*, 151 F.4th 1339, 1346 (Fed. Cir. 2025)). These factors are illustrative, not exhaustive. *See Sauer West*, 151 F.4th at 1346.

Plaintiffs categorize their claims into five distinct groups, each defined by the type of recording instrument used to convey the subject properties. (Pls.' Mot. at 11). The recording instruments fall within the following groups: (1) condemnations ("Group 1"); (2) deeds that reference railroad purposes in the granting clause ("Group 2"); (3) deeds that reference railroad purposes in the granting clause but also contain broader language regarding use of the easement ("Group 3"); (4) deeds that reference railroad purposes outside of the granting clause ("Group 4"); and (5) deeds that expressly incorporate the General Railroad Act ("GRA") ("Group 5").[1]

---

[1] The GRA, passed by the New York legislature, was formally titled "An Act to authorize the formation of railroad corporations, and to regulate the same[,]" passed on April 2, 1850. *See*

(Pls.' Mot. at 12–22). Plaintiffs move for summary judgment, requesting the Court find that all applicable source conveyances conveyed easements under New York law. (*Id.*). Assuming the Court finds that each recording instrument conveyed an easement, Plaintiffs also contend they have established a property interest in the rail corridor based on New York's centerline presumption. (*Id.* at 30–31). Finally, Plaintiffs seek summary judgment, asserting that the issuance of a NITU caused a taking. (*Id.* at 31–34).

The United States cross-moves for summary judgment but divides the Plaintiffs into 4 groups based on a different scheme than Plaintiffs. The United States moves for summary judgment for claims premised on: (1) original source deeds conveying a fee interest to the original Railroad ("Group A"); (2) the original source dees conveying a broad, general easement to the Railroad under New York law ("Group B"); (3) the centerline presumption ("Group C"); and (4) those properties adjacent to the "pre-existing Maybrook Trail" ("Group D"). (Def.'s Mot. at 1–3).

        1.     Easements

Plaintiffs argue that each source conveyance conveyed easements under New York law. (Pls.' Mot. at 12–22). The Court will evaluate each group in turn.

        i.    **Group 1 - Condemnations**

Plaintiffs allege that seventeen of the claims involve properties acquired through condemnation and label them as Group 1. (Pls.' Mot. at 12–15 (citing Pls.' Mot., Ex. 1, ECF No. 38-1)). Group 1 Plaintiffs are listed below, along with the corresponding parcel numbers and conveyance documents:

| Claim No. | Plaintiff | Parcel No. | Applicable Conveyance |
|---|---|---|---|
| 62 | Peter & Nancy O'Hara | 13.-2-92 | Baldwin V2/120 PLF001353-001357 |
| 3a | 581 Main Street Beacon LLC | 130200-6054-30-204843-0000 | Blossom 0-1/539 PLF000005-000051 |
| 3b | 581 Main Street Beacon LLC | 130200-6054-30-236870-0000 | Blossom 0-1/539 PLF000005-000051 |
| 90 | Brian Walker | 132800-6457-01-080517-0000 | Doughty 0-1/475 USZANZ000145-000169 |
| 31 | Arlene G. Durk | 13.-2-63 | Ord. 38/63 USZANZ000018-000106 |

---

N.Y. Law ch. 140 (1850); (Pls.' Mot., Ex. 8, ECF No. 38-8). Though they have similar naming conventions, this is not to be confused with the federal General Railroad Right-of-Way Act of 1875, 18 Stat. 482, 43 U.S.C. §§ 934–939. *See Marvin M. Brandt Revocable Trust v. United States*, 572 U.S. 93, 98 (2014) (discussing the congressional passage of the General Railroad Right-of-Way Act).

| 21 | Coyote Two, LLC | 133089-6055-15-668289-0000 | Rogers 0-1/497 PLF000143-000193 |
|---|---|---|---|
| 1 | Michael Zanzarella | 133089-6155-11-615684-0000 | Rogers 0-1/497 PLF000143-000193 |
| 77 | Louis Sebesta | 133089-6155-03-125211-0000 | Scofield 0-1/448 PLF000197-000204 |
| 12 | Dana Brown | 132200-6758-04-829254-0000 | Tabor SC/142 USZANZ0000130-142 |
| 16 | Anthony Chianese, Sr. & Anthony Chianese, Jr. | 132200-6758-04-860314-0000 | Tabor SC/142 USZANZ0000130-142 |
| 23 | James & Jean DeBonis | 132200-6758-04-880372-0000 | Tabor SC/142 USZANZ0000130-142 |
| 45 | Homer & Jo Ann Griffin | 132200-6758-04-831232-0000 | Tabor SC/142 USZANZ0000130-142 |
| 76 | Jessica Schleicher | 132200-6758-04-870342-0000 | Tabor SC/142 USZANZ0000130-142 |
| 87 | Brian Van Vlack | 132200-6758-04-875357-0000 | Tabor SC/142 USZANZ0000130-142 |
| 18 | John & Alexandra Colbert | 134089-6856-00-602005-0000 | W. Worden SC/151 PLF000212-000215 |
| 49 | Joette Forsblom Fero Kane 2018 Irrevocable Trust | 133089-6356-01-315608-0000 | White 0-1/435 PLF001358-001375 |
| 85b | Judith Valentino | 133089-6356-01-272582-0000 | White 0-1/435 PLF001358-001375 |

(*See* Pls.' Mot., Ex. 1). These Plaintiffs argue that New York law limits a railroad's interest in condemned property to an easement. (Pls.' Mot. at 12–15). The United States acknowledges that these properties were acquired via condemnation. (Def.'s Mot. at 18 ("[T]he United States concedes that, in some cases, [the] Railroad acquired their interest in the corridor via condemnation proceedings, as described in Plaintiffs' discussion of their 'Group 1' deeds.")).

The Court agrees with Group 1 Plaintiffs. Under New York State law, condemnations convey easements limited to railroad purposes. (*See* The New York Railroad Act of 1850 ("the GRA"), §§ 14–21, 25–26, 28 (Pls.' Mot., Ex. 8, ECF No. 38-8)). New York courts have consistently held that the GRA statute does not permit railroads to acquire property in fee pursuant to condemnation. *Crouch v. State*, 218 A.D. 356, 358 (N.Y. App. Div. 1926) ("[T]he general rule is that unless express authority to take a fee is given, the railroad company acquires title only in the nature of an easement.") (citing *Hudson & Manhattan R. R. Co. v. Wendel*, 193 N.Y. 166, 177, 179 (1908)); *Erie Lackawanna Ry. Co. v. State*, 38 A.D.2d 463, 464 (N.Y. App. Div. 1972); *People v. Helinski*, 222 A.D.2d 788, 790 (N.Y. App. Div. 1995) (finding the subject property was acquired through condemnation and thus the railroad could only acquire a permanent easement, not title in fee) (citing *O&W Lines, Inc. v. St. John*, 228 N.E.2d 370, 371 (N.Y. 1967)). The law in New York is clear—a railroad's interests in land acquired via

condemnations can only amount to an easement and not a fee title. Therefore, the Group 1 Plaintiffs succeed on this claim.

### ii.    Group 2 – Deeds Referencing Railroad Purposes In Granting Clause.

Plaintiffs argue that for twenty-two[2] of their claims, there is limiting language in the instruments through which the constructing railroad acquired its rights that limits the grant to railroad purposes. (Pls.' Mot. at 15–18). Plaintiffs assert that such language conveyed easements to the railroad. (*Id.* at 18). The United States does not dispute Plaintiffs' assertions. (Def.'s Mot. at 24–25 ("[A]s described in Plaintiffs' discussion of their Group 2 deeds. . . this is a *clear limited grant of land for railroad purposes only*, and the plain language reflects the grantor's intent.) (citing Pls.' Mot. at 15–18) (emphasis added)). Because the Parties agree that the Group 2 deeds conveyed easements to the original railroad, the Court finds that Plaintiffs are successful as to this portion of their Group 2 claims.

### iii.    Group 3 – Deeds Referencing Railroad Purposes In Granting Clause and Containing Broader Language.

Turning to Group 3, Plaintiffs note that Group 3 is treated separately from Group 2 only because the Group 3 deeds include broader language about "the type of use allowed."[3] (Pls.' Mot. at 18–19). As an example of the "broader language," Plaintiffs reference the Glenham Co. Deed, which states in pertinent part:

> The said party of the first part . . . have sold and by these Presents do grant and convey to the said Dutchess and Columbia Rail Road Company their successors and assigns for the purposes of constructing along and operating thereon a Freight and Passenger Railroad as aforesaid and **for such other uses and purposes as the Company may choose to apply said land** that portion of the lands of said party of the first part upon which said so laid said Railroad line is so located . . . .

(*Id.* (citing Pls.' Mot., Ex. 124, ECF No. 38-124); Def.'s Mot., Ex. 2 (emphasis added)).

According to Group 3 Plaintiffs, the cited language affects the breadth of the easement, not the character of the interest conveyed—i.e., fee versus easement. (Pls.' Mot. at 18). For this reason, Plaintiffs assert the deeds could only convey an easement to the railroad. (*Id.*). Once again, the United States does not dispute Plaintiffs' arguments. (Def.'s Mot. at 22 ("[T]he United States does not dispute that the Group B deeds conveyed an easement to the original

---

[2] The twenty-two Group 2 claims and the associated Plaintiffs are listed in Exhibit 2 of Plaintiffs' Motion. (Pls.' Mot. Ex. 2, ECF No. 38-2).

[3] The Group 3 Plaintiffs and their associated documents are listed in Exhibit 3 of Plaintiffs' Motion. (Pls.' Mot., Ex. 3, ECF No. 38-3).

railroad.")).[4] Because this issue is undisputed, the Court finds that the railroad only obtained an easement at the time of the original conveyance.

However, the United States cross-moves for summary judgment as to the Group 3 deeds. (Def.'s Mot. at 22–29). In doing so, the United States asserts that, though the deeds conveyed easements, they are "broad, general easements" such that they permit alternative uses, including implementation of a trail. (*Id.* at 22). Because of this, the United States argues that use of the rail corridor as a trail does not exceed the scope of the easement and therefore cannot constitute a taking. (*Id.*).

The Court finds *Romanoff Equities, Inc. v. United States* to be instructive. 119 Fed. Cl. 76, 79 (2014), *aff'd*, 815 F.3d 809 (Fed. Cir. 2016). In that case, plaintiffs challenged whether, under New York law, the scope of the easement permitted the government to convert the right-of-way into an elevated park.[5] *Romanoff Equities*, 119 Fed. Cl. at 78. The applicable deed contained the following:

> [Grantor] does hereby grant and convey unto the Railroad Company, its successors and assigns forever, the permanent and perpetual rights and easements to construct, maintain and operate, without interference or right of interference, its railroad and appurtenances within those portions of the parcels of land herein described included between an upper plane and a lower plane drawn at the respective elevations herein provided for as to each such parcel, ***together with the exclusive use of the portion of the parcels of land herein described included between said plane for railroad purposes and for such other purposes as the Railroad Company, its successors and assigns, may from time to time or at any time or times desire to make use of the same***, subject only to the permanent rights and easement herein specifically reserved to the [Grantor], its successors and assigns, in the portions of said parcels of land included between the said respective planes.

*Id.* at 79 (emphasis added).

The trial court determined the deed "clearly and unambiguously" contemplated that the easement may be used for purposes beyond the railroad. *Id.* at 81 (highlighting that the deed's

---

[4] While the United States declines to accept Plaintiffs' "Group 3" naming convention, it encompasses the same Plaintiffs and associated properties as those identified by Plaintiffs as "Group B." (Def.'s Mot. at 22 n.8 ("The Group B deeds in the United States' Motion correlate with the "Group 3" deeds in the Plaintiffs' Motion. However, as described above, the United States declines to adopt the Plaintiffs' naming convention.")).

[5] For context, this case concerned a railroad built in the airspace rather than on the ground—hence the term "elevated." *See Romanoff Equities, Inc. v. United States*, 119 Fed. Cl. 76, 79 (2014), *aff'd*, 815 F.3d 809 (Fed. Cir. 2016) (also referring to the recreational trail as the "Highline.")

language permitted use of the easement "for railroad purposes *and for such other purposes* as the Railroad Company, *its successors and assigns*, may from time to time *or at any time desire to make use of the same*." (emphasis added)). The Federal Circuit affirmed the decision, finding that under New York law, the intent of the parties must be determined based on the language found within the grant. *Romanoff Equities*, 815 F.3d at 812 (citing *Dowd v. Ahr*, 583 N.E.2d 911, 913 (N.Y. 1991)). Further still, when a deed's language grants such a broad easement, it will be construed as including "any reasonable use . . . provided the use is lawful and one contemplated by the grant." *Id.* (quoting *Phillips v. Jacobsen*, 499 N.Y.S.2d 428, 429 (1986)). For these reasons, the trial court determined, and the Circuit agreed, that utilizing the corridor for a public trail and park fell within the plain terms of the relevant easement. *Romanoff Equities*, 119 Fed. Cl. at 81, *aff'd*, 815 F.3d at 812–13.

There is no reason to depart from the Circuit's clear rationale regarding this issue. Under New York law, the Court looks to the language in the grant, and when the language is not limited to railroad purposes, but "expressly includes other purposes for which the grantee or its successors may desire[,]" the Court will not impose additional restrictions. *Romanoff Equities*, 815 F.3d at 812–13 ("The phrase 'for such other purposes as the Railroad Company . . . may . . . desire' means 'for any purposes' or 'for whatever purposes' the Railroad Company may desire[.]"). Plaintiffs cite the Glenham Co. Deed as "exemplary of the Group 3 deeds." (Pls.' Mot. at 18). In pertinent part, the granting clause of the Glenham Co. Deed expressly states that the conveyance would be "for the purpose of constructing . . . [a] Railroad . . . and for such other uses and purposes as the Company may choose to apply to said land." (Pls.' Mot., Ex. 124). This language is no different than the language evaluated by the Circuit in *Romanoff Equities*. Therefore, this Court finds that to the extent that the Group 3 deeds contain identical or analogous clauses, conversion of the rail corridor into a recreational trail does not exceed the scope of the easement.

Plaintiffs attempt to distinguish the present case from *Romanoff Equities* by raising two points: (1) that Plaintiffs can demonstrate that imposition of a trail damaged their existing parcel; and (2) the broad use language of the Group 3 deeds applies only to the railroad company and not its "successor and assigns." (Pls. Mot. at 26–29). The Court will take each point raised in turn.

Plaintiffs argue that under New York law, a "dominant estate" is not afforded the right to "significantly burden the servient estate nor its abutting land." (Pls.' Mot. at 26). Plaintiffs base this argument on the Court's discussion in *Romanoff Equities* which, after finding the relevant deed broad enough to encompass use of the rail corridor as a public park or trail, states:

> [U]se of the corridor for a public park would by the plain terms of the easement appear to be clearly within the scope of the easement, **absent evidence that the new easement** is not lawful **or imposes some significant new burden on the servient estate.** There is no question here that the Highline is a lawful project. **Plaintiff has not made any allegation to support a finding that use of the corridor for the Highline will impose significant new burdens on the servient estate.**

*Romanoff Equities*, 119 Fed. Cl. at 81–82 (citing *Gates v. AT&T*, 956 N.Y.S.2d 589, 591 (2012)) (emphasis added). Plaintiffs assert that the recreational trail has "significantly burdened" their properties, unlike in *Romanoff Equities*.[6] (Pls.' Mot. at 27). Specifically, Plaintiffs argue their remainder parcels are damaged "largely from [a] loss of privacy and security." (*Id.*).

To support this claim, Plaintiffs state that their expert appraiser, Luke Nordine ("Mr. Nordine"), analyzed New York real estate data and determined that, when applied to the Group 3 Plaintiffs, the recreational trail resulted in $693,900 in damages and a reduction in market value. (Pls.' Mot. at 27). Plaintiffs provide the Court with several pieces of evidence compiled by Mr. Nordine including: (1) a spreadsheet purporting to show damages to the remainder of each Plaintiffs' existing parcels due to imposition of the trail; (2) a 24-page "damage" study; and (3) excerpts from Mr. Nordine's report regarding each Group 3 Plaintiffs' remainder parcel and the associated damages. (*Id.* (citing Pls.' Mot., Ex. 159)). Nothing in Plaintiffs' arguments or evidence sufficiently demonstrates that the construction of a trail is a "significant new burden[.]"

