N THE UNITED STATES COURT OF FEDERAL CLAIMS

MICHAEL ZANZARELLA, *et al.*,               )
                                            )
                                            )        Case No. 24-239LL
                        *Plaintiffs*,       )
                                            )        Judge David A. Tapp
            v.                              )
                                            )
THE UNITED STATES OF AMERICA,               )
                                            )
                        *Defendant*.        )
                                            )

**PLAINTIFFS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

## TABLE OF CONTENTS

I.    INTRODUCTION ………………………………………………………………....1

II.   CONTENTIONS OF LAW…………………………………………………………..2

    A. FAIR MARKET VALUE IS DETERMINED BY A BEFORE AND AFTER
    APPRAISAL METHODOLOGY ………………………………………………...2

    B. DAMAGES TO THE REMAINDER AND "SPECIAL BENEFITS" VERSUS
    "GENERAL BENEFITS"…………………………………………………………8

III.  CONTENTIONS OF FACT…………………………………………………………...11

IV.   PRETRIAL COMPLIANCE…………………………………………………………23

V.    CONCLUSION……………………………………………………………..……24

# TABLE OF AUTHORITIES

**Cases**

*Almota Farmers Elevator & Warehouse Co.*, 409 U.S. 470 (1973) ………………………………..3

*Agapion v. United States*, 167 Fed. Cl. 761 (2023) ……..……………………….………………..7

*Barlow v. United States*, No. 13-396 L, 2026 WL 183765 *4 (Fed. Cl. Jan. 21, 2026)…………...18

*Bauman v. Ross*, 167 U.S. 548 (1897) …………………………….…………………….…………...9,10

*Bailey v. United States*, 128 Fed. Cl. 550 (2016) …………………….……………….………18

*Boston Chamber of Commerce v. City of Boston*, 217 U.S. 189 (1910) …………………………2

*Childers v. United States* 116 Fed. Cl. 486 (2013) …………………………….…………….........6,7,9

*Courval v. United States*, 140 Fed. Cl. 133 (2018) …………………….……………………….……18

*Furlong v. United States*, 132 Fed. Cl. 630 (2017) …………………….……………….……18

*Greenwood v. United States*, 131 Fed. Cl. 231 (2017) …………………….……………….……18

*Hardy v. United States,* 141 Fed. Cl. 1 (2018)……………………………………………passim

*Hendler v. United States,* 175 F.3d 1374 (Fed. Cir. 1999) ……………………………………...10

*Horne v. Department of Agriculture*, 576 U.S. 350 (2015) ……………………………………..10

*Howard v. United States*, 106 Fed. Cl. 343 (2012)…………………………………………………22

*Jackson v. United States,* 155 Fed. Cl. 689 (2021)…………………………………….........8,9,22

*Kaiser Aetna v. United States*, 444 U.S. 164 (1979)……………………………………………..22

*Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949) …………………………………….3

*Kotis Associates, LLC v. United States*, 176 Fed. Cl. 346 (2025) ……………………………..8

*Lamm v. Mauser*, 132 A.D.3d 1120, 18 N.Y.S.3d 728 (2015)………………………………..14

*Loveladies Harbor, Inc. v. United States*, 21 Cl. Ct. 153 (1990) …………………………………3

*Macy Elevator, Inc. v. United States,* 105 Fed. Cl. 195 (2012)...…………………………………6

*Marks v. Gaeckle*, 199 A.D.3d 672, 156 N.Y.S.3d 402 (2021)……………………………12,13

*Marvin M. Brandt Revocable Trust v. United States*, 572 U.S. 93 (2014) …………………………6

*McCann Holdings, Ltd. v. United States*, 111 Fed. Cl. 608 (2013) ………………..…………...7,9

*Minassian v. Temares*, 16 A.D.3d 634, 795 N.Y.S.2d 50 (2005)…………………………………14

*Mississippi & R.R. Boom Co. v. Patterson*, 98 U.S. 403 (1878) …………………..………………..3

*Mitchell v. United States*, 267 U.S. 341 (1925) …………………..……………………………...3

*Moore v. United States,* 54 Fed. Cl. 747 (2002)…………………………………………………23

*Moore v. United States,* 61 Fed. Cl. 73 (2004)……………………………………………………9

*Mott v. Mott*, 68 N.Y. 246 (1877)……………………………………………………………13

*Olsen v. United States*, 292 U.S. 246 (1934) …………………..…………………………...3

*Otay Mesa Prop., L.P. v. United States,* 670 F.3d 1358 (Fed. Cir. 2012)…………………………5

*Phillips v. United States*, No. 14-208L, 2019 WL 6333995 *1 (Fed. Cl. Nov. 25, 2019) ………18

*Preseault v. Interstate Commerce Comm'n,* 494 U.S. 1 (1990) …………………..………………..6

*Preseault v. United States*, 100 F.3d 1225 (Fed. Cir. 1996) …………………..……………...…6

*Price v. United State*s, 175 Fed. Cl. 1 (2025) …………………..……………..……………9,22

*Rasmuson v. United States,* 807 F.3d 1343 (Fed. Cir. 2015)…………………………………………5

*Rogers v. United States*, 101 Fed. Cl. 287 (2011) …………………..……………..……………6

*Seaboard Air Line Ry. Co. v. United States*, 261 U.S. 299 (1923) …………………………………2

*Sharp v. United States*, 191 U.S. 341 (1903) …………………………………………………...10

*Stanley Acker Fam. Ltd. P'ship v. DePaulis Enters. V, Ltd.*, 132 A.D.3d 657, 17 N.Y.S.3d 734 (2015)
……………………………………………………………………………13

*Sutton v. United States*, 107 Fed. Cl. 436 (2012)…………………………………………………12

*Toews v. United States*, 376 F.3d 1371 (Fed. Cir. 2004) …………………………..………………6

*United States v. 564.54 Acres of Land, More or Less, Situated in Monroe & Pike Counties, Pa.*, 441 U.S. 506 (1979)……………………………………….…………………………………4

*United States v. 901.89 Acres of Land in Davidson & Rutherford Ctys., Tenn.*, 436 F.2d 395 (6th Cir. 1970) ……………………………………………………………………………..10

*United States v. Cors*, 337 U.S. 325 (1949) …………………………………………………3

*United States v. Grizzard*, 219 U.S. 180 (1911) ……………….……………………….…..7,9,10

*United States v. Miller*, 317 U.S. 369 (1943) ……………….……………………………..2,3,5,7

*United States v. Toronto, etc. Nav. Co.*, 338 U.S. 396 (1949) ………………..………………….…..3

*United States v. Virginia Elec. & Power Co.*, 365 U.S. 624 (1961) …………….…………...2,3,5

*W. Ctr. Congregational Church v. Efstathiou*, 215 A.D.2d 753, 627 N.Y.S.2d 727 (1995)……...14

*Yancey v. United States*, 915 F.2d 1534 (Fed. Cir. 1990) ………………..………………………3

**Other Authorities**

American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 269 (9th ed. 1987) ……………………………………………….………………………………………….……...3