In *Lopez v. Adams*, plaintiffs sued for damages resulting from the defendants' repairs to an easement over plaintiffs' property. 69 A.D.3d 1162, 1162–63 (N.Y. App. Div. 2010). The easement granted the defendants the right to use a private roadway across plaintiffs' land to access their own property. *Id.* at 1163. The court held that the easement permitted the defendants not only to access the road but also "to carry out work as necessary to reasonably permit the passage of vehicles and, in so doing, to 'not only remove impediments but supply deficiencies in order to construct [or repair] a suitable road[.]'" *Id.* at 1163–64 (alteration in original). In reaching this conclusion, the court emphasized that easement holders may take actions "necessary to effectuate the express purpose of its easement[.]" *Id.* at 1164 (citing *Albrechta v. Broome County Indus. Dev. Agency*, 274 A.D.2d 651, 652 (N.Y. App. Div. 2000)). Regardless of this right, the court noted that the defendants were not permitted to materially increase the burden on the servient estate or impose new and additional burdens on the same. *Id.*

The defendants did conduct repairs on the private road; however, the court found that several of their actions during those repairs significantly burdened the plaintiffs' property. *Lopez*, 69 A.D.3d at 1164. Specifically, the defendants (1) destroyed land features that had previously prevented rocks, gravel, and earth from washing into a stream on plaintiffs' land; (2) altered the terrain of plaintiffs' property; and (3) caused flooding on plaintiffs' property. (*Id.* at 1164–65). Although the defendants had the right to repair the road under the easement, these actions "exceeded the [easement's] scope." *Id.* at 1165.

The *Lopez* decision illustrates what it means to "significantly burden" a servient estate. In essence, a significant burden arises when an easement holder undertakes actions that substantially interfere with the servient owner's use and enjoyment of the property in a manner not contemplated by the terms of the easement. Additionally, New York courts have explained, "[t]he rights of an easement holder are measured by the purpose and character of the easement."

_____

[6] For this argument the Plaintiffs do not assert that the trail itself was illegal, instead they choose to rely on the argument that this trail has created a new and significant burden on the Plaintiffs' remainder properties. (*See* Pls.' Mot. at 27).

*Whalen v. Town of Dover*, 226 A.D.3d 847, 850 (N.Y. App. Div. 2024) (quoting *Solow v. Liebman*, 175 A.D.2d 120, 121 (N.Y. App. Div. 1991). As previously determined, conversion of the rail line to a recreational trail is a use fully contemplated by the easement's terms and therefore does not, by itself, burden the servient estate. Although Plaintiffs contend that a trail will diminish their privacy or security, such concerns should have been contemplated at the time the easement was granted. *Romanoff Equities*, 119 Fed. Cl. at 81 ("Under New York law, the court's inquiry in a general easement must focus on what uses were contemplated when the easement was granted.") (internal citations omitted). For this reason, Plaintiffs' allegations of lost privacy or security provide no evidence of a burden uncontemplated by the original grant such that it could be construed as significantly burdening the servient estate or imposing a new and additional burden upon it.

Next, Plaintiffs argue that the language of the Group 3 deeds differs from that in *Romanoff Equities*, and is therefore distinguishable. (Pls.' Mot. at 29–30). Specifically, Plaintiffs argue that the grant in *Romanoff Equities* stated that the grant was for "railroad purposes and for such other purposes **as the Railroad Company, its successors and assigns**, may from time to time or at any time or times desire to make use of the same." (Pls.' Mot. at 29 (quoting *Romanoff Equities*, 119 Fed. Cl. at 812–15) (emphasis added)). The Plaintiffs compare this language to the Group 3 granting language, which generally state that the grants are "for the purposes of constructing along and operating thereon a Freight and Passenger Railroad as aforesaid and for such other uses and purposes **as the Company** may choose to apply said land." (*Id.* (citing Pls.' Mot., Exs., 121–130) (emphasis added)). Based on this, Plaintiffs argue that since the Group 3 deeds do not explicitly include the term "successors and assigns," MNR, as the successor to the original acquiring railroad, "has no right to use the easement for any purpose and is instead restricted to use as if the broad language did not exist[.]" (*Id.*).

The United States rebuts Plaintiffs' argument by first highlighting that the Circuit in *Romanoff Equities* did not analyze the scope of the easement based on the "successors and assigns" language. (Def.'s Mot. at 28). Second, the United States claims that New York law does not require "words of inheritance for an easement on the servient estate to be binding." (*Id.* (citing *In re Acquisition of Real Prop. by Warrensburg Hydro Power Ltd. Pshp.*, 263 A.D.2d 822, 824 (App. Div. 3rd Dept. 1999) and *Wilcox v. Reals*, 178 A.D.2d 885, 886 (App. Div. 3rd Dept. 1991))). Lastly, the United States points out that many of the Group 3 deeds do in fact include the "successors and assigns" language, effectively nullifying Plaintiffs' argument.

On appeal in *Romanoff Equities*, part of the plaintiff's principal argument was that the original easement "did not authorize the successors of the New York Central [Railroad Company] to use the property for other purposes, such as a park." *Romanoff Equities*, 815 F.3d at 812. The plaintiff raised several arguments to this end, first asserting that the scope of the easement was limited to railroad purposes, but the Circuit found this to be incorrect as the grant expressly included other purposes. *Id.* Even still, the Circuit noted that the cases on which the plaintiff relied to make its argument all concerned easements that were "limited to a specific purpose[,]" and therefore were distinguishable from the subject deed. *Id.* In making its analysis, the Circuit stated that the subject deed did not "limit the purpose[s] for which the easement [was] granted, but explicitly state[d] that the purposes extend to any purpose for which the grantee and its successors wish to use the property[.]" *Id.* Romanoff Equities, however, attempted to drill down even further by arguing that the ten-page easement document contained "only a single

sentence" regarding the "other uses" for which the rail corridor could be used. *Romanoff Equities*, 815 F.3d at 813. The plaintiff argued it was impossible to conclude, from this singular reference, that the original parties to the agreement intended the easement to grant New York City—the successor—the right to use the property for any purpose it "desired." *Id.* The Circuit disagreed, finding "the document **plainly authorizes such a successor** to use the property for such other purposes [as it may] desire to make use of the same." *Id.* (emphasis added). From this, the Circuit concluded that the granting document's text was "exactly contrary to [plaintiffs] argument that such a reading is 'impossible.'" *Id.*

The Court acknowledges that the Circuit in *Romanoff Equities* found the text of the granting clause expressly authorized successors to utilize the rail corridor for "other purposes." *See Romanoff Equities*, 815 F.3d at 812. However, Plaintiffs in this case are essentially asking this Court to find that if the grant document fails to expressly authorize successors to use the easement for "other purposes," then that flexibility extinguishes the moment the property is conveyed to a successor. The Court does not believe the Circuit in *Romanoff Equities* intended such a result. If the Court were to accept Plaintiffs' argument, it would be establishing a new rule—that failure to include the "successors and assigns" language is affirmative proof of the original parties' intent to limit the easement's broad language to the railroad. However, this would require the Court to infer an interpretation of the Circuit's decision that it did not expressly state. The Court declines to do so.

Additionally, Plaintiffs do not provide any caselaw to support such an inference but instead point to cases that simply state broad principles of deed interpretation.[7] (*See* Pls.' Reply at 11, ECF No. 46). In fact, as the United States points out, many New York cases have found that "words of inheritance" are unnecessary. *See Cronk v. Tait*, 305 A.D.2d 947, 949 n.1 (App. Div. 3rd dept. 2003) ("It merits observation that words of inheritance are not necessary to create an easement[.]") (quoting *Wilcox v. Reals*, 178 A.D.2d 885, 886 (App. Div. 3rd Dept. 1991));

---

[7] Plaintiffs cite to various cases arguing that in New York:

> "[I]t is a fundamental principle of deed construction that '[w]hen words have a definite and precise meaning, it is not permissible to go elsewhere in search of conjecture in order to restrict or extend the meaning.'" *BPGS Land Holdings, LLC v. Flower*, 198 A.D.3d 1344, 1346 (N.Y. App. Div. 2021) (quoting *Uihlein v. Matthews*, 64 N.E. 792, 794 (N.Y. 1902)). "An instrument creating an estate or interest in real property must be construed according to the intent of the parties, insofar as their intent can be determined by the language of the grant." *Hudson Valley Cablevision Corp. v. 202 Devs., Inc.*, 185 A.D.2d 917, 920 (N.Y. App. Div. 1992) (emphasis added). By the plain text of the deeds, the parties' intent was that the broad easement would not apply to anyone but the Dutchess and Columbia Rail Road. *See Edge Mgmt. Consulting, Inc. v. Blank*, 25 A.D.3d 364, 369 (N.Y. App. Div. 2006).

(Pls.' Reply at 11). None of these cases hold that a failure to include "successor or assigns" language indicates the original parties' intent to limit a broad conveyance.

*Pomygalski v. Eagle Lake Farms, Inc.*, 192 A.D.2d 810, 811–12 (App. Div. 3rd Dept. 1993) ("[T]he deed recites that the easement was 'granted' without any suggestion that the grant was temporary or that the grantor retained any right of revocation[.]"); *New York Land Development Corp. v. Bennett*, 160 A.D.3d 1366, 1367 (App. Div. 4th Dept. 2018) ("[N]o specific words are required to express the permanency of an easement[.]"). It is from this backdrop that the Court finds Plaintiffs' attempts to distinguish their Group 3 deeds unconvincing.

  The Court generally agrees with the United States regarding Plaintiffs' Group 3 deeds. Each of these deeds conveyed a broad, general easement that encompasses the transformation of the rail corridor into a recreational trail. Therefore, implementing a recreational trail is a reasonable use of the easement. Any resulting loss of privacy or security does not impose new or significant burdens on the servient estate, as such potential detriments were within the contemplation of the deeds when granted. Furthermore, the absence of "successors and assigns" language does not indicate an intent of the original parties to limit the "other purposes" conveyance to the railroad. Accordingly, for claims premised on the Group 3 deeds, the Court **DENIES** Plaintiffs' motion for partial summary judgment and **GRANTS** the United States' motion for summary judgment in accordance with the foregoing analysis.

  iv. <u>Group 4 – Deeds Referencing Railroad Purposes Outside of the Granting Clause.</u>

  Plaintiffs move for summary judgment as to Group 4, asking the Court to determine that those deeds conveyed easements limited to a "railroad purpose[.]" (Pls.' Mot. at 20–21). Group 4 consists of seven claimants listed in the following table:

| Claim No. | Plaintiff | Parcel No. | Applicable Conveyance |
|---|---|---|---|
| 2 | 334 Fishkill Ave., LLC | 130200-6054-23-284922-0000 | Boyce 142/613 PLF000055-000058 |
| 50 | KAP Realty NY, LLC | 130200-6054-23-280919-0000 | |
| 66 | Anne Provet | 130200-6054-23-374946-0000 | |
| 3b | 581 Main Street Beacon LLC | 130200-6054-30-236870-0000 | Boyce 142/613 PLF000055-000058 *See also Table A |
| 15 | Geraldine Cheverko | 56.8-1-11 | Marvin 47/424 PLF000120-000122 |
| 44 | Robin Greene | 56.27-1-5 | |
| 59 | Wilson Morales | 56.27-1-6 | |

(*See* Pls.' Mot., Ex. 4). Plaintiffs argue that each of the Group 4 deeds includes specific language sufficiently limiting the conveyed interest to an easement. (Pls.' Mot. at 20–21). As an example, Plaintiffs point to the "Boyce Deed," highlighting that its habendum clause includes a provision stating that the associated land is "conveyed expressly for railroad purposes and for no other." (*Id.* at 20 (citing Pls.' Mot., Ex. 131)). In its response, the United States did not contest that these deeds conveyed "railroad purpose easements." (*See* Def.'s Mot.; Def.'s Reply, ECF No. 47). Because there is no apparent dispute regarding the interest these deeds conveyed, the Court finds

that Plaintiffs have successfully demonstrated that the Group 4 deeds conveyed easements for railroad purposes.

### v.     Group 5 – Deeds Expressing the General Railroad Act of 1850.

For Group 5, Plaintiffs allege that because the railroad acquired its rights in the Line through recorded instruments "that expressly incorporate the provisions of the GRA[,][8] this demonstrates a "clear intent to limit the conveyance to only . . . an easement." (Pls.' Mot. at 21–22). Stated differently, Plaintiffs claim that regardless of the method through which the railroad obtains its property interest, if the granting clause incorporates the GRA, then it is limited to an easement. The United States disagrees and cross-moves for summary judgment, arguing that the Group 5 deeds "conveyed a fee simple interest" to the railroad under New York law. (Def.'s Mot. at 15–21). The United States' argument is primarily based on: (1) the plain language of the grant; (2) absence of express language limiting the estate granted; and (3) in some instances, valuable consideration paid. (*Id.* at 15). Additionally, the United States rejects the notion that simply referencing the GRA demonstrates an intent to limit the conveyance to an easement. (*Id.* at 19–21).

Group 5 consists of nine different deeds for eighteen claims. (*See* Pls.' Mot., Ex. 5, ECF No. 38-5). Plaintiffs point to the "Rogers Deed (149/59)" as an example of a deed that "expressly incorporates" the GRA. (Pls.' Mot. at 22 (citing Pls.' Ex. 138, ECF No. 38-138)). Specifically, the Plaintiffs highlight language that states: "estate title and interest therein of said part of the first part *subject nevertheless to all the duties and liabilities imposed on said party of the second part of the provisions and conditions of the [GRA] of the State of New York and the Amendment thereto.*" (Pls.' Ex. 138 (emphasis added)). Citing to *O&W Lines*, Plaintiffs argue that, by incorporating the "duties and liabilities" of the GRA, the grant limited the conveyance to an easement. (Pls.' Mot. at 22 (citing *O&W Lines, Inc.*, 228 N.E.2d at 371)). The Court cannot agree with such a broad assertion.

First, while the Court in *O&W Lines* did find the grant document "[e]xpressly incorporated by reference . . . the Railroad Act of 1850," Plaintiffs' reliance on this fact alone is misplaced. In reviewing the granting clause, the court in *O&W Lines* stated that:

> Expressly incorporated by reference into this indenture is the Railroad Act of 1850, which provides that, *following an appraisal and judgment of condemnation*, 'the (railroad) company shall be entitled to enter upon, take possession of, and use the said land for the purposes of its incorporation, during the continuance of its corporate existence, by virtue of this or any other act . . .

---

[8] The GRA, also referred to in many cases as the "General Railroad Law," was the New York law in effect authorizing the "formation of railroad corporations and regulating the same[.]" *Crouch v. State*, 218 A.D. 356, 357 (App. Div. 4th Dept. 1926); *see also* N.Y. Law ch. 140 (1850); Plaintiffs attach a copy of the Act to their Motion. (*See* Pls.' Mot., Ex. 8, ECF No. 38-8).

*O&W Lines, Inc.*, 228 N.E.2d at 371. However, the court did not hold that a mere reference to the GRA automatically limits a grant to an easement. Instead, the court emphasized that the deed also incorporated any amendments to the GRA, including one provision stating that "[a]ll lands acquired by any railroad company *by appraisal*, *for passenger and freight depots*, shall be held by such company in fee." *O&W Lines, Inc.*, 228 N.E.2d at 371. These distinctions make clear that whether land was acquired by "appraisal and judgment of condemnation" produces a materially different outcome than if the land was acquired by "appraisal [specifically] for passenger and freight depots." *Id.* The question of whether the railroad acquired a fee simple interest or an easement is therefore not governed solely by a reference to the GRA, or lack thereof; rather, the grant must be considered in its entirety to discern the original parties' intent.