*Dictionary of Real Estate Appraisal* (3rd ed.) ………..………………..……………………………5

Interagency Land Acquisition Conference, Uniform Appraisal Standards for Federal Land Acquisitions 65 (6th ed. 2016) (the "Yellow Book") …………………………………….3,5,7,8,10

*Nichols on Eminent Domain,* vol. 7 §12.02 (3rd ed. 1990)…………………………………………4

*Real Estate Valuation in Litigation* (2nd ed.) …………………………………………..…5

Uniform Standards of Professional Appraisal Practice ("USPAP") (1994 ed.)…………..……...4

## I.    INTRODUCTION

This is a rails-to trails takings case that is set for trial on April 6, 2026. As explained further below, the following factual issues remain to be resolved at trial: (1) whether the 16 Plaintiffs who did not prevail on the centerline presumption issue at the summary judgment stage owned land in the former railroad corridor that is the subject of this case; and (2) what is the Just Compensation due to these 16 Plaintiffs (assuming they prevail on the first issue) as well as 25 additional Plaintiffs who prevailed on the centerline presumption issue at the summary judgment stage?

On the first issue, Plaintiffs intend to move beyond the centerline presumption by introducing chain of title evidence to demonstrate the ownership interests of these 16 Plaintiffs. Plaintiffs will also present the ownership deeds of the 16 Plaintiffs, which independently move beyond the centerline presumption and show direct proof of ownership to the centerline of the railroad corridor.

On the second issue, Plaintiffs will introduce the testimony of representative landowners who will testify to the impacts of the recreational trail on their properties, which have been overwhelmingly negative due, *inter alia,* to loss of privacy and security. Plaintiffs will also introduce the testimony of appraiser Luke Nordine, MAI, who produced appraisals that employ a Before and After valuation methodology for a partial taking, which is based upon the government's own appraisal standards and guidelines set forth in the Uniform Appraisal Standards for Federal Land Acquisition (the "Yellow Book") and adopted by the CFC in countless other Trails Act cases. Mr. Nordine's appraisals and testimony will show the market loss suffered by the Plaintiffs because of the taking of their land by the federal government. His ultimate opinions are that the total market loss for Plaintiffs due to the taking was $2,603,800 (of which $905,600 is attributable

to the 16 Plaintiffs who lost on the centerline presumption issue and $1,698,200 is attributable to the 25 Plaintiffs who prevailed on that issue).

Plaintiffs anticipate the Defendant will introduce the testimony of Matthew Krauser, MAI, assuming he survives a motion *in limine* that Plaintiffs intend to file. The subject of that motion will primarily be that Mr. Krauser's methodology was unreliable and contrary to the law because, in the "After Condition" he essentially gives full value to the land within the former railroad corridor, despite it being subject to a recreational trail on which the landowners have no more right to use than a member of the general public. This valuation is incorrect as a matter of law and fact.

In addition to Mr. Nordine, Plaintiffs will introduce the rebuttal testimony of another appraiser, C. David Matthews, MAI. It is expected that Mr. Matthews will testify that he disagrees with various aspects of Mr. Krauser's methodologies, most notably his attribution of value to the recreational trail corridor land in the After Condition. Mr. Krauser's flawed methodology resulted in his valuing the market loss of all the Plaintiffs at $0.00, which is indefensible. The United States claims that it owes $0.00 for taking many acres of land that the railroad itself paid substantial sums of money to acquire in the Nineteenth Century. It is plainly absurd that the same land, 150 years later, could be worthless.

## II.   CONTENTIONS OF LAW.

### A. Fair Market Value is Determined by a Before and After Appraisal Methodology.

The standard for determining compensation is the value of what the owner lost, not what the government has gained. *See Seaboard Air Line Ry. Co. v. United States*, 261 U.S. 299, 304 (1923); *United States v. Virginia Elec. & Power Co.*, 365 U.S. 624, 635 (1961); *Boston Chamber of Commerce v. City of Boston*, 217 U.S. 189, 195 (1910). The "just compensation" due a property owner is the fair market value of the property at the time of the taking. *United States v. Miller*, 317

U.S. 369, 373 (1943). This is the amount that a willing and informed buyer would pay a willing and informed seller in an arm's-length transaction. *See Yancey v. United States*, 915 F.2d 1534, 1542 (Fed. Cir. 1990).

The fair market value is based upon the "highest and best use" of the property. *See Olsen v. United States*, 292 U.S. 246, 255 (1934); *United States v. Cors*, 337 U.S. 325, 377 (1949); *United States v. Toronto, etc. Nav. Co.*, 338 U.S. 396, 405 (1949); *see also* Uniform Appraisal Standards for Federal Land Acquisitions ("Yellow Book") (6th ed. 2016)). The "highest and best use" is "'[t]he reasonably probable and legal use of [property], which is physically possible, appropriately supported, financially feasible, and that results in the highest value.'" *Loveladies Harbor, Inc. v. United States*, 21 Cl. Ct. 153, 156 (1990) (quoting American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 269 (9th ed. 1987)).

The Supreme Court has made clear that the calculation of just compensation must include every element and attribute of the subject property that would affect the price a reasonable buyer would be willing to pay. *Almota Farmers Elevator & Warehouse Co.*, 409 U.S. 470, 474 (1973); *Virginia Elec. & Power Co.*, 365 U.S. at 635-36; *Kimball Laundry Co. v. United States*, 338 U.S. 1, 16 (1949); *Mitchell v. United States*, 267 U.S. 341, 343 (1925).  In *Miller*, the Supreme Court explained, "[C]ourts early adopted, and have retained, the concept of market value. The owner has been said to be entitled to the 'value,' the 'market value' and the 'fair market value' of what is taken. …It is usually said that market value is what a willing buyer would pay in cash to a willing seller." 317 U.S. at 374 (citations omitted). In *Mississippi & R.R. Boom Co. v. Patterson,* 98 U.S. 403, 407-409 (1878), the Court explained,

> In determining the value of land appropriated for public purposes, the same considerations are to be regarded as in a sale of property between private parties. The inquiry in such cases must be what is the property worth in the market, viewed not merely with reference to the uses to which it is at the time applied, but with

reference to the uses to which it is plainly adapted.

*See also United States v. 564.54 Acres of Land, More or Less, Situated in Monroe & Pike Counties, Pa.*, 441 U.S. 506, 511 (1979) ("The Court therefore has employed the concept of fair market value to determine the condemnee's loss. Under this standard, the owner is entitled to receive 'what a willing buyer would pay in cash to a willing seller' at the time of the taking.'").