Notably, in *Corning*, the plaintiffs argued that the railroad company only acquired an easement "because of the provisions of the [GRA] under which the [Railroad Company] had been incorporated." *Corning v. Lehigh Val. R. Co.*, 14 A.D.2d 156, 160 (App. Div. 4th Dept. 1961) ("[Plaintiffs] contend that . . . a voluntary grant to a railroad company incorporated under the 1850 act can convey to the railroad only a railroad easement, regardless of the terms of the grant."). The language of the relevant deed stated:

> [T]he said Daniel Valentine, in consideration of the sum of one dollar to him . . . hereby promises and agrees to and with the said Railroad Company to grant and convey to said Company, free of encumbrance and by a good and sufficient deed, *all the land* that said Company may require for the construction and convenient use of their Railroad, *upon and across the lands of said Daniel Valentine, along the Lake Shore, situated in the town of Genoa, County of Cayuga, in the State of New York*, and being a part of Lot No. 22 whenever said Company shall have finally built their Railroad . . . and a deed conveying the same.'

*Id.* at 159 (emphasis added). The court found that this language was sufficient to convey fee simple to the railroad, specifically highlighting use of the terms "to grant and convey . . . by a good and sufficient deed, all the land[.]" *Id.* ("These are the appropriate terms for the conveyance of a fee. There is no reference in the agreement to a railroad easement."). Additionally, the court found that the provisions of the GRA on which the plaintiff relied did not restrict the railroad's interest to an easement, but instead, made the railroad's interest "depend[ent] upon what the grant says." *Id.* at 161 (citing *In re City of Buffalo*, 206 N.Y. 319, 330 (1912) ("We can find nothing in the Railroad Law which contravenes or changes this rule [the rule that a railroad company may take a fee]"); *Holland v. McClusky*, 174 A.D.3d 1344, 1345 (App. Div. 4th Dept. 2019) (finding the railroad had only obtained a right of way easement based on the language in the deed)).

Accordingly, under the GRA, the "duties and liabilities" of condemnation proceedings arise only after a *judgment of condemnation* has been issued. *O&W Lines, Inc.*, 228 N.E.2d at 371 ("This particular section, authorizing railroad companies to acquire land *by condemnation* for any and all recognized purposes, has been authoritatively construed as giving the railroad not

a fee title, but merely an easement.") (emphasis added)). But for the purposes of determining the interest conveyed to the railroad, the Court must look to language of the deeds as determinative.[9]

In accordance with the reasoning above, the Court **DENIES** Plaintiffs' Motion for Partial Summary Judgment as to the Group 5 deeds. The Court also **GRANTS-IN-PART** and **DENIES-IN-PART** the United States' motion for partial summary judgment as to the Group 5 deeds in accordance with the chart below:

| Applicable Conveyance | Deed Language | Ruling |
|---|---|---|
| Hayt 47/139 PLF000085-000086 | "In consideration for the sum of $600 . . . have sold and by these presents does **grant and convey** to the said Boston Hartford and Erie railroad company their successors and assigns **All that piece or parcel of land situate in the town of Patterson, County of Putnam, and State of New York** . . . containing one acre and ninety-four one hundredths (1.94) of an acre more or less . . . . **With the appurtenances and all the estate title and interest therein of said parties of the first part** subject nonetheless to the duties and liabilities imposed on said party of the second part by the conditions and provisions of the general railroad act of the state of New York and the amendments thereto . . . he will forever warrant and defend against any person whomsoever lawfully claiming the same . . . ." PLF000085 (emphasis added). | Fee simple conveyed; no limiting language / Summary Judgment Granted. |
| Peck 47/142 PLF000125-000 | "The said parties of the first part . . . have sold and by these presents do **grant and convey** to the said Boston & Hartford Railroad Company their successors and assigns **All that piece or parcel of land situate in the Town of Patterson, County of Putnam, State of New York** . . . containing eleven one hundredths of an acre more or less . . . with the appurtenances and **all the estate title and interest therein of said parties of the first part** . . . subject nevertheless to the General Railroad Act of the State of New York . . . ." PLF000126 (emphasis added). | Fee simple conveyed; no limiting language / Summary Judgment Granted. |
| Peck 47/140 PLF000123-000124 | "The said parties of the first part . . . have sold and by these presents do **grant and convey to the said Boston & Hartford Railroad Company their successors and assigns All that piece or parcel of land situate in the Town of Patterson, County of Putnam, and State of New York** . . . and containing five acres and seven hundredths (5.07) acres more or less with the appurtenances and **all the estate title and interest therein of said parties of the first** | Fee simple conveyed; no limiting language / Summary Judgment Granted. |

---

[9] The Court notes that Plaintiffs' briefing supports this determination. (*See* Pls.' Mot. at 21). During their discussion of the Group 4 deeds, Plaintiffs highlight that one of their deeds utilized language denoting a "grant of 'all'" of the land to the grantee, 'their successors and assigns, forever,'" and acknowledged that this sort of language is indicative of "a fee simple grant." (*Id.*).

| | | |
|---|---|---|
| | **part** . . . subject nevertheless to the General Railroad Act of the State of New York . . . " PLF000123 – 124 (emphasis added). | |
| Rankin 149/104 PLF000132-000134 *See also Table A | No objection raised; No translation available | Summary Judgment Denied |
| Rogers 149/59 PLF000195-000196 | "The said parties of the first part . . . do **grant and convey to the said Boston Hartford and Erie RR their successors and assigns All that piece parcel of land situate in the town of East Fishkill, County of Dutchess, State of New York** . . . containing 41/100 acres of land be the same more or less . . . with the appurtenances and **all the estate, title and interest therein of said party of the first part** subject nevertheless to all the duties and liabilities imposed on said party of the second part by the provisions and conditions of the General Railroad Act of the State of New York." PLF000195 (emphasis added). | Fee simple conveyed; no limiting language / Summary Judgment Granted. |
| Rogers 47/138 PLF000193-000194 *See also Table A | "The said parties of the first part **in consideration of the sum of $1300** to them duly paid by the said railroad company have sold and by these presents do **grant and convey to the said Boston & Hartford Railroad Company their successors and assigns All that piece or parcel of land situate in the town of Patterson, County of Putnam, State of New York** . . . containing two one hundredths of an acre more or less with the appurtenances and **all the estate title and interest therein of said parties of the first part** . . . subject neverless to the General Railroad Act of the State of New York." PLF000193 - 194 (emphasis added). | Fee simple conveyed; no limiting language / Summary Judgment Granted. |
| St. John 47/141 PLF000205-000206 *See also Table A | "The said parties of the first part **in consideration of the sum of $1300** to them duly paid by the said railroad company have sold and by these presents do **grant and convey to the said Boston & Hartford Railroad Company their successors and assigns All that piece or parcel of land situate in the Town of Patterson, County of Putnam, State of New York** . . . containing 3 55/100 acres more or less with the appurtenances and **all the estate title and interest therein of said parties of the first part** . . . subject neverless to the General Railroad Act of the State of New York." PLF000205-206 (emphasis added). | Fee simple conveyed; no limiting language / Summary Judgment Granted. |
| Storm 149/68 | "The said parties of the first part . . . have sold and by these presents do **grant and convey to the said Boston & Hartford Railroad Company their successors and assigns All that piece or parcel** | Fee simple conveyed; no limiting |

| PLF000207-000209 | of land situate in the town of **East Fishkill, County of Dutchess, and State of New York** . . . containing two + seventy six one hundred acres of land more or less. with the appurtenances and **all the estate title and interest therein of said parties of the first part** . . . this conveyance is made subject to the terms, provisions, and conditions of the General Railroad Act of the State of New York . . . ." PLF000207 – 208 (emphasis added). | language / Summary Judgment Granted. |
|---|---|---|
| Tabor 149/75 PLF000210-000211 *See also Table A | "The said parties of the first part **in consideration of the sum of $2400 to them duly paid** by the said railroad company have sold and by these presents do **grant and convey to the said Boston & Hartford Railroad Company their successors and assigns all that piece or parcel of land situate in the Town of Beekman and County of Dutchess and State of New York** . . . containing 11.13-100 acres with the appurtenances and all the Estate, Title and Interest therein of said party of the first part subject nevertheless to all the duties and liabilities imposed on the parties of the second part by the General Railroad Act of the State of New York . . . ." PLF000210 (emphasis added). | Fee simple conveyed; no limiting language / Summary Judgment Granted. |

## 2. Centerline Presumption

The Court next turns to the Parties' dispute regarding the applicability of the "centerline presumption. The "centerline presumption" generally assumes that property owners whose land borders a railroad or road also own the land up to the centerline of that right-of-way, unless state law or the original deed shows otherwise. *Castillo*, 952 F.3d at 1311, 1314, 1320 (citing *Banks v. Ogden*, 69 U.S. 57, 68 (1864)). The presumption is just that—a presumption. It can be rebutted. New York law provides that where there is sufficient evidence—such as from the deed and surrounding circumstances—that the original grantor intended to transfer land only up to the edge of the road, the presumption is inapplicable. *Marks v. Gaeckle*, 156 N.Y.S.3d 402, 404 (N.Y. App. Div. 2021); *Bashaw v. Clark*, 699 N.Y.S.2d 533, 537 (N.Y. App. Div. 1999). Courts consider various factors, including the deed's language, land layout, and actions of past owners, to determine intent. *DiMarino v. United States*, __ Fed. Cl. __, 2025 WL 2985441, at *3 (Fed. Cl. Mar. 24, 2025) (citing *Marks*, 156 N.Y.S. at 404). When there is doubt as to intent, it can also be garnered from the practical construction of the grantor and grantee and their successors in title. *Id.* (citing *Lehrman v. Lake Katonah Club, Inc.*, 794 N.Y.S.2d 670 (N.Y. App. Div. 2005) (internal citations omitted)).

Plaintiffs now seek to establish their ownership of the land adjoining and underlying those segments of the corridor where the railroad acquired only an easement for railroad purposes. (Pls.' Mot. at 30–31). If they can prove adjacency, Plaintiffs then aim to assert a property interest in the rail corridor under New York's centerline presumption. (*Id.*). In its response, the United States does not raise arguments contesting whether any of the properties are adjacent to the Line. (*See* Def.'s Mot.). However, the United States challenges the application of the centerline presumption with respect to nearly every property and moves for summary judgment, asserting that Plaintiffs' "deed instruments do not convey an ownership interest in the underlying corridor." (*Id.* at 29–33). The United States further contends that Plaintiffs' broad reliance on the exhibits attached to their motion, as evidence of such an interest, fails to

substantively engage with the contents of those exhibits. (*Id.*). Specifically, the United States argues that, based on the "metes and bounds descriptions" and "attached maps[,]" the documents demonstrate an intent of the original grantor "to limit the conveyances to the exterior of the Beacon Line corridor." (*Id.* at 30).

In response, Plaintiffs assert that the United States places to much reliance on the fact that some of the deeds either describe various properties as running "along" the rail line or identify particular "lot[s.]" (Pls.' Reply at 16–19 ("If the government was correct, then any delineation of a public way of any type or style for any deed would rebut the presumption before it could ever arise.")). Plaintiffs also argue that a deed's reference to directions, boundaries, or mapped lines does not overcome the centerline presumption under New York law. (*Id.*). Finally, Plaintiffs suggest that unless the United States can provide evidence, "in the form of chain of title or otherwise," which demonstrates the Plaintiffs' sought to retain only a reversionary interest in the rail corridor, then the centerline presumption cannot be rebutted. (*Id.* at 19).

Plaintiffs' counter arguments appear to suggest that the boundaries their predecessors intended to convey cannot be determined from the deeds themselves. This assertion is incorrect. To clarify, numerous New York cases demonstrate that courts routinely interpret such boundaries directly from the deeds. *Marks*, 156 N.Y.S.3d at 404 (stating that the subject deed defined the properties' boundary as the "'[e]asterly line'—i.e., the outer edge—of the 30-foot private road, supporting the defendant's contention that the deed expressly excluded the disputed strip[.]"); *see also City of Albany v. State*, 270 N.E.2d 705, 707 (N.Y. 1971) ("[W]hen the deed describes the grant as starting at a corner of an intersection, and then running along parallel to or bounding on a street or streets to the beginning point , the grant is limited to the exterior line of the street[.]"). To overcome the centerline presumption, the deed must include language that affirmatively limits the scope of the conveyance. *Town of Clifton Park v. Boni Builders, Inc.*, 156 A.D.3d 1035, 1037 (N.Y. App. Div. 3rd Dept. 2017) (citing *Lamm v. Mauser*, 132 A.D.3d. 1120, 1123 (N.Y. App. Div. 3rd Dept. 2015)) (finding that utilization of terms such as "along a curve" and "the point or place of beginning" are "descriptive reference points" but do not indicate an intent to limit the conveyance to the edge of the boundary.); *Town of Lake George v. Landry*, 96. A.D.3d 1220, 1223 (N.Y. App. Div. 3rd Dept. 2012) (finding that a deed expressly limiting the conveyance to the "westerly bounds of a right of way" precluded a determination that the defendant's property extended to the eastern boundary of the adjoining parcel). Therefore, mere reference to metes and bounds, even where those bounds coincide with mapped lines, is insufficient to establish an intent to exclude the adjacent road's exterior.

Accordingly, where the deed lacks clear limiting language, the centerline presumption remains intact; conversely, where such limiting language is present, the presumption is rebutted. Therefore, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** both the Plaintiffs' and Defendant's motions for partial summary judgment as to the centerline presumption in accordance with the chart below:

| Plaintiff / Parcel No. | Claim/(Group) No. | Deed Language | Centerline Presumption: Ruling |
|---|---|---|---|
| Peter & Nancy O'Hara: 13.-2-92 | 62/(1 & 5) | No limiting language identified.<br><br>(Pls.' Ex. 71a). | Applies |
| 581 Main Street Beacon LLC: 130200-6054-30-204843-0000 | 3a/(1 & 2) | "BEGINNING at a point on the Easterly line of Herbert Street Extension, said point being the intersection of the Easterly line of Herbert Street Extension with the Southerly line of lands now or formerly of Consolidated Railroad Corp[.]<br><br>**THENCE along lands now or formerly of Consolidated Railroad Corporation, the following[:]** | Applies |
| 581 Main Street Beacon LLC: 130200-6054-30-236870-0000 | 3b/(1 & 4) | North 59 degrees 44 minutes 28 seconds East 147[.]14 feet, North 58 degrees 09 minut[e]s 35 seconds East 128[.]00 feet, North 32 degrees 40 minutes 06 seconds West 10[.]00 feet, on a curve to the right having a radius of 2242[.]51 feet for a distance of 405[.]05 feet, and North 67degrees 40 minutes 50 seconds East 203[.]78 feet to a point . . . ."<br><br>(Pls.' Ex. 31a). | |
| Brian Walker: 132800-6457-01-080517-0000 | 90/(1 & 3) | "ALSO all that certain piece or parcel of land situated in the Town of East Fishkill, Dutchess County, New York, bounded and described as follows: Beginning at a point and which said point is S 25° 33' 15" W, 50.00 feet more or less from the most southerly corner of lands conveyed to Mary I. Mulford by Charles G. H. Mulford and recorded August 14th, 1939 in Liber 576 of Deeds, Page 251, in the Office of the Clerk, County of Dutchess And thence proceeding from said point of beginning along the easterly boundary of a town road known as Fishkill Road N 64° 21' 25" E, 254.94 to a point, thence N 59° 30' 01" E, 307.47 feet to a point, thence N 53° 51' 18" E, 127.86 feet to a point, thence along the lands now or formerly of James E. Mulford and John R. Mulford S 16° 02' 54" E, 43.53 feet to a point; **thence** | Applies |

| | | | |
|---|---|---|---|
| | | **along the lands now or formerly the Penn-Central Railroad Company S 61 ° 43' 06" W, 680.53 feet to a point**, thence along the lands, now or formerly of A. D. Tompkins, N 25° 33' 15" W, 24.92 feet to the point or place of beginning, containing 0.34 acres more or less.<br><br>(Pls.' Ex. 107a). | |
| Arlene G. Durk: 13.-2-63 | 31/(1 & 5) | "[B]eginning is North 12° 26' 15" West 365.15 feet from the Northwesterly corner of lands of Thomas T. Daniels, formerly Davis; thence running along the Easterly side of Cushman Road North 3° degrees 21' 50" West 508.23 feet to the Northwesterly corner of premises being described; Thence leaving Cushman road running along the division line between premises being described and lands of Martha Bryan Cushman South 86° 52' 50" East 454.22 feed and North 54° 36' 10" East 337.55 feet **to the division line between premises being described and lands of New York, New Haven & Hartford Railroad; Thence along said division line on a curve to the left having a radius of 2059.53 feet a distance of 55.50 feet**; thence south 34° 43' 00" East 354.07 feet; thence north 55° 17' 00" East 100.00 feet; thence South 34° 43' 00" East 294.99 feet; thence on a curve to the left having a radius of 1383.19 feed a distance of 222.56 feet to the division line between premises being described and lands of Martha Bryan Cushman; thence along said division line North 88° 58' 20" West 744.30 feet; thence North 85° 25' 37" west 293.96 feet and North 87 degrees 20' 00" West 211.91 feet (the said last two courses and distances being lone the center line of a stone wall) to the easterly side of Cushman Rod the point or place of beginning."<br><br>(Pls.' Ex. 53a) | Rebutted, does not apply |
| Coyote Two, LLC: 133089- | 21/(1 & 3) | "[T]hence running along lands now or formerly Hull (Liber 1635 pg 646); South 37-33-10 East 238.41 feet to a point; thence along lands now or formerly Texaco South 36-55-21 | Applies |