The Appraisal Foundation has developed the Uniform Standards of Professional Appraisal Practice ("USPAP") to guide appraisers. The USPAP Standards provide five criteria to determine market value: (1) "buyer and seller are typically motivated;" (2) "both parties are well informed or well advised, and acting in what they consider their best interests;" (3) "A reasonable time is allowed for exposure to the market;" (4) "Payment is made in cash ... or comparable [to cash];" and, (5) "The price represents the normal consideration … unaffected by special or creative financing…." USPAP (1994 ed.), p. 8.[1]

The concept of market value determines what property is worth from the perspective of what a knowledgeable buyer in the marketplace would pay for the property. This litigation asks what a knowledgeable buyer would pay Plaintiffs for their remainder parcels (what is left after the STB's imposition of the rail-trail corridor easement) versus what the buyer would have paid for the parcels if it had included the land in the former railroad corridor. A knowledgeable buyer would, contrary to the Defendant's conclusion in this case, pay more for a larger property unencumbered by a recreational trail easement versus a smaller property encumbered by a recreational trail easement. Furthermore, in the After Condition, a knowledgeable buyer would not

---

[1] *See also Nichols on Eminent Domain*, vol. 7 §12.02 (3rd ed. 1990). ("The term 'fair market value' means the amount of money which a purchaser willing, but not obligated, to buy the property would pay to an owner willing, but not obligated, to sell it, taking into consideration all uses for which the land was suited and might be applied.").

pay anything for land in the former railroad corridor that is now subject to a recreational trail easement—the buyer would have no more right to use that land than the public.

In *Virginia Electric & Power, Co.*, the Supreme Court held "the [trial] court adopted an acceptable method of appraisal, indeed the conventional method, in valuing what was acquired by the Government by taking the difference between the value of the property before and after the Government's easement was imposed."  365 U.S. at 632. In *Miller*, the Supreme Court explained, "If only a portion of a single tract is taken, the owner's compensation for that taking includes any element of value arising out of the relation of the part taken to the entire tract. Such damage is often, though somewhat loosely, spoken of as severance damage." 317 U.S. at 376.

J.D. Eaton, formerly Assistant Chief Appraiser for the Justice Department, authored the leading text on property valuation, *Real Estate Valuation in Litigation* (2nd ed.). Eaton explained, "In its simplest form the federal [before-and-after] rule is: value before taking minus value after taking equals just compensation." *Eaton*, p. 24. The *Dictionary of Real Estate Appraisal* (3rd ed.), p. 87, says, "Generally, the difference in value of the whole property before the taking and the value of the remainder after the taking is the measure of the value of the part taken and the damages to the remainder."

Although government acquisitions in rails-to-trails cases are specific and niche in appearance, procedurally, they involve the same simple concepts and appraisal steps as all partial government acquisitions, namely a Before and After valuation. *See Rasmuson v. United States*, 807 F.3d 1343, 1345 (Fed. Cir. 2015); *Otay Mesa Prop., L.P. v. United States*, 670 F.3d 1358, 1364 (Fed. Cir. 2012); Yellow Book at 152. In *Hardy v. United States*, Judge Sweeney described the standard as follows:

> Acquisitions in Rails-to-Trails cases are partial acquisitions, those in which the
> federal government acquires only part of a larger parcel. In partial acquisitions,

> compensation is measured by the difference between the market value of the larger parcel *before* the government's acquisition and the market value of the remainder *after* the government's acquisition.

141 Fed. Cl. 1, 10 (2018) (emphasis added).

The Before Condition is the market value of the land comprising the landowner's parcel, combined with the area of the adjacent right of way that would have reverted to the landowner's sole possession and control. It is purely hypothetical and does not, nor has it ever existed. Instead, it is a reimagining of the landowner's parcel as though it includes exclusive possession of the land in the railroad corridor, and indeed, the land is "valued as property unencumbered by any railroad purpose easements." *Macy Elevator, Inc. v. United States*, 105 Fed. Cl. 195, 199 (2012). Although the NITU is the government action that triggers the taking, the Before Condition is not the reality of what is present "before" the NITU, *i.e.*, the parcel with an inactive railroad under the government's jurisdiction. Accordingly, any characterization pointing to the NITU as a temporal or substantive measuring stick "is inconsistent with the nature of a 'taking' under the Trails Act." *Macy Elevator, Inc.*, 105 Fed. Cl. at 198.

In the After Condition, the owner's reversionary right to exclusive use and possession of their property has been "destroyed" or "effectively eliminated."[2] The owner's remaining land is

---

[2] In *Marvin M. Brandt Revocable Trust v. United States*, 572 U.S. 93, 102 (2014), *Preseault v. Interstate Commerce Comm'n,* 494 U.S. 1, 18-19 (1990) ("*Preseault I")*, *Preseault v. United States*, 100 F.3d 1225, 1550 (Fed. Cir. 1996) ("*Preseault II"*), and *Toews v. United States*, 376 F.3d 1371, 1376 (Fed. Cir. 2004), the Supreme Court and Federal Circuit explained that the original easement to operate a railroad across the land terminates but for the government's invocation of section 8(d), and the STB's invocation of section 8(d) established new and different easements for railbanking and public recreation. *See also Childers v. United States*, 116 Fed. Cl. 486, 496-97 (2013) ("In a rails-to-trails case, the imposition of a recreational trail creates a new easement for a new purpose across the landowner's property, which constitutes a taking entitling the landowners to just compensation. Under the Trails Act, through a process known as 'railbanking,' the government retains jurisdiction [of the property] for possible future railroad use.") (citations omitted).

perpetually encumbered by a new easement for public recreation. *See, e.g.*, *Rogers v. United States*, 101 Fed. Cl. 287, 296 (2011); *McCann Holdings, Ltd. v. United States*, 111 Fed. Cl. 608, 614 (2013) ("Where the property interest permanently taken is an easement, the conventional method of valuation is the before-and-after method, *i.e.*, the difference between the value of the property before and after the Government's easement was imposed.") (internal quotations omitted); *Childers*, 116 Fed. Cl. at 497 (holding the same and adding, "In addition to the value of the property actually taken, just compensation includes severance damages—the diminution in value of the owner's remaining property resulting from the taking.") (citing *United States v. Grizzard*, 219 U.S. 180, 185 (1911), and *Miller*, 317 U.S. at 376).

An After Condition valuation is different from a Before Condition valuation. In the After Condition, the government's partial acquisition has reduced the landowner's land in size, as the government has acquired a portion of it for public recreational trail use. The landowner no longer has exclusive ownership and control of the land, and although the government takes only an easement (with the landowner retaining the burdened land), it is an exclusive easement, and so the landowner has no more rights to the land than the public. *See, e.g.*, *Agapion v. United States*, 167 Fed. Cl. 761, 775 (2023) ("An essential characteristic of unencumbered fee ownership—which these [rails-to-trails] plaintiffs no longer have—is the right to exclusive use of one's property."). Therefore, the landowners retain no valuable property rights to the land in the After Condition.