| | | | |
|---|---|---|---|
| 6055-15-668289-0000 | | West 120.65 feet to a point; **thence along lands now or formerly Consolidated Rail Corp., on a curve to the left having a radius of 1004.87 feet for a distance of 93.10 feet to a point**; thence along lands now or formerly Hancock the following: North 18-00-56 West 103.27 feet, North 16-32-59 West 26.05 feet, North 01-00-35 West 34.62 feet, and North 27-02-33 West 69.79 feet to a point; thence along the southerly line of Old Glenham Road North 67-57-26 East 93.70 feet to the point or place of BEGINNING." <br><br> (Pls.' Ex. 47a). | |
| Michael Zanzarella: 133089-6155-11-615684-0000 | 1/(1 & 3) | "BEGINNING at a point in the southerly line of Kipp Avenue, said point being distant southwesterly 710 feet from the intersection of the said southerly line of Kipp Avenue with the westerly line of Blodgett Road; and running thence with the said southerly line of Kipp Avenue, the following courses and distances: South 70 degrees 11' 40" West 6.57 feet; thence South 75 degrees 54' West 103 feet; thence South 81 degrees 36' 30" West 12.3 feet to line of lands of Ribera; thence with said line of lands of Ribera, South 12 degrees 16' East 144.99 **feet to the northerly line of lands of the New York, New Haven and Hartford Rail Road Company; thence with said northerly line of lands of said railroad company, North 64 degrees 21' 30" East 150.1 feet**; thence North 24 degrees 20' 10" West 116.16 feet to the place of BEGINNING." <br><br> (Pls.' Ex. 29a). | Rebutted, does not apply |
| Louis Sebesta: 133089-6155-03-125211-0000 | 77/(1 & 3) | No limiting language identified. <br><br> (Pls.' Ex. 96a). | Applies |
| Dana Brown: 132200-6758-04-829254-0000 | 12/(1 & 5) | No limiting language identified. <br><br> (Pls.' Ex. 40a). | Applies |

| | | | |
|---|---|---|---|
| Anthony Chianese, Sr. & Anthony Chianese, Jr.: 132200-6758-04-860314-0000 | 16/(1 & 5) | "RUNNING THENCE along said division line between Lots 31 and 32 South 66 degrees 45' 00" **East 312.69 feet to a point on the line of lands now or formerly New York, New Haven and Hartford R.R. Co.;**<br><br>RUNNING THENCE along same, South 31 degrees 36' 30" West 151.61 feet to a point on the division line between Lots 32 and 33 as shown on the aforesaid filed map;<br><br>RUNNING THENCE along same North 66 degrees 45' 00" West 290.65 feet to a point on the easterly line of Gold Road; RUNNING THENCE along same North 23 degrees 15' 00" East 150.00 feet to the point or place of BEGINNING."<br><br>(Pls.' Ex. 43a). | Applies |
| James & Jean DeBonis: 132200-6758-04-880372-0000 | 23/(1 & 5) | "RUNNING THENCE along the easterly side of said road, North 23 degrees 15 minutes 00 seconds East 150.00 feet; THENCE leaving said road and running along a parcel designated as Number 27, South 72 degrees 32 minutes 40 seconds East 289.88 **feet to the westerly exterior line of the NYNH and H Railroad Co.;** THENCE along said line, South 58 degrees 23 minutes 30 seconds East 66.00 feet and South 31 degrees 36 minutes 30 seconds West 181.00 feet; THENCE leaving said line and running along a parcel designated as Number 29, North 65 degrees 06 minutes 20 seconds West 327.51 feet to the point or place of BEGINNING."<br><br>(Pls.' Ex. 48a). | Rebutted, does not apply |
| Homer & Jo Ann Griffin: 132200-6758-04-831232-0000 | 45/(1 & 5) | No limiting language identified.<br><br>(Pls.' Ex. 64a). | Applies |
| Jessica Schleicher: 132200- | 76/(1 & 5) | "RUNNING thence along the southeasterly line of said Gold Road, North 23 degrees 15'00" East 150.00 feet; THENCE leaving said road and running along other lands of | Rebutted, does not apply |

| | | | |
|---|---|---|---|
| 6758-04-870342-0000 | | now or formerly Chauncey Gold and Monroe Gold, South 66 degrees 45'00" East 341.04 **feet to the westerly exterior line of the New York, New Haven and Hartford Railroad Co.; THENCE along said line, South 17 degrees 42'25" West 64.77 feet and South 31 degrees 36'30" West 66.45 feet**; THENCE leaving said line and running along other lands of said Chauncey Gold and Monroe Gold, North 66 degrees 45'00" West 334.73 feet to the point or place of BEGINNING." <br><br> (Pls.' Ex. 95a). | |
| Brian Van Vlack: 132200-6758-04-875357-0000 | 87/(1 & 5) | "Being known and designated as lot 29 on a certain map entitled "Indian Hills" filed in the Dutchess county clerk's office on June 21, 1963 as map no. 3140 and further described as follows: beginning at a point on the easterly side of gold road at the northwesterly corner of lot no. 30 on said map, running thence along the easterly side of gold road, north 23-15 east 150 feet to the southerly side of lot no. 28, running thence along the same, south 65-06-20 east 327.51 **feet to the westerly side of lands formerly of the New York New Haven and Hartford Railroad, now of Conrail, running thence along the same south 17-42-25 west 141.26 feet** to the northerly side of said lot no. 30, running thence along the same, north 66-45 west 341.04 feet to the point and place of beginning." <br><br> (Pls.' Ex. 104a). | |
| John & Alexandra Colbert: 134089-6856-00-602005-0000 | 18/(1 & 5) | "BEGINNING at a point the westerly side of the right of way of the New York, New Haven and Hartford Railroad Company which point of beginning is identified as being south 3° 58' E 502.74 feet measured southerly along said right of way from the northeasterly corner of the lands of Hahn, the southeasterly corner of lands now reputedly of Cole, formerly James Holmes; **thence running along the lands of the said railroad North 82° 11' W 105.13 feet and continuing on the same bearing 85 feet to** | Applies |

| | | | |
|---|---|---|---|
| | | the center of a large boulder; thence still continuing on this same bearing 50 feet to a point the southwesterly corner of the premises herein described being 8 feet easterly of a row of trees; thence running northerly and at right angles to the last course and at all times 8 feet from said row of trees 77 feet to a point located 5 feet east from a large maple tree; thence running westerly through the lands of Hahn 430 feet more or less to a point on the westerly line of the lands of Hahn and easterly line of the lands now or formerly of Baker; thence running along said Baker lands and lands reputedly of Cole north 41° 24' E 19, 85 feet north 27° 28' E 383.81 feet and south 84° **01' E 419. 96 feet to a corner in the westerly side of the right of way of the New York, New Haven & Hartford Railroad Company; thence along the said Railroad Company's land south 3° 58' E 502.74 feet to the point or place of beginning."**<br><br>(Pls.' Ex. 44a) | |
| Joette Forsblom Fero Kane 2018 Irrevocable Trust: 133089-6356-01-315608-0000 | 49/(1) | "BEGINNING at a stake on the west bank of Sprout Creek at the northwest corner of Boss (814 deeds page 490) and running thence along a wire fence S 55° 41' W 19.6 feet; Thence S 44° 54' W 143.2 feet to a point; thence along a stone wall and the northerly line of Boss and Hupe N 84° 36' W 389.5 feel to the end of the stone wall; **thence N 13° 06' W 5.24 feet to the southerly line of the New Haven Railroad; thence along the southerly line of the New Haven Railroad to the west bank of Sprout Creek aforementioned;** thence southerly along the west bank of Sprout Creek to the point of beginning;"<br><br>(Pls.' Ex. 68a). | Rebutted, does not apply |
| Judith Valentino: 133089-6356-01-272582-0000 | 85b/(1 & 2) | "BEGINNING at a point in the southerly line of Kipp Avenue, said point being distant southwesterly 330 feet from the intersection of the said southerly line of Kipp Avenue with the westerly line of Blodgett Road, and running thence with the said | Rebutted, does not apply |
| Judith Valentino: | 85a/(3) | southerly line of Kipp Avenue South 62 | |

| | | | |
|---|---|---|---|
| 133089-6155-11-644708-0000 | | degrees 43' west 120 feet; thence with other lands of Earl T. Ketcham South 30 degrees 7' 10" East **102.19 feet to the northerly line lands of the New York, New Haven and Hartford Railroad Company; thence with the said northerly line of lands of said Railroad Company North 64 degrees 21' 30" East 115 feet** to line of lands of Prendergast North 27 degrees 17' West 105.36 feet to the place of beginning." <br><br> (Pls.' Ex. 103a). | |
| Haslett/JLD Fishkill: 133089-6256-04-700259-0000 | 47a/(2 & 3) | "Commencing at a point on the westerly Right-Of Way (R.O.W.) line of New York State Route #52, said point also being the southeasterly corner of Parcel I as described herein, thence; **running northeasterly through said R.O.W. the following course; N 87°52'37" E a distance of 84.38 feet to a point on the easterly line of said R.O.W., said point also being the TRUE POINT OF BEGINNING**: thence; running northwesterly along said easterly R.O.W. line the following three courses; N 32°52'17" W a distance of 43.16 feet to a point, thence; N 37°45'28'' W a distance of 84.60 feet to a point, thence; N 41°41'02" W a distance of 109.62 feet to a point, thence; transitioning from said R.O.W. line to the southerly R.O.W. line of New York State Route 82 and running northeasterly along said line the following two courses; N 24°10'31" E a distance of 108.20 feet to a point, thence; N 67°04'31" E a distance of 47.41 feet to a point, thence . . . ." ; <br><br> (Pls.' Ex. 66a). | Applies |
| Haslett/JLD Fishkill: 133089-6256-04-711305-0000 | 47b/(2) | | |
| The Richard E. Monroe Trust: 133089-6256-04-960446-0000 | 58/(2 & 3) | "[R]unning; thence along the Southerly line of said Highway N 70-38 E 25.00 feet; thence along the Westerly line of now or formerly Chiavelli S 19-23 E 405.00 feet, thence along the Southerly line of lands now or formerly said Chiavelli and now or formerly or Ruppert N 70-38 E 188.24 feet; thence along the Westerly line of Michaels, the party of the second part hereto, S 19-23 E 405.59 **feet to the Northerly exterior line of the Dutchess** | Rebutted, does not apply |

| | | | |
|---|---|---|---|
| | | **and Columbia Railroad; thence along the Northerly exterior line and distant 49.50 feet at right angles and parallel to the monumented center line of said railroad S 67-38 W 213.54 feet;** thence leaving said line and along the Easterly line of now or formerly said K. Oscar Carlson N 19-23 W 821.75 feet to the point of beginning."<br><br>(Pls.' Ex. 77a). | |
| Firas Abbasi<br>133089-<br>6356-01-<br>189582-0000 | 4/(2) | "BEGINNING at a point in the southerly line of Mirras Boulevard, said point being distant along said street line South 85° 20' 10" East 224.59 feet from a pipe marking the intersection of said southerly line of Mirras Boulevard with the southerly line of Ward Place and running thence along the first mentioned street line South 85° 20' 10" East 105 feet to a point; thence with other land of Theiss South 3° 25' 7" East 235.96 feet **to a point in the northerly right of way line of New York, New Haven and Hartford Railroad; thence along the same South 82° 10' West 105 feet to a point;** thence along other lands of Theiss North 3° 15' 22" West 258.81 feet of the point or place of BEGINNING."<br><br>(Pls.' Ex. 32a). | Rebutted, does not apply |
| Lisa Badia:<br>133089-<br>6356-01-<br>077512-0000 | 7/(2) | No limiting language identified.<br><br>(Pls.' Ex. 35a). | Applies |
| BR Trust:<br>133089-<br>6356-01-<br>191540-0000 | 9/(2) | "**BEGINNING at the northeasterly corner of a 3.3 acre parcel by Michael Mirras and other to Baird and running thence along the right of way fence of the New York, New Haven and Hartford Railroad North 80 degrees 07 minutes East 203.33 feet and North 82 degrees 05 minutes East about 624 feet to the westerly side of a proposed road or street;** thence along the westerly line of said street southerly about 35 feet to an angle; South 36 degrees 05 minutes West about 195 feet; and South 25 degrees 08 minutes West 183.82 feet; thence leaving said street and running | Applies |

| | | |
|---|---|---|
| | | along the lands conveyed by Michael Mirras and others to Klinga South 43 degrees no minutes West about 50 feet to the bank of the cove of the Fishkill Creek; thence along said bank in the westerly direction about 540 feet to the southeasterly corner of the above mentioned Baird parcel; thence along the easterly line of the same North 07 degrees no minutes West about 320 feet to the point or place of BEGINNING . . . ."<br><br>(Pls.' Ex. 37a). | |
| Christopher & Donna Consaga: 133089-6356-03-058467-0000 | 19/(2) | No limiting language identified.<br><br>(Pls.' Ex. 45a). | Applies |
| Nicola Coppola: 133089-6356-03-012486-0000 | 20/(2) | No limiting language identified.<br><br>(Pls.' Ex. 46a). | Applies |
| Robert & Elisa DeWitt: 133089-6356-03-039448-0000 | 25/(2) | "BEGINNING at an iron pin on the southerly side of the New York, New Haven and hartford Railroad right of way, said pin being distant 969.13 feet southwesterly along said RR right of way from the intersection of the westerly line of McGrath Terrace and southerly side of the RR right of way; THENCE running north 66° 09' 49" East 248.19 **feet to a point on the southerly side of said right of way**; THENCE South 35° 07' 40" East 246.57 feet to a point; THENCE South 63° 05' 20" West 300 feet more or less to the bank of Fishkill Creek; THENCE northwesterly westerly and northeasterly along the creek bank to the point of beginning."<br><br>(Pls.' Ex. 50a). | Rebutted, does not apply |
| Vincent A. Fernandez & Meghan Bliss: 133089- | 33/(2) | "[S]outh 03 degrees 01 minutes 10 seconds east 301.27 **feet to a point on the line of lands N/F Midtown Trackage Adventures (ID836251) thence along said Midtown Trackage Adventures the following two courses and distances**; 1) South 82 degrees 10 | Applies |

| | | | |
|---|---|---|---|
| 6356-01-162573-0000 | | minutes 00 seconds west 44.00 feet to a point of curve, 2) On a curve to the left having a radius of 2914.51 feet an arc distance of 56.00 feet having a curve bearing of south 81 degrees 36 minutes 58 seconds west and a chord length of 56.00 feet to a point on the line of lands N/F Guthrie thence along the lands of Guthrie north 02 degrees 44 minutes 50 seconds west passing through an iron pipe on line at 38.23 feet for a total distance of 299.41 feet to a point on the southerly line of said Ward Place thence along the southerly line of said Ward Place the following two courses and distances; 1) North 74 degrees 53 minutes 00 seconds east 70.41 feet to an iron pipe found, 2) South 85 degrees 20 minutes 10 seconds east 29.59 feet to the place and paint of beginning." <br><br>(Pls.' Ex. 55a). | |
| Scott & Diane Ferris: 133089-6356-01-154526-0000 | 34/(2) | "**[R]unning thence along the southerly line of the consolidated Rail Corporation and the remains of an old wire fence**, N 75-57 - E 52.31 feet, N 76-33-00 E 69.34 feet to a point in the westerly line of lands now or formerly of Souers (L. 1424 cp 172); thence along the westerly line of lands now or formerly of Souers. S 07-00 E. 320.00 feet to a point on the northerly bank of the Fishkill Creek: thence along the Fishkill Creek N 77-40-05 W. 86.31 feet to a point in the easterly line of lands now or formerly of Kovach; thence along the easterly line of lands now or formerly of Kovach; N 15-05-00 W. 280.00 feet to the point or place of beginning." <br><br>(Pls.' Ex. 56a). | Rebutted, does not apply |
| John & Myrna Georges: 133089-6356-03-078483-0000 | 39/(2) | No limiting language identified. <br><br>(Pls.' Ex. 60a). | Applies |
| David Kuran 133089-6356-03-108498-0000 | 51(2) | "**BEGINNING at a point in the Southerly line of New York, New Haven and Hartford Railroad on the westerly side of McGrath Terrace 50.96 feet Northerly from the end of** | Rebutted, does not apply |