In the Before Condition and in the After Condition, the land is valued as though vacant and available for its highest and best use. This comes directly from the Yellow Book, at pages 22, 25, 64, and 70. Yellow Book at 22, 25, 64, 70. The Yellow Book adopts the Before and After standard and provides specific guidelines for partial acquisitions, including rails-to-trails acquisitions. Additionally, "[a]ny increase or decrease in the market value of real property prior to the date of

valuation caused by the government project for which the property is being acquired must be disregarded in developing the appraisal." Yellow Book at 16.

  **B.**  **Damages to the Remainder and "Special Benefits" versus "General Benefits"**

  Although the primary driver of valuation is a direct comparison between the Before and After valuations, it is not simply a matter of applying the same square footage value between the two, as diminution in value to the landowner's remaining land must be considered for proper compensation. *See* Yellow Book at 152–58. In Trails Act cases, damages to the remainder in the After Condition (also called severance damages) can result from such negative impacts as loss of privacy, increase in theft, littering, and trespass because of adjacency to trails. *See, e.g.*, *Hardy*, 141 Fed. Cl. at 7–8 (explaining that "plaintiffs testified credibly regarding their myriad concerns pertaining to safety, security, privacy, trespassing, vandalism, trash, and noise due to the creation of the hiking and biking trail."); *Jackson v. United States*, 155 Fed. Cl. 689, 716 (2021) (plaintiffs' expert's recommendation concerning damages to remainder were supported by "credible landowner concerns about trespass, loss of privacy, increased noise and traffic, and dumping and wildfires and lack of security. One Plaintiff … became emotional when testifying about the negative changes wrought by the trail easement on his property. The Court found this witness credible and his concerns, genuinely held."); *Kotis Associates, LLC v. United States*, 176 Fed. Cl. 346, 376 (2025) (awarding $42,641,740 in damages where Plaintiffs had multiple parcels and structures within the right of way, noting that, "[i]f and when the City upgrades the Corridor to include such features, the City's right to trail use will conflict with, and supersede, plaintiffs' right to maintain or build overlying structures."). Indeed, the CFC has consistently found compensable proximity damages in rails-to-trails cases. *See, e.g., Kotis Associates, LLC*, 176 Fed. Cl. at 381;

*Price v. United State*s, 175 Fed. Cl. 1, 41 (2025); *Jackson*, 155 Fed. Cl. at 711–16; *Hardy*, 141 Fed. Cl. at 24–29; *McCann Holdings*, 111 Fed. Cl. at 626–38; *Childers*, 116 Fed. Cl. at 509.

The above-described law and valuation principles have applied to a long history of federal partial acquisitions, and specifically to rails-to-trail partial acquisition appraisals, whereby a per square foot (or per acre) valuation of the subject tract is derived and applied to the Before Condition area, the same (or very similar) per unit value is applied to the After Condition area, damages to the remainder or special benefits (if applicable, and discussed below) are applied in the After Condition, and then the After Condition value is subtracted from the Before Condition value. *See Jackson*, 155 Fed. Cl. at 694; *Hardy*, 141 Fed. Cl. at 36; *McCann Holdings*, 111 Fed. Cl. at 618–26; *Childers*, 116 Fed. Cl. at 532; *Moore v. United States*, 61 Fed. Cl. 73, 77 (2004).

The Supreme Court has explained:

The "just compensation" thus guaranteed obviously requires that the recompense to the owner for the loss caused to him by the taking of a part of a parcel, or single tract of land, shall be measured by the loss resulting to him from the appropriation. If, as the court below found, the flooding and taking of a part of the plaintiff's farm has depreciated the usefulness and value of the remainder, the owner is not justly compensated by paying for only that actually appropriated, and leaving him uncompensated for the depreciation over benefits to that which remains.

*Grizzard*, 219 U.S. at 184. In *Bauman v. Ross*, 167 U.S. 548, 574 (1897), the Court similarly held:

Consequently, when part only of a parcel of land is taken for a highway, the value of that part is not the sole measure of the compensation or damages to be paid to the owner; but the incidental injury or benefit to the part not taken is also to be considered. When the part not taken is left in such shape or condition as to be in itself of less value than before, the owner is entitled to additional damages on that account. When, on the other hand, the part which he retains is specially and directly increased in value by the public improvement, the damages to the whole parcel by the appropriation of part of it are lessened.

The *Grizzard* Court described the government's obligation to pay the owner "severance damages" (the loss in value to the remaining property in addition to the value of the land physically taken) as "settled law." *Grizzard*, 219 U.S. at 184 (citing *Sharp v. United States*, 191 U.S. 341, 354 (1903)).

Compensable damages can be offset only after a finding of special benefits to the landowner that in fact increase the value of the remaining land in the After Condition. These special benefits must specifically inure to the landowner whose property has been taken and cannot be general benefits to the community. In *Hendler v. United States*, the Federal Circuit explained the difference:

> [A]s a general matter, special benefits are those which inure specifically to the landowner who suffered the partial taking and are associated with the ownership of the remaining land. In contrast, benefits that inure to the community at large are considered general. [In other words,] special benefits are those which arise directly and proximately to the remaining land as a result of the public work on the part taken, due to the particular relation of the land in question to the public work. In contrast, resulting benefits that are more or less common to all lands in the vicinity of the land taken are general.

175 F.3d 1374, 1380 (Fed. Cir. 1999); *see also* Yellow Book at 162 (a special benefit exists when the "remainder property 'is specially and directly increased in value by the public improvement.'") (quoting *Bauman*, 167 U.S. at 574). Examples of special benefits include "new access to a waterway or highway, or filling in of swampland." Yellow Book at 162 (quoting *Horne v. Department of Agriculture*, 576 U.S. 350, 369 (2015)). Proximity to and view of a lake created by a reservoir can be considered a special benefit. *United States v. 901.89 Acres of Land in Davidson & Rutherford Ctys., Tenn.*, 436 F.2d 395, 398 (6th Cir. 1970). In contrast, general benefits "are those 'which result to the public as a whole.'" Yellow Book at 163 (quoting *Bauman*, 167 U.S. at 581); *accord id.* (describing a general benefit as a "general increase in the value of property in the neighborhood" (quoting *Bauman*, 167 U.S. at 580)).

### III.    CONTENTIONS OF FACT

<u>Background</u>

Plaintiffs' land adjoins a 41.1-mile section of rail corridor, running from Milepost 71.2 on the Connecticut/New York state line in Brewster, New York, to Milepost 0.0, in Beacon, New York (the "Line").  On February 8, 2024, the Surface Transportation Board (the "STB") issued a Notice of Interim Trail Use (the "NITU") that authorized the Line for interim trail use and railbanking pursuant to the Trails Act. The NITU was issued at the request of Metro-North Commuter Railroad Company ("MNR") following its filing in the STB of an Abandonment Application and a Petition for Notice of Interim Trail Use. MNR both owned the Line and proposed to be the trail sponsor. MNR is currently in active discussions with a potential third-party to become the trail sponsor but has made clear in STB filings that if negotiations fail, MNR will be the trail sponsor. Notwithstanding, MNR has already built a recreational trail over part of the Line, generally proceeding from Hopewell Junction to Brewster, New York (this segment is commonly referred to as the "Maybrook Trail" and is part of the larger "Empire State Trail").