| | | | |
|---|---|---|---|
| | | **McGrath Terrace; and CONTINUING FROM THENCE along the Westerly line of McGrath Terrace and the Westerly line of the lands of Baird South 33 degrees 30 minutes East 280 feet more or less to the bank of the Fishkill Creek**; THENCE Southwesterly along the Northerly bank of said creek 135 feet more or less to the Southwesterly corner of the herein described parcel; THENCE North 37 degrees 45 minutes 00 seconds West 375 foot more or less **to the Southerly line of the New York, New Haven and Hartford Railroad; THENCE North 67 degrees 38 minutes East 150 feet to the point of BEGINNING.**"<br><br>(Pls.' Ex. 70a). | |
| Jason A. & Stacey L. Meister: 133089-6356-01-136518-0000 | 55/(2) | "THENCE along the lands now or formerly Cowen (Liber 1204 cp 583), South 15 degrees 05'00" East 446.57 feet to a point; THENCE along the bank of the Fishkill Creek, South 75 degrees 55'52" West 259.85 feet to a point; THENCE along the lands now or formerly Pinto (Liber 1795 cp 845), North 20 degrees 50'00" West 432.72 feet to a point; **THENCE along the lands now or formerly Consolidated Rail Corporation the following five (5) courses and distances:** 1) North 68 degrees 51 '00" East 9.00 feet; 2) North 71 degrees 04'00" East 106.88 feet; 3) North 72 degrees 43 '00" East 84.69 feet; 4) North 74 degrees 28'00" East 64.95 feet and; 5) North 75 degrees 37'00" East 38.00 feet to the point or place of BEGINNING."<br><br>(Pls.' Ex. 74a). | Applies |
| Caroline Meyer: 133089-6356-03-041494-0000 | 56/(2) | "BEGINNING at the corner formed by the intersection of the easterly line of East Court with the southerly line of McGrath Terrace; Running thence along the southerly line o[f] McGrath Terrace south 65 degrees 19' East 168.57 feet to the westerly line of Lot 20 on said map; Running thence along same South 24 degrees 41' west 176.58 feet and **South 67 degrees 38' 56.96 feet to the easterly line of East Court' Running** thence along same | Applies |

| | | | |
|---|---|---|---|
| | | North 2 degrees 22° West 53.35 feet and north 1 degrees 49' 00" West 203. 28 feet to the point or place of beginning." (Pls.' Ex. 75a). | |
| Catherine F. Oken 133089-6356-01-180579-0000 | 63/(2) | "BEGINNING at a point in the southerly line of Mirras Boulevard, said point being distant along said street line South 85 degrees 20' 10" East 124 59 feet from a pipe marking the intersection of said southerly line of Mirras Boulevard with the southerly line of Ward Place and running thence along the first mentioned street line south 85 degrees 20' 10" East 100 feet to a point, thence along lands of Strohecker South 3 degrees 15' 22" East 258 81 **feet to a point in the northerly right-of-way line of the New York, New Haven and Hartford Railroad, thence along the same South 82 degrees 10' West 100 feet to a point**, thence along lands of Emil Theis North 3 degrees 7' 34" West 280 57 feet to the point of beginning . . . ." (Pls.' Ex. 82a). | Rebutted, does not apply |
| Anthony M. Ott, III & Tracy Ott (f/k/a Tracy Smith) 133089-6356-01-125554-0000 | 64/(2) | "[R]unning thence along said street line North seventy four degrees fifty three minutes East one hundred feet; thence leaving said street line and running along lands of Emil Theiss, South nine degrees no minutes twenty seconds East two hundred seventy seven and eighteen hundredths **feet to a point in the northerly line of the New York, New Haven and Hartford Railroad on a curve; thence along said railroad line, on a curve to the left radius 2914.511 feet, a distance of one hundred feet (the chord bearing being South seventy four degrees twenty two minutes twenty seconds West)** to the southeasterly corner of the abovementioned Partridge and Knapp lands; thence along said lands North nine degrees one minute thirty seconds West two hundred seventy eight and six hundredths feet to the point of beginning." (Pls.' Ex. 83a). | Rebutted, does not apply |

| | | | |
|---|---|---|---|
| Jason Payne:<br>133089-<br>6356-01-<br>212588-0000 | 65/(2) | "RUNNING THENCE along the southerly and westerly side of Mirraas Boulevard the following distances and courses: North 82 degrees 20 minutes East 93.68 feet; South 53 degrees 35 minutes East 37.53 feet and South 17 degrees 19 minutes East 195.53 **feet to the northerly right of way line of the New York, New Haven and Hartford Railroad Company; THENCE along the North line of said right of way line of said railroad, South 82 degrees 10 minutes West 169.20 feet** to the southeasterly corner of lands of Wendover; THENCE along land of Wendover, North 3 degrees 33 minutes 3 seconds West 219.93 feet to the place of BEGINNING."<br><br>(Pls.' Ex. 84a). | Rebutted, does not apply |
| Jeffrey Roosa & Stacey Roosa f/k/a Stacey Van Den Thoorn:<br>133089-<br>6356-03-<br>056496-0000 | 70/(2) | No limiting language identified.<br><br>(Pls.' Ex. 89a). | Applies |
| Richard Tivnan:<br>133089-<br>6356-01-<br>108542-0000 | 84/(2) | "BEGINNING at a point in the southerly line or Ward Place at the most northerly corner of the herein described parcel said point is bearing South 58 degrees 30'00" West 120.00 feet from the northwest corner of lands formerly of Charles Theiss and now or formerly of Carl J. Frey (Liber 1150 cp 327); THENCE running with said road line, South 58 degrees 30'00" West 110.00 feet to a square iron bar found at the most northerly corner of lands now or formerly of John J. Reynolds (Liber 1064 cp 33) THENCE running with the easterly line of said lands, South 15 degrees 22'50" East 224.00 feet to a point in line with 0.09 feet short of another square iron bar found; **THENCE running with the northerly line of the lands of the Consolidated Rail Corp., formerly of the New York, New Haven and Hartford Railroad Co., along a curve to the right having a radius of 2914.43** | Rebutted, does not apply |

| | | | |
|---|---|---|---|
| | | **feet for a distance of 100.18 feet** to the southwest corner of lands now or formerly Hugh H. McDowell (Liber 1006 pg. 429); THENCE running with the west line of said McDowell (Liber 1006 pg. 429) North 14 degrees 03'20" West 247.71 feet to the aforementioned road line and the point or place of BEGINNING . . . ."<br><br>(Pls.' Ex. 102a). | |
| Verdi Boy Realty Group LLC: 130200-6054-37-113729-0000 | 89/(3) | "BEGINNING at a point, said point being the intersection of the southerly line of Main Street with the easterly line of Churchill Street, and running thence along said southerly line of Main Street the following: North 54 degrees 52' 00" East 157.00 feet; and North 53 degrees 27' 10" East 74.90 feet;<br><br>**THENCE along the northerly line of lands, now or formerly Con Rail Corp., the following: along a curve to the right, having a radius of 902.19 feet and being distant westerly 213.47 feet; and North 55 degrees 12' 00" West 15.27 feet;**<br><br>THENCE along said easterly line of Churchill Street, North 47 degrees 55' 30" West 22.53 feet to the point of BEGINNING."<br><br>(Pls.' Ex. 106a). | Rebutted, does not apply |
| ANK Realty Inc.: 133089-6256-04-516255-0000 | 5/(3) | "Beginning in the southerly line of the road from Fishkill to Wiccopee (Route 52) at a point 582 feet more or less westerly from the line of lands formerly of Christie, which point is the northwesterly corner of lands of Knapp, and running thence along the road South 84 degrees 22' West 298 feet more or less, and South 77 degrees 23' West 51 feet more or less to lands of Lanci; thence along side lands of Lanci South 5 degrees 48' East 276.6 **feet more or less to the northerly line of the New Haven Railroad Company; thence along the railroad line easterly 343 feet more or less to the line of lands of Knapp;** thence along said Knapp line North 13 degrees 39' West 280 feet more or less to the place of beginning. BEING | Rebutted, does not apply |

| | | more particularly described by a recent survey made by J. William Komisar, NYS LLC, dated 06/26/2014 and bounded and described as follows:<br><br>All that tract or parcel of land situate in the Town of Fishkill, County of Dutchess, and the State of New York, bounded and described as follows:<br><br>Beginning at a point in the Southerly line of N. Y. S. Route 52, said point being the Northwesterly comer of lands now or formerly Nenni Construction Company, Inc. (Liber 1568, cp 611 ); thence along the Westerly line of the said lands now or formerly Nenni Construction Company, Inc. (Liber 1568, cp 611), South 13-39-00 East 250.60 feet to a point; **thence along the Northerly line of lands now or formerly Midtown Trackage Ventures LLC (Deed Document Number 22007/986)** on a curve to the left having a radius of 3869.33 feet a length of 388.18 feet to a point; thence along the Easterly line of lands now or formerly Gulla (Liber 1650, cp 366) North 5-48-00 West 273.92 feet to a point in the said Southerly line of N.Y.S. Route 52, said point being 4.6 feet, more or less, Southerly from a concrete monument found; thence along the said Southerly line of N.Y.S. Route 52 the following two courses: North 70-01-00 East 52.25 feet to a point and North 77-00-00 East 298.00 feet to the point or place of beginning."<br><br>(Pls.' Ex. 33a). | |
| Ballistic Bodyworks, LLC: 133089-6256-04-634245-0000 | 8/(3) | No limiting language identified.<br><br>(Pls.' Ex. 36a). | Applies |
| Stephanie Devine: 133089- | 24/(3) | No limiting language identified.<br><br>(Pls.' Ex. 49a). | Applies |

| | | | |
|---|---|---|---|
| 6155-17-012230-0000 | | | |
| Dean & Deborah A. DiRubbio: 133089-6155-03-043256-0000 | 26/(3) | "BEGINNING at the southerly line of Petticoat Lane 225 feet East of the easterly line of Winterberry Road, as extended and running thence along Petticoat Lane S 46-14-00 E 273.6 feet **to the northerly line of the Penn Central Railroad, thence westerly along the same on a curve to the right (1512.88 feet) a distance of 331+ feet to a point**, thence N 40 E 233 feet to the place of BEGINNING."<br><br>(Pls.' Ex. 51a) | Rebutted, does not apply |
| Robert & Beverly Dross: 133089-6155-17-003230-0000 | 30/(a) | "[T]hence running along the northerly side of Park Lane in a westerly direction South 83° 50' 00" West 80 feet to Lot 11 on the aforesaid map; thence running along the dividing line between Lot 11 and Lot 10 in Block 1 on the aforesaid map in a **northerly direction North 13° 00' 40" West 205.74 feet to the lands now or formerly of New York - New Haven and Hartford Railroad; thence running along the lands now or formerly of New York – New Haven and Hartford Railroad on a curve to the left with a radius of 1612.[]8 feet and a length of 120.00 feet to Lot 9' in Block 1 on the aforesaid map**; thence running southerly along the division line of Lot 9 and Lot 10 in Block 1 on the aforesaid map, South 2° 17' 11" East 175.46 feet to the northerly side of Park Lane and the point of beginning.<br><br>(Pls.' Ex. 52a). | Applies |
| Michael J. & Rosemary Engel: 133089-6155-17-060233-0000 | 32/(3) | No limiting language identified<br><br>(Pls.' Ex. 54a). | Applies |
| Richard & Marie A. Fonteneou: 133089-6155-17-020229-0000 | 35/(3) | "Thence along the northerly line of Park Avenue, South 83° 50' 00" West 80.00 feet to a point; thence along Lot No. 9, Block 1, on said Filed Map No. 2461, North 02° 24' 48" West 160.78 feet to a point; **thence along lands now or formerly Conrail Corp., On a curve to the left having a radius of 1612.88** | Applies |

| | | | |
|---|---|---|---|
| | | **feet for a distance of 80.00 feet to a point**; thence along Lot No. 7, Block 1, on said Filed Map No. 2461, South 02° 25' 20" East 150.01 feet to the point or place of BEGINNING."<br><br>(Pls.' Ex. 57a). | |
| Vincent Gaglioti & Mary Rodriquez n/k/a Mary Gaglioti: 132800-6457-01-120505-0000 | 36/(3) | **"[T]hence N 26° 25' W 480.37 feet to a point in a wire fence marking the southerly boundary of the lands of the New York, New Haven and Hartford railroad; thence along the last mentioned boundary line N 59° 42' E 236.76 feet to a stake set in the junction of wire fences;** thence along a wire fence marking the west line of lands formerly of Mulford, now of Nelson and others S 16° 07' E 524.38 feet to a point in the north line of the New York State Highway Route #82; thence along the north line of the New York State Highway Route #82 S 71° 24' W 143.71 feet to the point or place of beginning . . . ."<br><br>(Pls.' Ex. 58a). | Rebutted, does not apply |
| Daniel Goodman: 133089-6055-16-828257-0000 | 42/(3) | "[T]hence along the northerly line of Washington Avenue (a/k/a Glenham Avenue) S 88-26-17 W 80.00 feet to a point; **thence along the lands now or formerly Powell, N 03-49-23 W 204.10 feet to a point; thence along the lands now or formerly Consolidated Rail Corp.,** on a curve to the right having a radius of 1096.31 feet a distance of 81.92 feet to a point; thence along the lands now or formerly Nichols, S 03-02-35 E 200.40 feet to the point or place of BEGINNING . . . ."<br><br>(Pls.' Ex. 61a). | Applies |
| Jaime Gordon & Richard Nappi 132800-6457-03-099490-0000 | 43/(3) | "THENCE along the said northerly bounds of N.Y.S. Route No. 82, south 71 degrees 24 minutes west, 126.50 feet to an iron rod found; THENCE turning and running along lands now or formerly of Hayden, north 26 degrees 25 minutes west, 434.39 feet to an iron rod found; **THENCE turning and running along lands now or formerly of Metro North Commuter Railroad Co., north 59 degrees 42 minutes east, 98.31 feet to a point**; THENCE turning | Applies |

| | | | |
|---|---|---|---|
| | | and running along lands now or formerly of Scott, south 26 degrees 25 minutes 06 seconds east, 275.0 feet to an iron rod found; THENCE turning and running along the same, south 75 degrees 54 minutes 49 seconds east, 35.81 feet to a point; THENCE turning and running still along the same, south 26 degrees 25 minutes 06 seconds east, 160.00 feet to the point or place of BEGINNING." <br><br> (Pls.' Ex. 62a). | |
| Alfredo & Marie Gulla: 133089-6256-03-440213-0000 | 46/(3) | "[B]eginning at the Northwestern corner of said parcel, N. 64 degrees 30' E. for a distance of 610.20 feet to a pole, then running North 69 degrees 8' E. for a distance of 219.35 feet then running to a pole; then running N. 70 degrees 50' E. for a distance of 300.95 feet to a pole; then running N. 77 degrees 23'E. for a distance of 243.42 feet to the Eastern corner boundary pole; a distance of 276.00 feet; **then running along the Northerly exterior line of the N.Y. N.H. &H.R.R. Co. to the Westerly boundary pole along an oblique line for 1,462.46 feet**; then running along the tree and fence line of Rowe to Pulombo Bros., in a Northerly direction N. 7 degrees 8'E, for a distance of 332.50 feet." <br><br> (Pls.' Ex. 65a). | Rebutted, does not apply |
| Robert A. Malvarosa: 133089-6155-10-392507-0000 | 53/(3) | "RUNNING THENCE from said point of beginning along said division line between Lots Nos. 59 and 58 on the aforementioned map, South 25° 59' 30" **East 115.00 feet to lands now or formerly New York, New Haven & Hartford Railroad; RUNNING THENCE along said last mentioned lands, South 64° 00' 30" West 80.00 feet to the division line between Lots Nos. 58 and 57 on the aforementioned map;** RUNNING THENCE along said division line, North 25° 59'30" West 115.00 to a point on the southerly side of Van Steuben Road; RUNNING THENCE along the southerly side of Van Steuben Road, North 64° 00' 30" East 80.00 feet to the point and place of BEGINNING." | Applies |