<u>Ownership</u>

Although a cognizable property interest has been established for 25 of the Plaintiffs at the summary judgment stage, this Court ruled that for 16 Plaintiffs, the centerline presumption had been rebutted. At the same time, this Court has stated that its summary judgment ruling "(1) addressed only the centerline presumption; (2) did not direct the entry of partial final judgment; and (3) did not foreclose the possibility that those Plaintiffs may have some interest in land underlying the width of the railroad easement." *See* ECF No. 66, at 2.

Accordingly, at trial, the 16 Plaintiffs intend to prove ownership by offering additional evidence and argument. First, Plaintiffs will move beyond reliance on the centerline presumption

by submitting evidence to show that they owned land into the railroad corridor. Specifically, Plaintiffs will provide the chains of title for the 16 Plaintiffs and expect to show that their ownership rights derive from ancestors in title who owned the land underlying the railroad corridor on the date of the creation of the railroad easement. In this regard, this case should be highly analogous to *Sutton v. United States*, a rails to trails case arising out of California, wherein the landowners showed through their chains of title that they owned fee simple in the land at issue, just as their ancestors in title did, without regard to the centerline presumption and despite a description denoting the line of the easement as a boundary. 107 Fed. Cl. 436, 441 (2012) (where plaintiffs argued that "[p]laintiffs have come forward with evidence that not even a single conveyance could be located (either *inter vivos* or intestate, both of which would appear in the public records) from any grantor in any of the subject Plaintiffs' chains of title relating to the fee underlying the railroad (other than the conveyances in the Plaintiffs' chains of title)," the Court held "[w]here plaintiffs have produced chain of title evidence showing that their predecessors held fee title to the railroad corridor, and defendant has produced no evidence that the corridor had ever been conveyed to anyone else, plaintiffs have demonstrated a property interest in the corridor; they are entitled to compensation for the Government's placement of a new easement across their lands."); *accord Marks v. Gaeckle*, 199 A.D.3d 672, 674-675, 156 N.Y.S.3d 402, 403-04 (2021)) (question of ownership of a private road could not be resolved as a matter of law despite the extrinsic evidence submitted by the parties which included "[t]he absence of any subsequent conveyance or claim of title to the disputed strip by the common grantors during their lifetimes, Surrogate's Court records in which the heirs of the common grantors asserted that the grantors did not own any real property upon their deaths, and subsequent deeds in the plaintiffs' chain of title [and] other extrinsic evidence, such as a policy insuring title to the defendant's property as well as

tax maps…·").

Secondly, for the 16 Plaintiffs who lost on the centerline presumption issue, Plaintiffs intend to present their current ownership deeds to move beyond the centerline presumption issue and separately show ownership in the corridor. These ownership deeds contain the following language: "TOGETHER with all right, title and interest, if any, of the party of the first part in and to any streets and roads abutting the above described premises to the center lines thereof." *See, e.g.,* ECF No. 38-48a, Exh. 48a to Plfs.' MSJ (DeBonis Ownership Deed). Plaintiffs brought this argument to the Court's attention in their Motion for Clarification (*see* ECF No. 57, at 3-4), and the Court rejected the argument, stating that "it would not alter the Court's analysis."[3] (*See* ECF No. 66, at 2). Yet, Plaintiffs ask for the Court's indulgence to consider this language, not solely in the context of the centerline presumption argument, but rather as part of the present trial analysis which considers not just the language of the description on its face, but also "the terms of the deed, read as a whole" along with "the situation of the lands and the condition and relation of the parties to those and other lands in the vicinity." *Marks*, 199 A.D.3d at 674 (citing *Mott v. Mott*, 68 N.Y. 246, 246 (1877)).

Plaintiffs note that this specific language has been recognized by New York decisions as important, including the "if any" language the Court identified at the oral argument regarding Plaintiffs' Motion for Clarification (ECF No. 57). *See Stanley Acker Fam. Ltd. P'ship v. DePaulis Enters. V, Ltd.*, 132 A.D.3d 657, 660, 17 N.Y.S.3d 734, 738 (2015) (although Defendants had

---

[3] Plaintiffs acknowledge that the Court also stated that "given that Plaintiffs had the opportunity to raise this issue during summary judgment briefing, but failed to do so, that argument is waived." (ECF No. 66, at 2.) Plaintiffs respectfully submit that since the Court's summary judgment ruling only pertained to the narrow issue of whether the centerline presumption had been rebutted, and furthermore because Plaintiffs' argument regarding this language goes beyond the centerline presumption issue to attempt to establish direct proof of ownership into the former railroad corridor, waiver should not apply here and the Court should consider the argument.

rebutted the centerline presumption, the Plaintiffs nonetheless raised a triable issue of fact as to whether the grantors intended to pass title to the centerline, where all deeds subsequently conveying two of the pertinent lots, included a grant of either "all the right, title and interest of the parties of the first part [sellers] of, in and to the land lying in the bed of the fifty foot street, known as Old Orchard Lane, opened or proposed, in front of or adjoining said premises to the center line thereof" or "[t]ogether, with all right, title and interest, **if any**, of the party of the first part [seller] in and to any streets and roads abutting the above described premises to the center lines thereof," which the court determined was "indicative of the intent to include a conveyance of title to the centerline of the street...") (emphasis added); *Minassian v. Temares*, 16 A.D.3d 634, 637, 795 N.Y.S.2d 50 (2005) (finding that deed which provided for the transfer of "all right, title and interest, **if any**, of the [grantors] in and to any streets and roads abutting the above described premises to the center lines thereof" to be "sufficient to effect the intent of the original grantors … to grant all subsequent owners of property abutting the roadway ownership of that portion of the roadway abutting their property to the centerline, which encompasses use for all purposes, including parking, subject only to the right of others to use the same for ingress and egress.") (emphasis added). Highly similar cases, but without the "if any" language, are also apt and favor Plaintiffs' position. *See Lamm v. Mauser*, 132 A.D.3d 1120, 1122, 18 N.Y.S.3d 728, 731 (2015); *W. Ctr. Congregational Church v. Efstathiou*, 215 A.D.2d 753, 754, 627 N.Y.S.2d 727 (1995) ("With regard to that part of the disputed road abutting Efstathiou's property, we note that the church as grantor conveyed to Efstathiou all of the church's right, title, and interest to any streets and roads abutting the property to the center line thereof. The wording in the deed controls and the church is therefore not entitled to any easements over this property by necessity or otherwise");

Evidence from Plaintiff-Landowners

Plaintiffs intend to present a handful of Plaintiffs to testify at trial to provide the Court with representative examples of the impact of the recreational trail on Plaintiffs' properties. It is expected that the evidence will show that the rail to trail conversion has resulted in both actual negative impacts to landowners as well as serious concerns about impacts that could occur. Loss of privacy and loss of security are common complaints. It is expected that the Court will hear the following testimony:

- Kyle Perrucci, on behalf of KAP Realty NY, LLC, a used car lot and bike business, is expected to testify that he is concerned about loss of privacy, increased risk of theft, and loss of control of the property, including that increased traffic in the back of the property could limit things the business could do and distract employees trying to perform their work, such as working on repairs while a vehicle is on a lift.