| | | | |
|---|---|---|---|
| | | (Pls.' Ex. 72a). | |
| Mark A. & Christine Matthews: 133089-6055-20-992230-0000 | 54/(3) | "Thence Westerly along the Northerly line of Park Lane South 83-50-00 West 100.00 feet to a point; thence northerly along lands reputedly of the Town of Fishkill North 11-30-10 West 233.56 feet to a point; **thence easterly along lands reputedly of The Consolidated Rail Corporation South 79-57-00 East 101.23 feet to a point**; thence southerly along Lot 10 South 13-00-40 East 205.74 feet to a point on the northerly line of Park Lane and the point or place of beginning." <br><br>(Pls.' Ex. 73a). | Applies |
| Robert Musiello: 133089-6155-00-715730-0000 | 60a/(3) | **"[T]hence from said point of beginning, running along the southerly side of the aforementioned New York, New Haven & Hartford Railroad North 64 ° 40' 40'' East 645.83 feet** to lands now or formerly of Fishkill Properties, Inc.; thence along other lands of Fishkill Properties South 25° 19' 20''·East 123.23 feet, South 48° 42' 20" West 394.68 feet, South 25° 19' 20" East 66.04 feet, South 64 ° 40' 40" West 230.74 feet and North 32° 08' 50" West 300.00 feet to the point and place of BEGINNING . . . ." <br><br>(Pls.' Ex. 79a). | Rebutted, does not apply |
| Robert Musiello: 133089-6155-00-738755-0000 | 60b/(3) | | |
| Robert Musiello: 133089-6155-00-764735-0000 | 60c/(3) | | |
| Linda Nevels f/k/a Linda Slinskey: 133001-6155-11-656717-0000 | 61/(3) | "South fifty-one degrees forty-eight minutes thirty seconds West thirty-seven and forty-five hundredths feet; thence South sixty-one degrees twenty-one minutes thirty seconds West ninety-eight and forty-six hundredths feet, thence South sixty-two degrees forty-three minutes West fourteen and nine hundredths feet; thence with other lands of party of the first part (Ketcham) South twenty-seven degrees seventeen minutes East one hundred five and thirty-six hundredths feet **to the Northerly line of lands of the New York New Haven and Hartford Railroad Company; thence with the said Northerly line of lands of said Railroad Company North sixty-four degrees twenty-one minutes thirty seconds East one hundred** | Rebutted, does not apply |

| | | | |
|---|---|---|---|
| | | **sixty-one and thirty-four hundredths feet** to line of lands of Ainsworth; thence with said line of lands of Ainsworth North thirty-three degrees one minute West one hundred twenty and one tenth feet to the place of beginning." (Pls.' Ex. 80a). | |
| Barbara Reale: 133001-6155-11-665726-0000 | 67/(3) | "[R]unning thence along the westerly line of said Robinson, South 33-01-00 East 142.01 **feet to a point in the northerly line of lands of New York, New Haven & Hartford Railroad Co., South 64-21-30 West 100.42 feet to a point marking the most southerly corner of the herein described parcel** and that most easterly corner of lands now or formerly of Prendergast (Liber 740 cp 559); running thence along the easterly line of said Prendergast, North 33-01-00 West 120.10 feet to a point in the southerly line of the aforementioned Kipp Avenue; running thence along the same, N 51-48-30 E 100.00 feet to the point or place of BEGINNING." (Pls.' Ex. 86a). | Rebutted, does not apply |
| Barbara M. Renza 2020 Irrevocable Trust: 133089-6155-14-378494-0000 | 68/(3) | "South 25 deg. 59' 30" East from a monument and point of curvature in the southerly side of Lot No. 16, as shown on said map, which monument is South 64 deg. 00' 30" West 40 feet from the southeasterly comer of said lot 16; thence on a curve to the right having a radius of 110 feet a distance of 73.89 feet; thence South 16 deg. 38' 28" West 188.88 **feet to a point which is the intersection of the line of lands now or formerly of Hammond and lands now or formerly of New York, New Haven, and Hartford Railroad; thence North 64 deg. 00' 30" East along lands now or formerly of New York, New Haven and Hartford Railroad, 196.33 feet**; thence North 25 deg. 59' 30" West 115 feet to the point or place of beginning . . . ." (Pls.' Ex. 87a). | Applies |
| Rombout Fire District: 133089- | 69/(3) | "[T]hence running along said west line of said Lot Number 7, South 03-33-00 East 50 **feet to a point on the north line of the right of way** | Rebutted, does not apply |

| | | | |
|---|---|---|---|
| 6256-04-574274-0000 | | **of the Central New England Railway Company; thence along north line of said Railroad right of way** South 83-53-00 West 75 feet to a point in the east line of lands now or formerly of Henry Morgenthau1 Jr.; thence North 03-33-00 West 50 feet along said lands of said Morgenthau to a point; thence still along said lands of said Morgenthau North 83-53-00 East 75 feet to the place of BEGINNING."<br><br>(Pls.' Ex. 88a). | |
| Sean Michael Rowan: 133089-6155-10-405517-0000 | 71/(3) | No limiting language identified.<br><br>(Pls.' Ex. 90a). | Applies |
| Richard Runion 133089-6155-17-044231-0000 | 72/(3) | No limiting language identified.<br><br>(Pls.' Ex. 91a). | Applies |
| Anthony & Jessica Russo: 132800-6457-03-107499-0000 | 73/(3) | "RUNNING THENCE north 26 degrees 25 minutes 06 seconds West, 160.00 feet; THENCE North 75 degrees 54 minutes 49 seconds West, 35.81 feet; THENCE North 26 degrees 25 minutes 06 seconds West, 275.00 feet; **THENCE North 59 degrees 42 minutes 00 seconds East, 126.29 feet;** THENCE South 26 degrees 25 minutes 07 seconds East, 480.37 feet to a point on the northerly side of New York State Route 82; THENCE along the northerly side of New York State Route 82, South 71 degrees 24 minutes 00 seconds West, 99.70 feet to the point or place of BEGINNING."<br><br>(Pls.' Ex. 92a). | Applies |
| Mary Ann Schetter Irrevocable Trust Agreement dated 8/27/2019: | 74/(3) | "[R]unning thence along the southwesterly line of Petticoat Lane S 47 degrees 22' 20" E 37.50 feet to a point; thence leaving said line and running through lands of parties of the first part (Goldsmith) S 38 degrees 51' 40" W **277.10 feet to a point on the northerly line of lands of the New York, New Haven and Hartford** | Rebutted, does not apply |

| | | | |
|---|---|---|---|
| 133089-6155-03-018271-0000 | | **Railroad, on a curve convex to the south, having a radius of 1512.88 feet and a length westerly of 42.03 feet to a point**; thence leaving said line and running along the southerly line of lands of Noel and Patricia Schetter and along the southerly line of lands of the party of the second part N 38 degrees 51' 40" E 296.03 feet to the point of beginning . . . ." <br><br> (Pls.' Ex. 93a). | |
| Adolph J. Schetter: 133089-6055-16-994262-0000 | 75/(3) | "**BEGINNING at** an iron pipe set at the southernly corner of lands of Gordon Schetter and running thence with the line of lands of Archibald S 40 deg. W 161.03 feet to a pipe set in the northerly line of the New York, New Haven & Hartford Railroad Company; **thence with lands of said Railroad Company the following courses and distances on a curve to the right (radius 1512.88 feet) in a general westerly direction 140.21 feet**; thence N 67 deg. 2' W 167.49 feet to the easterly bank of the Fishkill creek; thence down along the easterly bank of the Fishkill Creek the following course and distances: N 42' 26" E 125.58 feet; thence N 2 deg. 41' 39" W 59.99 feet; thence N 44 deg. 56' 50" W 61.14 feet; thence N 16 deg. 5' 10" E 7.79 feet; thence with line of lands of Archibald S 85 deg. 47' 30" E 238 feed to an iron pin set at the westerly corner of lands of Fitzgerald; thence with lands of Fitzgerald and line of lands of Noel and Patricia Schetter S 41 deg. 2' 40" E 196.62 feet; thence with line of lands of Gordon Schetter S 45 deg 43' E 90 feet to the place of beginning." <br><br> (Pls.' Ex. 94a). | Applies |
| Diane Sherwood: 133089-6155-03-075268-0000 | 78/(3) | No limiting language identified. <br><br> (Pls.' Ex. 97a). | Applies |
| Cynthia Simmons: 130200- | 79/(3) | [R]unning with that land South 27° East **117 feet to the exterior line of the New York, New Haven and Hartford Railroad** | Rebutted, does not apply |

| | | | |
|---|---|---|---|
| 6055-04-625271-0000 | | **company; thence with said exterior line in a parallel line with the center line of said railroad** and 49 1/2 feet distant northwesterly therefrom westerly about 290 feet to the southeasterly side of Fishkill Avenue; thence along the same North 57° East 275 feet to the place of BEGINNING."<br><br>(Pls. Ex. 98a). | |
| Zachary Solomon & Amanda Berman: 133089-6055-16-839257-0000 | 81/(3) | "BEGINNING at a point, said point being the intersection of the westerly line of Bridge Street with the northerly line of Washington Avenue, and RUNNING THENCE along said northerly line of Washington Avenue S 88-26-17 W 150.00 feet; THENCE along the easterly line of Moseman N 03-20-35 W 200.40 feet; **THENCE along the southerly line of lands now or formerly Consolidated Rail Corp., along a curve to the right having a radius of 1096.28 feet and being distant easterly 150.00 feet**; THENCE along the said westerly line of Bridge Street S 04-09-05 E 178.00 feet to the point of BEGINNING."<br><br>(Pls.' Ex. 100a). | Rebutted, does not apply |
| Anthony R. Thomaselli: 133089-6155-11-631696-0000 | 83/(3) | "BEGINNING at a point in the southerly line of Kipp Avenue said point being distant southwesterly 535.00 feet from the intersection of the said southerly line of Kipp Avenue with the westerly line of Blodgett Road and running thence with the said southerly line of Kipp Avenue the following courses and distances: South 65° 20' West 26.4 feet; thence South 68° 44' 40'' West 58.6 feet; thence with lands of party of the first part (Ketcham) **South 24° 27' 40" East 107.47 feet to the northerly line of lands of the New York New Haven and Hartford Railroad Company; THENCE with the said northerly line of land of said Railroad Company North 64° 21' 30" East 85.00 feet:** THENCE with other lands of party of the first part (Ketcham) North 24° 30' 20" West 102.54 feet to the place of BEGINNING."<br><br>(Pls.' Ex. 101a). | Rebutted, does not apply |

| | | | |
|---|---|---|---|
| David Van Voorhis, Donald Van Voorhis, and Susan Murray: 133089-6256-03-232018-0000 | 88/(3) | "BEGINNING at an iron pipe set in the southerly line of the State Road leading from Fishkill Village to Brinckerhoff at the Northwesterly corner of lands of Horton and running thence with line of lands of Horton the following courses and distances, South nine (9) degrees ten (10) minutes East three hundred (300) feet; thence North seventy two (72) degrees fifty eight (58) minutes thirty (30) seconds East two hundred (200) feet to line of lands of Palumbo; thence with line of lands of Palumbo South nine (9) degrees ten (10) minutes East one hundred sixty seven (167) **feet to the Northerly line of lands of the New York, New Haven and Hartford Railroad Co., thence with the Northerly line of the New York, New Haven and Hartford Railroad Co. in a general Westerly direction two thousand one hundred eighty five** (2185) feet more or Less to the Easterly line of lands of Ursulla Hotel Corporation; thence with the Easterly line of the Ursulla Hotel Corporation North thirteen (13) degrees twelve (12) minutes West one thousand two hundred seventy (1270) feet more or less to the inter section of the Easterly line of lands of the Ursulla Hotel Corporation . . . ." (Pls. Ex. 105a). | Rebutted, does not apply |
| 334 Fishkill Ave., LLC: 130200-6054-23-284922-0000 | 2/(4) | No limiting language identified. (Pls.' Ex. 30a). | Applies |
| KAP Realty NY, LLC: 130200-6054-23-280919-0000 | 50/(4) | "[T]hence running N87° 14' 46" E 23.00' to a point thence running N81° 45' 46"E 96.82' to a point. Thence running S06° 47'16"E 120.85' along lands now or formerly 334 Fishkill Ave LLC to a point. **Thence running S67° 40'50"W  88.09' along lands now or formerly Metro-North to point. Thence running N22 ° 19'10"W 24.50' to a point.** Thence still running along lands now or formerly Niche Modern LLC S67°31'50"W 32.00' to a point. Thence running N06°07'00"W 128.58' along lands now or | Applies |

| | | | |
|---|---|---|---|
| | | formerly 326 Fishkill Avenue LLC to the point of BEGINNING." (Pls.' Ex. 69a). | |
| Anne Provet: 130200-6054-23-374946-0000 | 66/(4) | "BEGINNING in the northerly line of Liberty Street at the easterly comer of Lot #11, and running thence along Lot #11 , North 27 degrees 34' West 225 feet to the back of the creek; **THENCE up and along the creek easterly 100 feet to the extension of the easterly line of Lot #15**; THENCE South 27 degrees 34' East 104 feet to land reserved by Navarro (818 Deeds, page 387); THENCE along the same South 62 degrees 26' West 84 feet; and South 27 degrees 34' East 84 feet to the northerly line of Liberty Street; THENCE along the same, South 62 degrees 26' West 16 feet to the place of BEGINNING." (Pls.' Ex. 85a). | Applies |
| Geraldine Cheverko: 56.8-1-11 | 15/(4) | "THENCE of an iron pin, South 43° 04' 15" West 70.21 feet, THENCE on a curve to the left having a radius of 50' 46.52 feet to an iron pin and then the southeasterly comer of premises being described, THENCE North 47° 59' 45" West 91.91 feet to an iron pin, THENCE North 87° 26' 45" West 34.50 feet to a point on the easterly side of Pump House Road, THENCE along the easterly side of Pump House Road, North 2° 33' 15" East 98.19 feet to an iron pin, **THENCE along lands now or formerly of Penn Central Railroad, New Haven Division**, THENCE on a curve to the left having a radius of 3174.88', 85.21 feet to an iron pin, THENCE along the southerly line of Lot No. 4, South 39° 43 ', 30" East 183.21 feet to an iron pin at the westerly side of Fairview Road to the point and place of BEGINNING." (Pls.' Ex. 42a). | Applies |
| Robin Greene: 56.27-1-5 | 44/(4) | No limiting language identified. (Pls.' Ex. 63a). | Applies |