- Graham Lawlor, on behalf of 334 Fishkill Ave., LLC, which owns property used primarily for Airbnb rentals, is expected to testify that he is concerned about both his and his guests' loss of privacy and loss of security, including litter, theft, property damage, trespassing, presence of homelessness, and that noise will increase with the conversion of the Line to a recreational trail.

- Robin Greene, the owner of a single-family residence near a lake, is expected to testify that the recreational trail that is built next to her property has negatively impacted her property due to litter, trespassing, behavior of pedestrians, effect of pedestrians on her dog's barking, aesthetics of the property, noise, effect on traffic, loss of privacy, loss of a sense of security, and loss of wildlife, changing the character of what was once a quiet property.

- Geraldine Cheverko, the owner of a single-family residential home, is expected to testify that her property has gone from being a private and peaceful home to a very public area, that she has had to plant additional trees and install a desk with high privacy walls to maintain privacy, and that users of the trail have thrown litter on her back lawn and park along her property line.

- John Colbert, the owner of a single-family residential home, is expected to testify that the recreational trail has caused a loss of privacy because people frequently wander off the trail and onto his property, that trespassers block his driveway, that there is litter from users of the rail-trail, and that there are hazards created by the rail-trail because users do not obey his road right-of-way and ignore the stop signs on both sides of the road and then bike in front of cars and other traffic in the driveway.

15

- William Ehrlich (if permitted to testify remotely), on behalf of 581 Main St. Beacon LLC, a real estate development holding company, is expected to testify about his concern that increased pedestrian traffic, particularly the presence and danger of bicycles, could change the desirability of the property for purposes of residential development, and that the taking could inhibit the ability to fully develop the land due to a reduction in size.

- Mr. Nordine is expected to testify about the remainder of the Plaintiffs' concerns about the negative impacts from the recreational trail, as taken from Interrogatory Answers from the Plaintiffs.

Plaintiffs will also present the testimony of Mr. Nordine to provide his opinions regarding the market loss suffered by the Plaintiffs because of the taking. Mr. Nordine is a Designated Member of the Appraisal Institute (MAI) and has more than a decade of appraisal experience. In addition to being directly trained in rails-to-trails appraisal methodology from Mr. Matthews (Plaintiffs' rebuttal expert, discussed below), and performing dozens of rails-to-trails appraisals across the country, Mr. Nordine has a wide range of appraisal experience and has held several prominent professional leadership positions, including President of Indiana's Chapter of the Appraisal Institute.

Mr. Nordine performed standard rails-to-trails appraisals in this case. In the Before Condition, Mr. Nordine originally appraised Plaintiffs' properties under the hypothetical condition that the prior railroad easement has terminated and the unencumbered land has reverted to the adjacent landowner, who then owns the unencumbered fee estate interest. Following and consistent with this Court's summary judgment opinion, Mr. Nordine was then instructed to consider the Maybrook Trail in the Before Condition to calculate just compensation where the Before Condition is most accurately characterized as a trail corridor in which the physical trail remains, but pedestrian traffic is absent, because the reversionary interest would have extinguished trail use altogether. Mr. Nordine did so and concludes there was no change in the Before Condition value

to any of the Plaintiffs' properties due to the Maybrook Trail (or due to any remnants of the railroad), an opinion echoed by the Defendant's appraiser, Mr. Krauser.

In the After Condition, Mr. Nordine appraised Plaintiffs' properties with the land being burdened by an easement for an interim public recreational trail and for possible future reactivation of a railway line. The valuation date for both the Before Condition and After Condition is February 8, 2024, the date the STB authorized recreational trail use by issuing a NITU. In Mr. Nordine's Before and After Condition valuations, the sales comparison approach is used, and the land is valued as though vacant. Also, in both the Before and After Conditions, Mr. Nordine selected comparable sales of properties, considering various adjustments to the sales based on market conditions (time), location, size, zoning, shape and topography, size, location, and other factors.

However, the After Condition valuation was not simply a matter of applying the same per square foot values from the Before Condition to the After Condition, because there was still the matter of damages to the remainder and special benefits to consider. Mr. Nordine concludes there were damages to certain Plaintiffs' properties in the After Condition, and that no special benefits were conferred on Plaintiffs' properties. Mr. Nordine relies on a study he conducted, specifically a paired sales analysis that included the very trail at issue in this case. He also relies on other studies and anecdotal evidence, including studies done on other rails-to-trails conversions and the comments and concerns of the Plaintiff-landowners.

In performing his appraisals, Mr. Nordine valued every Plaintiff's property. As is standard in rails-to-trails appraisals, he grouped Plaintiffs' properties by type and location. Within each group can be found the "representative parcel appraisal" and write-ups showing the adjustments, if any, he made to the "non-representative parcel appraisals." This efficient and economical method of appraising simply saves paper – all the same work that is required in a representative

appraisal benefits the non-representative appraisals, and in this way, every property is fully appraised. *See Hardy*, 141 Fed. Cl. at 58 (adopting representative appraisal value conclusions); *see also, e.g.,* class action settlement approvals in *Barlow v. United States*, No. 13-396 L, 2026 WL 183765 *4 (Fed. Cl. Jan. 21, 2026); *Courval v. United States*, 140 Fed. Cl. 133, 136 (2018); *Furlong v. United States*, 132 Fed. Cl. 630, 632 (2017); *Greenwood v. United States*, 131 Fed. Cl. 231, 235 (2017); *Bailey v. United States*, 128 Fed. Cl. 550, 552 (2016); *Phillips v. United States*, No. 14-208L, 2019 WL 6333995, at *1 (Fed. Cl. Nov. 25, 2019).