| | | | |
|---|---|---|---|
| Wilson Morales: 56.27-1-6 | 59/(4) | No limiting language identified.<br><br>(Pls.' Ex. 78a). | Applies |
| Robert C. Kalbfell Revocable Trust and Nanci Pinto Kalbfell Revocable Trust: 13.-2-12 | 48/(5) | "THENCE along said lands of Peck the following courses and distances: North 87° 33' 26" West 32.21 feet; North 68° 34' 29" West 60.17 feet; North 62° 13' 22" West 10.45 feet and North 75° 08' 44" West 82.04 **feet to a point in the easterly side of the right of way of the New York-New Haven and Hartford Railroad Company; THENCE along said lands of said railroad company and along a post and wire fence the following courses and distances**: North 9° 10' 35" West 241.86 feet; North 8° 11' 28" West 32.85 feet; North 9° 05' 22" West 262.30 feet to a point in the southerly boundary line of lands now or formerly of Rogers; THENCE along said lands of Rogers on a course North 86° 09' 29" East 206.30 feet passing through two iron pins set in the ground to a third iron pin set in the westerly side of said public highway; THENCE along the westerly side of said public highway, the following courses and distances: South 2° 04' 28" East 52.74 feet; South 7° 57' 21" East 147.86 feet; South 3° 21' 29" West 122.61 feet; South 4 ° 08' 59" East 14 7 .86 feet; South 3°· 21' 29" West 122.61 feet; South 4 ° 08' 59" East 141.55 feet and South 12° 59' 53" East 134.08 feet to the point or place of BEGINNING."<br><br>(Pls. Ex. 67a). | Applies |
| Anthony Luca & Filomena Didomenico: 13.-2-14 | 52/(5) | "RUNNING THENCE along said land now or formerly of Rogers, north 88 degrees 21 minutes 59 seconds west, 91.20 feet, south 88 degrees 10 minutes 01 second west, 168.21 **feet to land now or formerly of the New York, New Haven and Hartford Railroad Company; THENCE along said land, north 14 degrees 18 minutes 29 seconds west, 34.23 feet, north 17 degrees 52 minutes 29 seconds west, 134.49 feet to a fence post** and lands now or formerly of Cushman; THENCE along said land now or formerly of Cushman, north 00 degrees 30 minutes 49 seconds west, 132 | Applies |

| | | | |
|---|---|---|---|
| | | feet to a drilled hole and lands now or formerly of O'Hara; THENCE along said lands now or formerly of O'Hara, north 88 degrees 14 minutes 00 seconds east, a distance of 311.01 feet to an iron pin at the westerly side of Route Nos. 216 and 311; THENCE along said westerly side of Route Nos. 216 and 311, south 05 degrees 15 minutes 11 seconds west, 7.15 feet and south 00 degrees 00 minutes 01I second west, 292.85 feet to the point or place of BEGINNING."<br><br>(Pls. Ex. 71a). | |
| Matthew & Catherine Castellano: 13.-2-19 | 14/(5) | No limiting language identified.<br><br>(Pls.' Ex. 41a). | Applies |
| Gavin & Louise Skinner: 132800-6557-03-435119-0000 | 80/(5) | "Thence along the northerly line of N.Y.S. Route 52, North 88-07-00 West 51.91 feet to a point; Thence along lands now or formerly Silveri (Doc. #2005-10707) and generally along the remains of a wire fence, North 17-28-55 East 347.29 feet to a point; Thence continuing along lands now or formerly Silveri (Doc. #2005-10707), North 81-41-00 West 250.41 feet to a point; Thence along lands now or formerly Nicolari (Doc. #2000-1987), along lands now or formerly Beal (Doc. #1999-10589), along lands now or formerly Large LLC (Doc. #2004- 2338) and along a stone walk North 13-45-00 East 7.68 feet, North 17-46-00 East 61.23 feet, North 15-03-00 East 83.00 feet and North 15-59-00 East 303.95 feet to a point; **Thence along lands now or formerly Metro North Commuter Railroad Company (Liber 1956 page 339), South 80-29-00 East 412.44 feet to a point**; Thence along lands now or formerly Tucker & Gosen (Liber 1994 page 116) and along a stone wall, South 70-40-00 East 117.29 feet to a point; Thence along lands now or formerly White (Liber 1661 page 217) and along a stone wall, South 15-23-00 West 77.50 feet, South 11-10-00 West 21.50 feet, South 17-14-00 West 43.60 feet, South 11-18-00 West 52.00 feet, South 17-12-00 West 60.00 feet and South 14- | Applies |

| | | | |
|---|---|---|---|
| | | 19-00 West 168.17 feet to a point; Thence along Parcel I as shown on said Filed Map No. 3928, North 81-41-00 West 232.62 feet to a bent iron pin found, South 38-45-50 West 35.93 feet to an iron pin found and South 17-28-55 West 310.00 feet to the point or place of beginning."<br><br>(Pls.' Ex. 99a). | |
| Brache-Lanza Family Trust: 13.-2-61.1 | 10/(5) | "RUNNING THENCE along the line of said lands now or formerly of Amanda C. Hoffman along a stone wall, North 80 degrees 1 7 minutes 40 seconds West, 163.18 feet and North 81 degrees 35 minutes 40 seconds West, 405.14 feet to the easterly side of Cushman Road; THENCE along the easterly side of Cushman Road, North 02 degrees 51 minutes 00 seconds East, 210.20 feet, North 01 degree 18 minutes 00 seconds East, 201.40 feet and North 04 degrees 24 minutes 03 seconds East, 117.69 feet to lands now or formerly of Keith and Juliet Irvine; THENCE leaving said road and running along said lands now or formerly of Keith and Juliet Irvine, **North 86 degrees 52 minutes 30 seconds East. 601 .96 feet to the westerly exterior line of said lands now or formerly of Con-Rail Corp; THENCE along the line of said lands, South 06 degrees 13 minutes 10 seconds West, 585.99 feet to the point of BEGINNING.**"<br><br>(Pls.' Ex. 38a). | Rebutted, does not apply |
| William Antalek: 132800-6657-03-145245-0000 | 6/(5) | "South 05 degrees 24' 33" West 184.80 feet; thence North 81 degrees 50' 27" West 59.40 feet; thence South 05 degrees 24' 33" West 178.20 feet to a point; **running thence along lands now or formerly of Metro North Commuter Railroad Company South 77 degrees 58' 49" West 219.74 feet to a point;** . . . North 01 degrees 00' 00" East 445.50 feet to a point running thence in the midst of Seaman Road a/k/a Back Road) South 83 degrees 00' 00" East 243.99 feet; thence South 05 degrees 24' 33" West 8.59 feet; thence along the southerly line of Seaman road (a/k/a Back Road) South 81 degrees 50' 27" East | Applies |

| | | | |
|---|---|---|---|
| | | 59.40 feet to the point or place of BEGINNING." (Pls.' Ex. 34a). | |
| Paul T. Brady Revocable Trust & Donna R. Brady Revocable Trust: 132800-6657-03-226236-0000 | 11/(5) | No limiting language identified. (Pls.' Ex. 39a). | Applies |
| Michael Gallo, Jr.: 132800-6657-03-195259-0000 | 37/(5) | "[T]hence, South 79 degrees 22' 30" East along the southerly side of said highway, 196.90 feet; thence continuing along the southerly side of said highway, South 77 degrees 41' 30" East 129.55 feet; thence continuing along the southerly side of said highway, South 77 degrees 02' 00" East 492.95 feet to a point; **thence, South 79 degrees 20' 00" West 930.05 feet to a point**; thence along a fence, North 8 degrees 50' 10" West 178.20 feet; thence, South 78 degrees 24' 50" East 59.40 feet; thence, North 8 degrees 50' 10" East 184.80 feet to the point or place of BEGINNING." (Pls.' Ex. 59a). | Applies |
| The Mikiel Family Trust: 132800-6657-03-208229-0000 | 57/(5) | No limiting language identified. (Pls.' Ex. 76a). | Applies |

48

3.      The Maybrook Trail

The United States also moves for summary judgment on the basis that several Plaintiffs are unable to establish both causation and just compensation due to the existence of the "Maybrook Trail."[10] (Def.'s Mot. at 34–38). The Maybrook Trail, which runs along several of the subject properties to this litigation, was opened in 2020 (predating the NITU), and is currently being utilized as a pedestrian walking and biking trail. (*Id.* at 34; Pls.' Reply at 20 ("It is not disputed that there is a trail on part of the corridor that is subject to the NITU.")). First, the United States posits that the Group D Plaintiffs cannot establish causation, because the Maybrook Trail makes it impossible for Plaintiffs to prove "that the STB's NITU has taken something from the Group D landowners . . . [as the] pre-existing use of the railroad corridor for walking and biking" would continue even in the



Image of the Maybrook Trail (Def.'s Mot., Ex. 4 at 8, ECF No. 43-4)

NITU's absence. (Def.'s Mot. at 35–36). Second, the United States argues that Plaintiffs are unable to meet their burden of proof on the element of just compensation. (*Id.* at 36–38).

### i.    **Causation**

For its causation argument, the United States first points to *Caquelin*. (Def.'s Mot. at 35). The *Caquelin* court held that "a NITU does not effect a taking if, even in the absence of a NITU, the railroad would not have abandoned its line (a necessary prerequisite for termination of the easement under state law) during the period of the NITU." *Caquelin*, 959 F.3d. at 1363. This is because, in such circumstances "the NITU takes nothing from the landowner that the landowner would have had in the absence of the NITU." *Id.* Relying on this principle, the United States argues that "there can be no taking if the Plaintiffs would never have their land back unencumbered by a trail but for the NITU[.]" (Def.'s Mot. at 35). However, the land's current encumbrance by the Maybrook Trail does not constitute evidence that the Railroad would not, in

---

[10] The United States asserts this argument for twenty-three (23) of the claims in this matter ("Group D"). (*See* Def.'s Ex. 4, ECF No. 43-4). This grouping does not correlate with any of Plaintiffs' groupings.

fact, have abandoned its line absent the NITU. Instead, the Court must consider a variety of factors to properly discern the Railroad's intent. *See Sauer West*, 151 F.4th at 1346.

Pursuant to the Trails Act, the "railbanking" process typically begins when the rail carrier files either an abandonment application or a request for an exemption with the STB. *Caldwell v. United States*, 391 F.3d 1226, 1229 (Fed. Cir. 2004 (citing 49 U.S.C. §§ 10903, 10502)). Upon the STB's approval and publication of the notice of exemption, any potential trail operator can file a railbanking petition which must include "(1) a map of the right-of-way, (2) a statement indicating that the trail operator will assume financial and legal liability for the right-of-way, and (3) an acknowledgement that the right-of-way may be reactivated for railroad use in the future." *Id.* (citing 49 C.F.R. § 1152.29(a)). Assuming the petition meets the proper criteria, and the railroad agrees to negotiate with the petitioner, the STB will issue a NITU which permits the railroad "discontinue service, cancel tariffs, and salvage track and other equipment . . . without consummating abandonment[.]" *Id.* A taking is accomplished when the NITU blocks state law reversionary property interest that would otherwise take effect pursuant to normal abandonment proceedings. *Caquelin*, 959 F.3d at 1363 (citing *Caldwell*, 391 F.3d at 1236)). When no trail-use agreement has been reached, but the NITU compels the railroad to delay its abandonment, the issuance of a NITU may effect a temporary physical taking. *Ladd*, 630 F.3d at 1023–24. In the absence of a trail use agreement, it must be clearly shown that the railroad intended to abandon its lines during the NITU period but was prevented from doing so by the existence of the NITU. *Memmer*, 50 F.4th at 145.

In order reach the question of whether the Plaintiffs here have established causation, the Court must first determine the proper analytical framework as set forth by the Federal Circuit. A NITU alone is not sufficient to establish that the government has caused a taking; the Court should take a totality of the circumstances approach to discern "whether [the railroad] would have consummated abandonment in the absence of the NITU." *Sauer West*, 151 F.4th at 1346. In *Sauer West*, the Circuit discussed many different factors that the Court could consider when seeking to discern the railroad's intent; these factors included things such as (1) the railroad's request to abandon the line; (2) refusing to consent to an extension of the NITU; (3) abandonment of the line within months of the NITU's expiration; (4) whether the NITU authorized track removal during the NITU period; and (5) whether the railroad did in fact remove tracks. *Id.* (citing *Caquelin*, 959 F.3d at 1373; *Memmer*, 50 F.4th at 145 (comparing different factors considered in *Caquelin* and *Memmer*)). The Circuit, however, pointed out how in *Sauer West* the Claims Court considered additional factors beyond those listed in *Caquelin*, including: (1) six one-year extensions to negotiate the trails agreement; (2) improvements to the Line; (3) no removal of tracks; (4) railcar storage on the line; (5) negotiations with other parties to reopen the Line, and (6) the eventual decision not to abandon. *Id.* (citing *Sauer West v. United States*, 168 Fed. Cl. 49, 68 (2023) (finding plaintiffs had not demonstrated that the railroad would have abandoned the line and therefore failed to establish causation)).

Notably, none of these cases state that a plaintiff is unable to recover damages due to their land being encumbered by a trail that pre-existed the NITU. The Circuit's focus has always been on the NITU's issuance and, in the absence of a trail use agreement, the railroad's intent, or lack thereof, to abandon the rail line. For these reasons, the Court does not find the United States' arguments persuasive, as they appear to suggest that real-world conditions—namely, the Maybrook Trail—eliminate the need to apply the totality-of-the-circumstances approach

articulated by the Circuit. The United States' reliance on *Loveridge* only heightens the Court's concerns with its position.

The United States contends that the "real-world conditions" of this case are comparable to the circumstances in *Loveridge v. United States*. (Def.'s Mot. at 34 (citing *Loveridge v. United States*, 174 Fed. Cl. 379, 389–90 (2024), *appeal docketed*, No. 25-1244 (Fed. Cir. Dec. 4, 2024)). Specifically, the United States argues that "[t]he construction of and continued maintenance of the Maybrook Trail is inconsistent with an intent to abandon MNR's property rights in this corridor." (*Id.* at 36). To start, the United States' suggestion that MNR's "construction and continued maintenance" of the Maybrook Trail is somehow indicative of MNR's intent not to abandon the rail line is simply illogical. (*Id.*). The purpose of the Trails Act is to "preserve the right-of-way for future use, and, in the interim, convert the corridor into a recreational trail[;]" a railroad acting in accordance with the Act's stated purpose does not preclude the Court from finding a taking occurred. *Dimarino*, 2025 WL 2985487, at *2 (Fed. Cl. May 13, 2025) (quoting *Chicago Coating Co. LLC v. United States*, 892 F.3d 1164, 1167 (Fed. Cir. 2018) (internal citation omitted)).[11] It is hardly surprising that MNR—having volunteered to assume financial and legal responsibility for the proposed trail—would take steps to ensure that its pre-existing trail remained serviceable. Moreover, had a trail-use agreement already been executed and a trail constructed pursuant to that agreement, MNR's actions would be entirely consistent with, if not expected of, a trail sponsor. In any event, maintenance of the Maybrook Trail is fundamentally distinct from the continued maintenance of the rail line itself, and the former provides no basis for concluding that the Railroad would not have abandoned the line.

The Court also finds United States' comparison of the present case to *Loveridge* lacking. In *Loveridge*, the Port of Tillamook Bay Railroad ("POTB") entered a third-party contract to operate a scenic train known as the "Oregon Coast Scenic Railroad" ("OCSR") prior to the issuance of the NITU. *Loveridge*, 174 Fed. Cl. at 388. OCSR did not conduct freight services but instead was established to educate the public about railroad's logging history. *Id*. Because the language of POTB's easements were broad, the decision to enter a third-party contract with OCSR would most likely not have exceeded the scope of their easement. *See id.* at 390 (citing *Loveridge v. United States*, 150 Fed. Cl. 143, 150 (2020)).[12] However, this issue was never properly before the Court.

---

[11] The United States also argues that there can be no causation because "MNR has not elected to consummate abandonment of [the rail] line." (Def.'s Mot. at 40). But this argument fails for the same reasons, namely MNR has not consummated abandonment because it continues to pursue a trail-use agreement, but this is an expected part of the railbanking process and does not resolve the question of whether a taking occurred. *See Galt Auto.*, 2025 WL 3012202, at *4.

[12] Interestingly, during the liability phase of the litigation, neither party disclosed OCSR's existence which resulted in a finding by Judge Firestone that a taking had occurred. *Loveridge*, at 389. During a subsequent site visit to the rail line, the Court was surprised to find the scenic train operating on the subject rail line. *Loveridge*, 174 Fed. Cl. at 389. The existence of the scenic

To be clear, *Loveridge* was concerned with the possibility that the railroad's third-party agreement with OCSR was a use contemplated by the broad scope of the subject easement. *Loveridge*, 174 Fed. Cl. at 390 ("[T]he scenic rail was in operation on the same rail corridor prior to and after the issuance of the NITU . . . I certainly think it impacts the decision of whether there was a taking to begin with."). This is not the same scenario, and the United States' arguments fail to comport with the Court's analysis in *Loveridge*. Here, the United States is not arguing that the Maybrook Trail is a use contemplated by the underlying easement, rather it asserts that the mere existence of the trail prevents the Plaintiffs' from establishing causation because their land would remain encumbered. (Def.'s Mot. at 35). Again, the government's position elevates the effects of "real-world conditions" over the express terms of the railroad's deed. Under this reasoning, a railroad could hypothetically construct a trail despite deed language limiting its interest to railroad purposes, and later, when seeking to abandon the line, argue that the plaintiffs cannot establish causation because their property would remain encumbered even in the absence of the NITU. The *Loveridge* decision made no such finding, and the United States has not cited any case supporting this approach. Adopting it would create a loophole that would allow the United States to avoid paying just compensation after depriving property owners of the reversionary interests to which they are entitled. Having clarified the proper analysis set forth by the Circuit, the Court proceeds to determine whether the Plaintiffs have established causation.