By grouping, Mr. Nordine's valuation conclusions are as follows (the highlighted Plaintiffs are those who did *not* prevail on the centerline presumption issue):

**Representative Parcel: Zanzarella (Group 1)**

| Plaintiff | Parcel Number | Before Area (sq.ft) | Before Value (rounded) | After Area (sq.ft) | After Value (rounded) | Just Comp. (Before - After) |
|---|---|---|---|---|---|---|
| Zanzarella, Michael | 133089-6155-11-615684-0000 | 22,572 | $90,300.00 | 17,424 | $52,300.00 | $38,000.00 |
| Provet, Anne | 130200-6054-23-374946-0000 | 20,163 | $80,700.00 | 13,068 | $52,300.00 | $28,400.00 |
| Valentino, Judith (85a) | 133089-6155-11-644708-0000 | 17,454 | $69,800.00 | 11,761 | $35,200.00 | $34,600.00 |

**Representative Parcel: Antalek (Group 2)**

| Plaintiff | Parcel Number | Before Area (sq.ft) | Before Value (rounded) | After Area (sq.ft) | After Value (rounded) | Just Comp. (Before - After) |
|---|---|---|---|---|---|---|
| Colbert, John & Alexandra | 134089-6856-00-602005-0000 | 308,026 | $154,000.00 | 283,140 | $106,200.00 | $47,800.00 |
| DeBonis, Janes & Jean | 132200-6758-04-880372-0000 | 75,917 | $151,800.00 | 60,984 | $85,400.00 | $66,400.00 |

| | | | | | |
|---|---|---|---|---|---|
| Van Vlack, Brian | 132200-6758-04-875357-0000 | 62,337 | $140,300.00 | 52,272 | $82,300.00 | $58,000.00 |
| Schleicher, Jessica | 132200-6758-04-870342-0000 | 59,941 | $134,900.00 | 52,272 | $117,600.00 | $52,600.00 |
| Chianese, Sr., Anthony & Anthony Chianese, Jr. | 132200-6758-04-860314-0000 | 51,065 | $114,900.00 | 43,560 | $68,600.00 | $46,300.00 |
| Brown, Dane | 132200-6758-04-829254-0000 | 61,578 | $138,600.00 | 56,628 | $95,500.00 | $43,100.00 |
| Griffin, Homer & Jo Ann | 132200-6758-04-831232-0000 | 67,320 | $151,500.00 | 47,916 | $75,500.00 | $76,000.00 |

**Representative Parcel:Haslett/JLD (Group 3)**

| Plaintiff | Parcel Number | Before Area (sq.ft) | Before Value (rounded) | After Area (sq.ft) | After Value (rounded) | Just Comp. (Before - After) |
|---|---|---|---|---|---|---|
| Haslett/JLD Fishkill (47a) | 133089-6256-04-700259-0000 | 393,268 | $393,300.00 | 368,518 | $365,600.00 | $27,700.00 |
| Haslett/JLD Fishkill (47b) | 133089-6256-04-711305-0000 | 48,330 | $290,000.00 | 40,729 | $239,800.00 | $50,200.00 |
| 581 Main St Beacon LLC (3a) | 130200-6054-30-204843-0000 | 103,705 | $1,296,300.00 | 68,825 | $833,800.00 | $462,500.00 |
| 581 Main St Beacon LLC (3b) | 130200-6054-30-236870-0000 | | $0.00 | | $0.00 | $0.00 |
| KAP Realty NY LLC | 130200-6054-23-280919-0000 | 25,962 | $155,800.00 | 15,551 | $90,700.00 | $65,100.00 |
| 334 Fishkill Ave. LLC | 130200-6054-23-284922-0000 | 17,827 | $107,000.00 | 7,710 | $43,800.00 | $63,200.00 |
| Coyote Two, LLC | 133089-6055-15-668289-0000 | 36,922 | $169,800.00 | 35,284 | $161,300.00 | $8,500.00 |

**Representative Parcel: Sebesta (Group 4)**

| Plaintiff | Parcel Number | Before Area (sq.ft) | Before Value (rounded) | After Area (sq.ft) | After Value (rounded) | Just Comp. (Before - After) |
|---|---|---|---|---|---|---|
| Sebesta, Louis J. | 133089-6155-03-125211-0000 | 872,840 | $43,700.00 | 871,200 | $43,400.00 | $300.00 |
| Walker, Brian R. | 132800-6457-01-080517-0000 | 31,928 | $8,000.00 | 30,928 | $7,500.00 | $500.00 |
| Coppola, Nicola | 133089-6356-03-012486-0000 | 63,954 | $48,000.00 | 60,984 | $45,200.00 | $2,800.00 |

**Representative Parcel: Payne (Group 5)**

| Plaintiff | Parcel Number | Before Area (sq.ft) | Before Value (rounded) | After Area (sq.ft) | After Value (rounded) | Just Comp. (Before - After) |
|---|---|---|---|---|---|---|
| Payne, Jason | 133089-6356-01-212588-0000 | 39,303 | $157,200.00 | 30,928 | $92,800.00 | $64,400.00 |
| Richard E. Monroe Trust | 133089-6256-04-960446-0000 | 108,580 | $217,200.00 | 98,010 | $147,000.00 | $70,200.00 |
| DeWitt, Robert & Elisa | 133089-6356-03-039448-0000 | 108,153 | $162,200.00 | 95,832 | $107,800.00 | $54,400.00 |
| Meyer, Caroline | 133089-6356-03-041494-0000 | 22,422 | $89,700.00 | 19,602 | $51,000.00 | $38,700.00 |
| Consaga, Christopher & Donna | 133089-6356-03-058467-0000 | 58,113 | $174,300.00 | 45,738 | $102,900.00 | $71,400.00 |
| Roosa, Jeffrey & Van Den Thoorn, Stacey | 133089-6356-03-056496-0000 | 34,304 | $137,200.00 | 19,602 | $51,000.00 | $86,200.00 |
| Georges, John J. & Acevedo-Georges, Myrna | 133089-6356-03-078483-0000 | 57,846 | $202,500.00 | 44,431 | $116,600.00 | $85,900.00 |
| Badia, Lisa A. | 133089-6356-01-077512-0000 | 28,671 | $114,700.00 | 16,988 | $44,200.00 | $70,500.00 |
| Kuran, David | 133089-6356-03-108498-0000 | 109,459 | $164,200.00 | 91,476 | $102,900.00 | $61,300.00 |
| Tivnan, Richard E. | 133089-6356-01-108542-0000 | 28,481 | $113,900.00 | 23,522 | $70,600.00 | $43,300.00 |
| Meister, Jason A. & Stacey L. | 133089-6356-01-136518-0000 | 139,170 | $208,800.00 | 124,146 | $139,600.00 | $69,200.00 |

| | | Before Area (sq.ft) | Before Value | After Area | After Value | Just Comp. |
|---|---|---|---|---|---|---|
| Ferris, Scott & Diane | 133089-6356-01-154526-0000 | 36,078 | $108,200.00 | 30,056 | $67,600.00 | $40,600.00 |
| Ott, III, Anthony & Ott, Tracy | 133089-6356-01-125554-0000 | 32,523 | $130,100.00 | 27,573 | $82,700.00 | $47,400.00 |
| BR Trust | 133089-6356-01-191540-0000 | 280,533 | $210,400.00 | 239,580 | $134,800.00 | $75,600.00 |
| Fernandez, Vincent & Bliss, Meghan | 133089-6356-01-162573-0000 | 34,571 | $138,300.00 | 29,621 | $88,900.00 | $49,400.00 |
| Oken, Catherine F. | 133089-6356-01-180579-0000 | 31,522 | $126,100.00 | 26,572 | $79,700.00 | $46,400.00 |
| Abbasi, Firas | 133089-6356-01-189582-0000 | 30,898 | $123,600.00 | 25,700 | $77,100.00 | $46,500.00 |
| Valentino, Judith (85b) | 133089-6356-01-272582-0000 | 55,687 | $194,900.00 | 43,560 | $114,400.00 | $80,500.00 |
| Joette Forsblom Fero Kane 2018 Irrevocable Trust | 133089-6356-01-315608-0000 | 74,140 | $148,300.00 | 49,658 | $64,500.00 | $83,800.00 |