First, MNR filed an abandonment application with the STB, reflecting its intent to abandon the rail corridor. (Pls.' Mot., Ex. 6, ECF No. 38-6). It is clear from the filings that MNR is filling the shoes of the trail operator. MNR states that it acknowledges that use of the line "is subject to MNR, as owner and sponsor of the proposed trail," and that it is assuming responsibility for any financial and legal liability that may arise. (Pls.' Mot., Ex. 6 at 4). MNR also acknowledged that the right-of-way will be subject to potential reactivation of the rail line. (*Id.* at 5). MNR's application was accepted, which led to the STB's issuance of a NITU. (Pls.' Mot., Ex. 7, ECF No. 38-7). Upon approving MNR's Abandonment Application, the STB specifically notes that "MNR is both the owner of the Line and the trail sponsor, [therefore] the negotiations that normally take place to reach a trail use agreement as contemplated under 49 C.F.R. § 1152.29 may not be needed." (*Id.* at 2).

Second, MNR has on several occasions stated its intent to abandon the line to pursue recreational trail use to the STB. (*See* Pls.' Ex. 26 at 4 ("This Verified Notice concerns MNR's planned abandonment of the [rail line]"), 5 ("MNR intends to consummate the proposed abandonment[.]"), and 6 ("MNR is seeking abandonment of the Line")).[13] In the absence of convincing evidence to the contrary, these statements strongly indicate MNR's intent to abandon the rail line. *See Galt Auto.*, 2025 WL 3012202, at *4 ("MNR's self-expression of its intent to

---

train, previously unknown during the liability stage, raised questions about whether a taking had, in fact, occurred. *Id.* at 390. The Court expressed significant concern that this information had not been expressly presented during the liability phase and noted that the scenic train "may have altered the liability outcome." *Id.* at 390.

[13] Citations to page numbers are those assigned by CM/ECF.

abandon, and the United States failure to rebut the presumption of abandonment, left no doubt that a taking had in fact occurred.") (citing *DiMarino*, 2025 WL 2985441, at *3).

To rebut this presumption, the United States submits a Declaration from Susan Sarch, former Vice President and General Counsel for MNR, in which she states:

> MNR uses the existing rail yard near Hopewell Junction and portions of the Beacon Line property for storage of equipment and materials used in MNR's provision of commuter rail service on its active rail lines; however, MNR does not use the Beacon Line for any other purposes except for fiber optic communication (there is a fiber optic cable spanning the entire Beacon Line).

(Decl. of Susan Sarch, at ¶ 19, ECF No. 43-6). There also does not seem to be any evidence that MNR has removed any tracks, even from along the areas alongside the Maybrook Trail. (Def.'s Mot. at 41). Even so, while MNR has sought and obtained a one-year extension of the NITU, the United States acknowledges that service on the rail line has been discontinued for some time now. (Def.'s Mot. at 40 ("[T[here is no dispute that service on the Beacon Line has only been discontinued[.]")).

The Court finds that the United States has not presented evidence "affirmatively indicating the railroad would have delayed abandonment . . . had there been no NITU[.]" *Sauer West*, 151 F.4th at 1346. MNR's fiber optic cable and use of one rail yard are insufficient to find in favor of the United States. Plaintiffs, however, have demonstrated that MNR would have abandoned the rail line absent the NITU. Again, MNR's statements and reaffirmance support this finding. (*See* Pls.' Ex. 26). Therefore, the Court **DENIES** the United States' Motion as to causation. Additionally, while the United States moved for summary judgment as to causation specifically as to Group D Plaintiffs, the Court's finding is also applicable to any Plaintiffs outside of this Group who have successfully demonstrated an interest in the rail corridor. Therefore, the Court **GRANTS** partial summary judgment, as to causation, for any Plaintiff who has demonstrated a property interest as discussed earlier in this decision.[14]

## ii. <u>Just Compensation</u>

Next, the United States argues that the Plaintiffs cannot meet their burden of proof as to just compensation because their expert reports failed to account for the Maybrook Trail. (Def.'s Mot. at 36–38). According to the United States, Plaintiffs' expert ("Mr. Nordine") was expressly instructed by legal counsel "*not* to consider [the Maybrook Trail] in the 'Before' scenario of his appraisal reports." (*Id.* at 37 (emphasis in original)). Therefore, the United States claims that Mr. Nordine's reports fail to provide an opinion of market value that incorporates the Maybrook Trail but instead are based on a "counter-factual Hypothetical Condition" that the land within the corridor is unencumbered. (*Id.*).

---

[14] For Plaintiffs whose property interests have not yet been determined, this finding would be instructive if those interests are established.

Where a taking has been established, property owners bear "the burden of proving an actual loss has occurred" to determine just compensation. *Otay Mesa Prop., L.P. v. United States*, 779 F.3d 1315, 1323 (Fed. Cir. 2015). Landowners bear the burden of establishing a railroad corridor's value, which is a factual inquiry. *Memmer v. United States*, 150 Fed. Cl. 706, 753–54 (2024). Landowners bear the burden of establishing the value of the railway corridor. *Hyatt v. United States*, 170 Fed. Cl. 417, 432 (2024) (internal citations omitted). Property owners meet this burden if they show actual damages "with reasonable certainty." *Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005). This "requires more than a guess, but less than absolute exactness." *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 833 (Fed. Cir. 2010).

The Federal Circuit has recognized that traditional compensation methods are not exclusive, and that alternative valuation approaches may be appropriate in cases involving the taking of an easement. *See Vaizburd v. United States*, 384 F.3d 1278, 1285–87 (Fed. Cir. 2004); *see also Yaist v. United States*, 17 Cl. Ct. 246, 257 (1989) ("[t]he court may use its judgment in selecting the method to determine fair market value."). In ruling on disputes over valuation standards in takings cases, the Court is cognizant of the guiding principle that "just compensation should be carefully tailored to the circumstances of each particular case." *Otay Mesa Prop., L.P. v. United State*s, 670 F.3d 1358, 1368 (Fed. Cir. 2012). The Court seeks "the full monetary equivalent" of the property interest taken to ensure that property owners receive just compensation under the Fifth Amendment. *Almota Farmers Elevator & Whse. Co. v. United States*, 409 U.S. 470, 473–74 (1973).

In rails-to-trails cases, the Court uses the "before and after" method of assessing damages where just compensation equals the difference in market value of the land before and after the easement is imposed. *Otay Mesa Prop., L.P.*, 670 F.3d at 1364. Although "the 'conventional' method" of valuing an easement "is the 'before-and-after' method, i.e., 'the difference between the value of the property before and after the Government's easement was imposed[,]' . . . there may be appropriate alternative valuation methods for the taking of an easement." *Id.* at 1364 (internal quotes omitted); *see Balagna v. United States*, 138 Fed. Cl. 398, 404 (2018).

The Court may exclude legal restrictions in calculating the "before and after" condition of properties. In *Moore v. United States*, the Court held that "fair market value of the entire affected parcel [is determined] as if the easement did not exist and then another determination in light of the taking." 54 Fed. Cl. 747, 749 (2002). The next year, this Court went on to explain that the "before and after" calculation requires "a determination of the fair market value of the entire affected parcel as if the easement did not exist and then another determination in light of the taking." *Illig v. United States*, 58 Fed. Cl. 619, 624 (2003) (citing *Moore*, 54 Fed. Cl. at 749)). In 2011, the Court held:

> [T]he extent of the taking depends not on plaintiffs' property interests at the time of the NITU, but rather "upon the nature of the state-created property interest that petitioners would have enjoyed absent the federal action and upon the extent that the federal action burdened that interest." This view is consistent with well-settled Federal Circuit precedent that "[t]he taking, if any, when a railroad right-of-way is converted to interim trail use under the Trails Act occurs when state law reversionary property interests that would

otherwise vest in the adjacent landowners are blocked from so vesting." Because the easement would have reverted back to plaintiffs under state law, the fee simple value of plaintiffs' properties is the appropriate starting point in a damages analysis for just compensation; the appropriate measure of damages is the difference between the value of plaintiffs' land unencumbered by a railroad easement and the value of plaintiffs' land encumbered by a perpetual trail use easement subject to possible reactivation as a railroad.

*Raulerson v. United States*, 99 Fed. Cl. 9, 12 (2011) (internal citations omitted).

Regardless of how value is calculated, it must account for the physical condition of the property at the time of the taking. *See Rasmuson v. United States*, 807 F.3d 1343, 1345–46 (Fed. Cir. 2015) ("[T]he fair market value of the land includes the physical remnants of the railway that would have remained on the landowners' property but for the issuance of the NITUs[.]" "[A] 'before' calculation that does not account for the costs of removing the physical remnants of the railway will result in an artificially inflated value and yield a windfall to the landowner."). In *Rasmuson*, the parties disagreed whether the "before" condition should include the remnants of the railroad's use, including earthen embankments, ties, and poor soil conditions. *Id.* The Federal Circuit found that the "before" condition "has to account for [the] physical conditions," of the land when "[a]bsent the NITUs, the land would have returned to the landowners," with those physical conditions. *Id.* at 1346. *Rasmuson* and analogous decisions make clear that the "before" condition distinguishes between land free of legal encumbrances and land free of the tangible, physical traces left by a railway. *See id.* The relevant real-world context for the "before" condition is the property's actual physical state, unburdened by the easement created by the NITU.

Plaintiffs argue that the Maybrook Trail does not impact the just compensation and simply cites to several cases generally holding that the "[b]efore condition is considered unencumbered with any railroad purpose easement." (Pls.' Reply at 30 (citing multiple cases)). However, because of the preceding analysis, Plaintiffs' statement is oversimplified.[15]

Upon review of the entire record, the Court finds that overlooking the Maybrook Trail would obscure the fact that the trail does in fact exist. A fundamental principle of just compensation is that the public must not pay property owners more than the value of what they have actually lost. *Bauman v. Ross*, 167 U.S. 548, 574 (1897) (explaining that an owner "is entitled to receive the value of what he has been deprived of," and that awarding more "would be unjust to the public"). In this case, the Maybrook Trail was constructed before the NITU,

---

[15] The United States cannot be held accountable for MNR's conduct preceding issuance of the NITU. Any harms resulting from third-party actions in this case cannot be imputed to the United States. *See Rancho Vista Del Mar v. United States*, 169 Fed. Cl. 299, 306 (2024). Even if MNR's construction of a trail exceeded the scope of its easement, that issue lies outside the matters properly before the Court.

remains in active public use, and would continue to exist under any conceivable scenario. The Court therefore concludes that excluding the Maybrook Trail from the "before" condition may artificially inflate the properties' before-value and compensate Plaintiffs for more than what was taken. *United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 633 (1961); *Almota Farmers Elevator & Warehouse Co.*, 409 U.S. at 473–74 ("The owner is to be put in the same position monetarily as he would have occupied if his property had not been taken."). Nevertheless, this factor does not resolve the question of just compensation, since it may have no bearing on the outcome.

While the Court concurs with the United States that ignoring a trail would create a hypothetical construct that may inflate Plaintiffs' potential recovery, this is not a certainty. This argument fails to account for Plaintiffs' right to repair the harm inflicted by the Maybrook Trail, a right extinguished by the taking. The before-condition in valuation seeks to establish the property's worth absent the burden of a railroad easement. *See Raulerson*, 99 Fed. Cl. at 12. Even if the physical trail remained in place, there is no guarantee—nor any reasonable basis to expect—that the public would continue to use it, as continued public use depends on factors independent of the mere physical presence of a path. This is materially different from the situation in *Loveridge*, where the scenic train continued to operate over the easement even after issuance of the NITU. *Loveridge*, 174 Fed. Cl. at 388. That ongoing rail activity created a real-world condition that prospective purchasers would reasonably factor into valuation. In this case, the "before" condition is most accurately characterized as a trail corridor in which the physical trail remains, but pedestrian traffic is absent, because the reversionary interest would have extinguished the trail use altogether.

Accordingly, the Plaintiffs must instruct its expert to consider the Maybrook Trail in its "before condition" to calculate just compensation. The Court notes that, given the findings above, inclusion of the Maybrook Trail may have little to no effect on the damages to which Plaintiffs may be entitled. Given that fact and expert discovery have already closed in this matter, the Court finds that additional time is warranted for Plaintiffs to evaluate property values inclusive of the preexisting Maybrook Trail. Accordingly, the Court grants an additional thirty five (35) days to complete expert discovery and extends all pending deadlines, including trial, by the same amount of time.

### III.    Conclusion

The Court **GRANTS-IN PART** and **DENIES-IN-PART** Plaintiffs' Motion for Partial Summary Judgment as to liability, (ECF No. 38), and **GRANTS-IN PART** and **DENIES-IN-PART** the United States' Cross-Motion, (ECF No. 43). Additionally, just compensation is a highly fact-specific inquiry which the Court intends to resolve at trial. To allow an additional thirty-five days to complete expert discovery, the Court modifies the current pre-trial schedule according to the following chart:

| Event | Previous Deadline | New Deadline |
|---|---|---|
| Plaintiff's Witness List and Exhibit List | December 4, 2025 | January 8, 2026 |

| Defendant's Witness List and Exhibit List | December 4, 2025 | January 8, 2026 |
|---|---|---|
| Defendant's Objections to Plaintiffs' Witness List and Exhibit List | December 18, 2025 | January 22, 2026 |
| Plaintiffs' Objections to Defendant's Witness List and Exhibit List | December 18, 2025 | January 22, 2026 |
| Plaintiffs' Reply to Objections to Witness List and Exhibit List | January 2, 2026 | February 6, 2026 |
| Defendant's Reply to Objections to Witness List and Exhibit List | January 2, 2026 | February 6, 2026 |
| Plaintiffs' Pretrial Memorandum, not to exceed 25 pages | January 2, 2026 | February 6, 2026 |
| Motions *in limine* Filing Deadline for all Parties | January 8, 2026 | February 12, 2026 |
| Defendant's Pretrial Memorandum, not to exceed 25 pages | January 15, 2026 | February 19, 2026 |
| Responses to *Motions in limine* | January 22, 2026 | February 26, 2026 |
| Replies to Motions *in limine* | January 29, 2026 | March 5, 2026 |
| Meeting of Counsel | February 2, 2026 | March 9, 2026 |
| Joint Stipulation of Facts | February 5, 2026 | March 12, 2026 |
| Joint Statement of Good Faith | February 5, 2026 | March 12, 2026 |
| Joint Exhibit List, filed in CM/ECF | February 5, 2026 | March 12, 2026 |
| Final Pretrial Conference | February 18, 2026 11:00 AM (ET); ZOOM | March 16, 2026 11:00 AM (ET); ZOOM |
| Order of Witnesses, filed in CM/ECF | February 25, 2026 | April 1, 2026 |
| Site Inspection (if requested by the Court) | TBD | TBD |
| Trial | March 2 – March 13, 2026 | April 6 – April 17, 2026 |

In light of this updated schedule, the Parties Joint Motion to Amend the Schedule, (ECF No. 55), is **DENIED** as **MOOT**.

Recognizing that a site visit may be necessary, the Court hereby **ORDERS** the Parties to meet and confer, and to submit a joint status report by **January 12, 2026**, proposing dates for a site visit prior to the commencement of trial. The joint status report should include any information the Parties deem pertinent, to include items such as: sequence of locations to be visited, estimated time needed, number of individuals expected to attend, and any other details helpful to facilitate the visit.

**IT IS SO ORDERED.**



s/  David A. Tapp
DAVID A. TAPP, Judge