**Representative Parcel: Durk (Group 6)**

| Plaintiff | Parcel Number | Before Area (sq.ft) | Before Value (rounded) | After Area (sq.ft) | After Value (rounded) | Just Comp. (Before - After) |
|---|---|---|---|---|---|---|
| Durk, Arlene G. | 13.-2-63 | 610,722 | $210,300.00 | 569,765 | $193,100.00 | $17,200.00 |
| Cheverko, Geraldine | 56.8-1-11 | 26,572 | $106,800.00 | 20,909 | $63,000.00 | $43,800.00 |
| Morales, Wilson | 56.27-1-6 | 29,751 | $119,600.00 | 19,166 | $53,900.00 | $65,700.00 |
| Greene, Robin B. | 56.27-1-5 | 15,638 | $71,700.00 | 10,454 | $33,600.00 | $38,100.00 |
| O'Hara, Peter & Nancy | 13.-2-92 | 1,228,025 | $281,900.00 | 1,165,230 | $200,600.00 | $81,300.00 |

Plaintiffs will also present the rebuttal testimony appraiser of C. David Matthews. Mr. Matthews has approximately 50 years of experience, is one of the premier appraisers in the United States and is arguably the preeminent rails-to-trails appraiser in the United States. Mr. Matthews was hired as a consultant during the appraisal phase of *Preseault v. United States*, and, since that time, has been retained and/or consulted in approximately 35 rails-to-trails cases over the last 20

years, many times as a joint appraiser, and has also been hired by the Department of Justice in conjunction with an extensive project to measure and assess railroad right-of-way widths. Mr. Matthews also co-authored the chapter on rails-to-trails valuations in the text *Corridor Valuations: An Overview and New Alternatives*, published by the Appraisal Institute, the International Right-of-Way Association, and the Appraisal Institute of Canada.

Mr. Matthews is expected to testify that the Defendant's expert appraiser, Mr. Krauser, used improper methodology in reaching his value conclusions and thus Mr. Krauser's opinions are not reliable. The primary criticism of Mr. Krauser's appraisals is that they improperly ascribe value in the After Condition to the land within the former railroad corridor that is now encumbered with an exclusive recreational trail easement subject to future railroad activation, such that, even though Plaintiffs' properties have lost land area, Mr. Krauser incorrectly opines that they have suffered no market loss.

Plaintiffs note that Mr. Krauser's opinions regarding full value of land in the easement area in the After Condition are inconsistent with other rails-to-trails decisions, wherein the CFC has consistently found landowners are entitled to compensation for 100 percent of the value of the land taken. *See Price*, 175 Fed. Cl. at 43; *Jackson*, 155 Fed. Cl. at 702 (noting courts in rails-to-trails cases have "consistently held that the owners of land subject to a trail easement retain virtually no rights in the encumbered land and awarded the plaintiffs the fee simple value of the encumbered parcel"); *Hardy*, 141 Fed. Cl. at 15–16 (holding landowners in rails-to-trails cases retain no valuable rights in land underlying a perpetual trail use easement and citing *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979) for the principle that a landowner's right to exclude others as "one of the most essential sticks in the bundle of [property] rights"); *Howard v. United States*, 106 Fed. Cl. 343, 367 (2012) (explaining a railbanked line "would appear to be lost to the fee holder

for all intents and purposes in perpetuity"); *Moore v. United States*, 54 Fed. Cl. 747, 751 (2002) (holding a railroad right of way parcel "should be diminished 100% in the 'after' analysis because the landowners had no effective remaining use of the property").

As part of this analysis, *inter alia*, Mr. Matthews is expected to debunk Mr. Krauser's opinion that additional land on a parcel is unlikely to add much, if any, value to a property so long as a similar size home sits on that property. Mr. Matthews will point out the straightforward reality that a decrease in a parcel's land area will result in a lower value. Indeed, Mr. Matthews will explain the simple concept that land has value, and that the United States' appraisal opinion would lead to the result where the sovereign is permitted to acquire vast amounts of land for its rights of way by piecemeal takings, with $0 paid to its citizens, which defies logic and is incorrect as a matter of standard appraisal methodology.

## IV.    PRETRIAL COMPLIANCE

In accordance with Appendix A, ¶¶ 15(a) and 16 of the RCFC, Plaintiffs file contemporaneously herewith their witness list and exhibit list. Pursuant to Appendix A, ¶14(a)(3), Plaintiffs state that their objections to Defendants' witnesses and exhibits that were provided pursuant to Appendix A, ¶13, are as follows:

- Defendant's Exhibit 47 (Declaration of Metro-North, dated June 12, 2025): Plaintiffs object on the basis of relevancy and hearsay.

- Defendant's Exhibits 1–28 (Defendant's expert appraisal reports): Plaintiffs do not object to the general introduction of these reports. However, Plaintiffs contend that Mr. Krauser's testimony is based on improper methodology, which will be addressed in a forthcoming Motion *in Limine*, and Plaintiffs object to that extent.

- Witness Matthew Krauser: Plaintiffs object to his testimony on the basis of improper methodology, which will be addressed in a forthcoming Motion *in Limine*.

- Witness Metro-North Commuter Railroad Company and Witness Housatonic Railroad Company, Inc.: Plaintiffs object to their testimony on the basis of relevancy.

## V.    CONCLUSION

Plaintiffs have taken a straightforward approach by instructing an appraiser to employ a standard Before and After methodology pursuant to the Yellow Book and applicable law. That is because this is a straightforward exercise, despite the volume of appraisal work that was involved. Plaintiffs respectfully request that the Court award them a total of $2,603,800 as Just Compensation, for the reasons set forth above. Despite the Defendant's strenuous efforts to deny Plaintiffs any compensation whatsoever by using incorrect appraisal methodology, Plaintiffs' position is the correct position and so they request that the Court reject the Defendant's arguments entirely.

Respectfully submitted by:

**STEWART, WALD & SMITH, LLC**

By: *_/s/ Steven M. Wald_*
    Steven M. Wald
    Michael J. Smith
    Allison P. Bettlach
    3636 S. Geyer Rd., Suite 200
    St. Louis, MO 63127
    Telephone: (314) 720-0220
    Facsimile: (314-899-2925
    wald@swslegal.com
    smith@swslegal.com
    bettlach@swslegal.com

    -and-

    Thomas S. Stewart
    Reed W. Ripley
    3515 W. 75th St., Suite 201
    Prairie Village, KS 66208
    Telephone: (816) 303-1500
    Facsimile: (816) 527-8068
    stewart@swslegal.com
    ripley@swslegal.com

    ATTORNEYS FOR PLAINTIFFS