# In the United States Court of Federal Claims

No. 24-239
Filed: July 31, 2026

|  |
|---|
| **MICHAEL ZANZARELLA, et al.,**<br><br>    *Plaintiffs*,<br><br>**v.**<br><br>**THE UNITED STATES,**<br><br>    *Defendant*. |

*Steven M. Wald*, with *Michael J. Smith*, *Thomas S. Stewart*, and *Reed W. Ripley*, Stewart, Wald & Smith, LLC, St. Louis, MO, for Plaintiffs.

*Emily A. Davis*, Environment and Natural Resources Division, Natural Resources Section, with *Adam R.F. Gustafson*, Acting Assistant Attorney General, U.S. Department of Justice, Washington, D.C., for Defendant.[1]

## POST-TRIAL OPINION AND ORDER

**TAPP, Judge.**

This case concerns more than an abandoned railroad corridor. It concerns the relationship between theory and proof. Throughout litigation, Plaintiffs advanced broad theories of liability under the Trails Act, while the evidentiary record revealed narrower—and often different—questions of property ownership and valuation. Rather than developing complete chains of title before filing suit, or even during litigation, Plaintiffs largely relied on legal presumptions to establish property interests. Likewise, Plaintiffs persisted in pursuing a takings theory contrary to longstanding Federal Circuit precedent. The Court's task is therefore not simply to determine whether government action occurred, but whether Plaintiffs proved the property interests they claimed, the theory of liability they advanced, and the measure of just compensation required by the Fifth Amendment. For the reasons that follow, the Court concludes that Plaintiffs have not carried their burden.

---

[1] Emily A. Davis was counsel of record prior to and during trial. On April 29, 2026, Brian R. Herman filed a Notice of Substitution, (ECF No. 117), thereby terminating Ms. Davis's involvement on the record. Because Ms. Davis was counsel of record during trial, her name appears in the introduction above.

## I.    Introduction

Plaintiffs alleged that conversion of portions of the Beacon Line into a recreational trail effected a taking of their property under the Fifth Amendment. (Compl., ECF No. 1). Following discovery, both parties moved for partial summary judgment on several threshold issues concerning the nature of the railroad's property interest and Plaintiffs' ownership of the underlying rail corridor.

On December 15, 2025, the Court granted in part and denied in part the parties' cross-motions for partial summary judgment. *See Zanzarella v. United States*, 180 Fed. Cl. 91 (2025); (docketed at ECF No. 56). The Court first determined whether the historical conveyance instruments transferred fee simple title or merely an easement to the railroad, concluding that certain deeds conveyed fee title while several condemnation proceedings conveyed only easements under New York law. *Id.* at 108–11. The Court also addressed Plaintiffs' reliance on the centerline presumption, holding that the presumption applied under New York law, but could be rebutted. *Id.* at 111–41. Finally, the Court held that because the parties never finalized a trail use agreement, Plaintiffs could only claim a temporary taking under the National Trails System Act. *Id.* at 142–43. Although the Court resolved several legal questions at summary judgment, significant factual disputes concerning ownership, liability, and valuation remained for trial. *Id.* at 148. After a site visit to the remaining properties, the case proceeded to a two-day bench trial in Manhattan, New York, on April 6 and 7, 2026. (ECF Nos. 33, 55).

## II.    Findings of Fact[2]

The "Beacon Line" lies between Milepost 0.0 at Beacon, New York, and Milepost 71.2 at the Connecticut/New York state line, a distance of 41.1 miles in Dutchess & Putnam Counties, New York. (Joint Stipulations of Fact ("JSOF") at ¶ 1, ECF No. 95). Metro-North Railroad ("Metro-North") acquired its interests in the Beacon Line in January 1995, at which time common-carrier freight service had already ceased, subject only to the Housatonic Railroad Company ("HRRC") obtaining authority to discontinue its freight operations. (*Id.* at ¶¶ 2, 5, 6) On April 30, 2021, Metro-North filed an application for adverse discontinuance with the Surface Transportation Board ("STB"), seeking to terminate HRRC's rights to operate on the line. (*Id.* at ¶¶ 7) The STB subsequently published notice of HRRC's verified notice of exemption to discontinue its trackage rights on February 17, 2023, and HRRC's discontinuance became effective on March 19, 2023. (*Id.* at ¶¶ 8–9). Four months later, Metro-North petitioned the STB for partial revocation of its exemption under 49 U.S.C. Subtitle IV, and the STB granted that request on November 21, 2023. (*Id.* at ¶¶ 10–11). Metro-North then filed a Verified Notice of Exemption for Abandonment of the Beacon Line on December 21, 2023, which the STB published in the Federal Register on January 10, 2024. (*Id.* at ¶¶ 12–13). Shortly thereafter, Metro-North petitioned the STB for a Notice of Interim Trail Use ("NITU"), and the STB issued a NITU on February 8, 2024, covering the Beacon Line's 41.1-mile corridor. (*Id.* at ¶¶ 14–15). Metro-North subsequently sought one-year extensions of the NITU's trail-use negotiating period

---

[2] To the extent they are relevant, the Court adopts the findings in prior and related opinions. A comprehensive recitation of facts can be found in the Court's Summary Judgment Opinion. *Zanzarella v. United States*, 180 Fed. Cl. 91 (2025); (docketed at ECF No. 56).

on January 27, 2025, and January 28, 2026, both of which the STB granted, thereby extending the period for trail-use negotiations. (*Id.* at ¶¶ 16–19); *Zanzarella*, 180 Fed. Cl. at 111. The NITU is scheduled to expire February 8, 2027. (Joint Exhibit ("JX") 24).

Unlike most rails-to-tails cases, this rail line already has a recreational tail (the "Maybrook Trail") running alongside the track. *Zanzarella*, 180 Fed. Cl. at 141. The railroad, without federal government involvement, constructed the trail. *Id.* The Maybrook Trail is a 23-mile recreational trail that was built within the Beacon Line, running from Brewster, New York, to Hopewell Junction, New York. (JSOF at ¶ 3). Metro-North's construction of the Maybrook Trail concluded in 2020, four years prior to the NITU, and has since been open for public use. (*Id.* ¶ 4). During the site visit, the Court observed people walking and cycling on the well-surfaced trail. In the Court's estimation, should a trail-use agreement reach fruition, the resulting trail might overlay the existing trail, be constructed alongside the existing trail or on the other side of the rail line, or perhaps, a combination of all three alternatives. Regardless, completion of another trail remains entirely speculative.

Nine landowners remain in this case; their properties and parcels are described as follows:

- Ms. Dana Brown owned her property as of the date of the NITU, and that property adjoined a portion of the railroad line described in the NITU. Her property is identified as Parcel No. 132200-6758-04-829254-0000. (JSOF at ¶¶ 20–23).

- Mr. Anthony Chianase, Sr. and Mr. Anthony Chianase, Jr. owned their property as of the date of the NITU, and that property adjoined a portion of the railroad line described in the NITU. Their property is identified as Parcel No. 132200-6758-04-860314-0000. (*Id.* at ¶¶ 24–27).

- Ms. Robin Greene owned her property as of the date of the NITU, and that property adjoined a portion of the railroad line described in the NITU. Her property is identified as Parcel No. 56.27-1-5. (*Id.* at ¶¶ 28–31).

- Mr. Homer Griffin and Ms. Joanne Griffin owned their property as of the date of the NITU, and that property adjoined a portion of the railroad line described in the NITU. Their property is identified as Parcel No. 132200-6758-04-831232-0000. (*Id.* at ¶¶ 32–35).

- Mr. Wilson Morales owned his property as of the date of the NITU, and that property adjoined a portion of the railroad line described in the NITU. His property is identified as Parcel No. 56.27-1-6. (*Id.* at ¶¶ 36–39).

- Mr. Peter O'Hara and Ms. Nancy O'Hara owned their property as of the date of the NITU, and that property adjoined a portion of the railroad line described in the NITU. Their property is identified as Parcel No. 13.-2-92. [3] (*Id.* at ¶¶ 40–43).

- Ms. Anne Provet owned her property as of the date of the NITU. Her property is identified as Parcel No. 130200-6054-23-374946-0000. (*Id.* at ¶¶ 44–47).

Three witnesses testified at trial, including a single Plaintiff, Ms. Robin Greene.[4] Mr. Luke Nordine ("Mr. Nordine"), Plaintiffs' expert, provided the only valuation testimony in this case using a comparable sales analysis. Mr. Nordine was a credible witness; however, his appraisal report was premised on the assumption that the alleged taking in this case was permanent as opposed to temporary. (Trial Transcript[5] ("Tr.") Nordine, 255:25–256:2). Mr. Nordine testified that he valued each property at issue as vacant despite acknowledging they were all improved. (*Id.*, 179:25–180:7). To make each property truly vacant, Mr. Nordine acknowledged that the improvements on each property would need to be demolished, though he did not produce any costs associated with potential demolitions. (*Id.*, 181:13–182:2). His data set of comparable sales was also vacant land sales. (*Id.*, 179:3–5). Mr. Nordine explained that he used vacant land sales as comparable sales to conduct a strict "land to land" comparison, meaning that his valuation considered but did not include or make adjustments for various improvements on each property such as homes or garages. (*Id.*, 180:13–181:12). Mr. Nordine considered the Maybrook Trail in his after-condition analysis, while in the before condition he assumed the trail itself was not present but that its "remnants," including potential railroad remnants, remained. (*Id.*, 127:6–7, 234:1–236:17).

The only market adjustment used in Mr. Nordine's report was an 8%-time adjustment, which reflected the appreciation between the oldest comparable sale date up to the effective valuation date of February 8, 2024. (*Id.*, 175:23–176:6, 176:20–177:2). When questioned about how he arrived at the 8%-time adjustment rate, Mr. Nordine explained that he relied on a study of market conditions which utilized local sales, home price indexes from the Federal Reserve for the Local Dutchess and Putnam Counties, Zillow home price index, Case-Shiller price index, and changes in the Consumer Price Index ("CPI"). (*Id.*, 177:20–178:6). Mr. Nordine was unable to

---

[3] Plaintiff Peter O'Hara passed away during the pendency of this litigation. (*See* Pls.' Mot. to Substitute Party, ECF No. 105). He has since been substituted by Nancy O'Hara, in her capacity as the Administrator of Peter O'Hara's Estate. (*See* Order Granting Mot. to Substitute Party, ECF No. 107). From here on, the Court will refer to Nancy O'Hara when referencing both the Estate of Peter O'Hara and Nancy O'Hara, collectively.

[4] Two of the three witnesses were instructive. Ms. Robin Greene provided general background testimony that does not affect the Court's findings or conclusions herein.

[5] The Trial Transcript consists of 366 pages and is separated into two volumes located at ECF Nos. 114 (pp. 1–281), and 115 (pp. 282–366). The Court cites the Transcript using the name of the testifying witness, counsel, or the Court, then the consecutive pagination and line numbers, (Tr. NAME, __:__ – __).

explain the formula used to arrive at a time adjustment rate of 8%-time adjustment. (*Id.*, 178:10–15 (Mr. Nordine: "[T]here might not be a specific formula that shows [8%], but I believe that, in aggregate, a typical [8%] is reasonable and supported.")).

Mr. Nordine also conducted a damages study which he applied to each of the properties at issue in this litigation. (*Id.*, 182:20–22, 183:15–18). This damages study includes three paired sales analyses and a property-to-land ratio study. (*Id.*, 183:19–184:10). Mr. Nordine explained that the property-to-land ratio study, which analyzes the proportion of a property's total value belonging to the raw land versus the physical structures built upon it, was required to isolate potential damages to the land only. (*Id.*, 184:22–185:3). Importantly, as discussed below, Mr. Nordine confirmed that the fair rental value of Plaintiffs' properties could not be derived from his calculations alone and would require a valuation specialist. (*Id.*, 256:7–257:20).

### III.    Conclusions of Law[6]

#### A.    *Liability*[7]

In Trails Act cases, a taking occurs when government action interferes with state-defined property rights. (*Ladd v. United States*, 630 F.3d 1015, 1019, 1025 (Fed. Cir. 2010); *see also Caquelin v. United States*, 959 F.3d 1360, 1367 (Fed. Cir. 2020)). Such interference happens when the government converts a railway easement to a recreational trail outside the easement's original scope, or when it forces the continuation of a railroad easement to negotiate a trail-use agreement, even if those negotiations ultimately fail. *Ladd*, 630 F.3d at 1019, 1025.

Courts assess takings liability through a three-part inquiry: (1) did the railroad hold fee simple title or only easements; (2) if easements existed, were they limited strictly to railroad use or did they allow recreational trails; and (3) had any such easement terminated prior to the alleged taking, restoring full, unencumbered title to the landowners. *Galt Auto. Warehouse, Inc. v. United States*, 179 Fed. Cl. 138, 143–44 (Fed. Cl. 2025) (citing *Preseault v. United States*, 100 F.3d 1525, 1550 (Fed. Cir. 1996)); *see also Ellamae Phillips Co. v. United States*, 564 F.3d 1367, 1373 (Fed. Cir. 2009). Crucially, these underlying property rights are defined by state law. *Castillo v. United States*, 952 F.3d 1311, 1319 (Fed. Cir. 2020).

##### 1.    The Greene and Morales Property

At summary judgment, the parties did not dispute that the Greene and Morales properties were adjacent to the rail corridor. *Zanzarella*, 180 Fed. Cl. at 111 ("[T]he United States does not

---

[6] The Court will include additional findings of fact as necessary for the conclusions reached herein.

[7] On March 31, 2026, Plaintiffs filed a Motion to Exclude six of the United States' exhibits as untimely produced. (*See* Pl.'s Mot. to Exclude, ECF No. 108). During trial, the Court admitted three of the challenged exhibits. (Tr., 312:3–15 (admitting DX 188); 312:18–313:8 (admitting DX 189); 362:8–25 (admitting DX 191)). The United States did not offer the remaining three exhibits into evidence. Accordingly, Plaintiffs' Motion is **DENIED**.

raise arguments contesting whether any of the properties are adjacent to the Line."). The Court therefore examined the relevant deeds and concluded that the centerline presumption applied to those properties. *Id.* at 113–40. Because adjacency was undisputed, application of the centerline presumption established that the Greene and Morales properties extended to the centerline of the railroad corridor, thereby establishing a property interest in the land underlying the corridor. *See, e.g., DiMarino v. United States*, 179 Fed. Cl. 119 (2025), *opinion clarified*, 178 Fed. Cl. 733 (2025).

At trial, the United States sought to relitigate this issue. The United States attempted to introduce certified copies of the relevant deeds for the Greene and Morales properties to show that they did not own a property interest in the corridor. (Tr., Def.'s Counsel, 19:3–7). The Court acknowledges that the evidence the United States highlights are relevant to this case. However, chains-of-title in particular are public records and were available to the United States when they filed briefs on the motions for summary judgment. The Court is not inclined to relitigate issues utilizing information that should have been previously identified. Because the United States failed to raise arguments as to land ownership for the Greene and Morales properties, the Court finds that these Plaintiffs have successfully demonstrated that their property was taken by the United States.

2.    The Griffin, Brown, and Chianese Property

At summary judgment, the Court made two rulings relevant to the Griffin, Brown, and Chianese properties. With respect to the Tabor condemnation proceeding order (Tabor SC.142), (DX49), neither party disputed that the Railroad acquired its interest through condemnation, and the Court held that, under New York law, the Railroad's interest was limited to an easement. *Zanzarella*, 180 Fed. Cl. at 101–02. However, the Court also held that the Tabor warranty deed (Tabor 149/75), (DX 188), which also applies to these properties, conveyed fee simple title to the Railroad. *Id.* at 107–10. Those legal conclusions were established at summary judgment and were not revisited at trial. Neither party disputes that both instruments apply to the Griffin, Brown, and Chianese properties.

Prior to trial, the United States' Motion *in Limine* raised the question of whether those interests merged under New York law. (*See* Def.'s Mot. in Lim. at 11–12, ECF No. 72). Plaintiffs argued that the United States improperly raised the merger doctrine after summary judgment. (Pls.' Resp. at 14, ECF No. 76). Although it would have been preferable to resolve this issue via dispositive motion, the argument was not waived; rather, it arose directly from the Court's summary judgment ruling. Having determined that the Tabor condemnation order conveyed an easement, the Tabor warranty deed conveyed fee simple, and both instruments applied to the same properties, the remaining question was the legal effect of those interests under New York law. However, the Court denied the Motion *in Limine* because resolution of the merger issue depended on factual questions concerning the sequence and legal effect of the historical conveyance instruments. (Order on Mots. In Lim., ECF No. 104).

At trial, Plaintiffs presented no evidence resolving those factual disputes. Nor did they present evidence demonstrating that the Tabor warranty deed and condemnation order conveyed different property interests or otherwise precluded application of the merger doctrine. Instead, Plaintiffs continued to argue that the Tabor warranty deed conveyed only an easement—a legal

6

position the Court had already rejected at summary judgment. *Zanzarella*, 180 Fed. Cl. at 109–10. The Court does not suggest that a particular form of proof was required. Plaintiffs could have introduced complete chains of title, retained a title expert to explain the historical conveyances, offered testimony from a land surveyor or historian regarding the sequence and legal effect of the relevant instruments, or otherwise presented documentary evidence establishing why the Tabor condemnation order and Tabor warranty deed did not result in the merger of estates. They did none of those things. Instead, Plaintiffs repeatedly asserted that the United States should have produced the chain-of-title evidence. (Tr. Pls.' Counsel, 319:14–16 ("The United States had that time to produce chain of title documents. Okay? They did not do that.")). That argument misconstrues the parties' respective burdens. It was Plaintiffs—not the United States—who bore the burden of establishing a compensable property interest. The United States had no obligation to develop Plaintiffs' case for them. *BHL Props., LLC v. United States*, 135 Fed. Cl. 222, 229 (2017) ("[I]t is [plaintiffs'] burden to prove [their] ownership of the land abutting the railway corridor; it is not the government's burden to disprove it.")

Nor is the Court persuaded by Plaintiffs' assertion that they lacked sufficient time after summary judgment to obtain the necessary evidence because they had been "preparing for a valuation trial." (Tr. Pls.' Counsel, 321:14–16 ("[W]e have not had any time whatsoever to go secure our own title expert. We've been preparing for a valuation trial.")). At the outset of this case, Plaintiffs made a conscious decision not to obtain chain of title evidence. (*See* Pls.' Mot. for Clarification at 4, ECF No. 57). The Complaint was filed on February 15, 2024, (ECF No. 1), and the Court's summary judgment opinion, issued on December 15, 2025, identified the legal principles governing the disputed property interests and left unresolved factual questions concerning the historical conveyance instruments. Accordingly, Plaintiffs' assertion that they were preparing only for a valuation trial is inconsistent with the Court's summary judgment opinion, which expressly left issues bearing on liability for trial. *See Zanzarella*, 180 Fed. Cl. at 145 n.14 ("For Plaintiffs whose property interests have not yet been determined, this finding would be instructive if those interests are established."). Plaintiffs elected to file this action without first obtaining complete title evidence, and even after the Court's summary judgment opinion elected not to supplement the evidentiary record before trial.

Even still, trial did not commence until April 7, 2026. Thus, Plaintiffs had almost four months after the summary judgment opinion—and more than two years after initiating this action—to develop evidence supporting their ownership theory. Those litigation choices do not relieve Plaintiffs of their burden of proof, nor do they shift that burden to the United States. The Court's summary judgment opinion resolved discrete questions of New York property law, including the applicability of the centerline presumption to certain deeds. Those legal rulings did not relieve Plaintiffs of their burden to establish the remaining factual and legal predicates necessary to prove a compensable property interest. *See, e.g., Loveridge v. United States*, 149 Fed. Cl. 64, 76 (2020) (finding plaintiffs failed to establish ownership in the railroad right of way despite succeeding on the centerline presumption). The Court is also not obligated to reconstruct a 19th-century chain of title on the parties' behalf when the evidentiary record does not permit a reliable determination. Because Plaintiffs bore the burden of establishing a compensable property interest, the absence of evidence resolving these factual issues is fatal to their claim.

3.    The Provet Property

On summary judgment, the Court held that the centerline presumption applies to the Provet property. *See Zanzarella*, 180 Fed. Cl. at 113–40; (*see also* ECF No. 56 at 44). Contrary to Plaintiffs' suggestion at trial, however, the Court did not hold that the Provet property had definitively established liability. (*See also* Order Den. Mot. for Clarification at 2 ("The Court's summary judgment opinion addressed Plaintiffs' claims regarding property alleged to extend to the centerline of pre-existing roadways."), ECF No. 66). Following the site visit and trial, the Court concludes that, although the centerline presumption applied, Plaintiffs did not establish that the Provet property includes an interest in the land underlying the rail corridor.

As a general rule, when land is conveyed with a brook or other watercourse described as a boundary, the grant is presumed to extend to the centerline of the watercourse unless the conveyance expressly manifests an intent to limit the boundary to the water's edge or shore. *Henry v. Malen*, 263 A.D.2d 698, 701 (N.Y. App. Div. 1999). Likewise, a boundary running "along" a watercourse is ordinarily construed to extend to its centerline. *Id.* (citing *White v. Knickerbocker Ice Co.*, 172 N.E. 452, 454 (N.Y. 1930)).

The Provet property is separated from the rail corridor by Fishkill Creek:



(JX2-G-0009 (depicting Provet property, Fishkill Creek, and rail corridor (upper left corner)). As the Court explained on summary judgment, the deed describes the boundary as running "to the back of the creek; THENCE up and along the creek easterly 100 feet to the extension of the easterly line of Lot #15[.]" *See Zanzarella*, 180 Fed. Cl. 91, 113–40 (emphasis omitted); (JX2-G-0006). Because the deed contains no limiting language, the centerline presumption applies. But that presumption extends the Provet property's boundary only to the centerline of Fishkill Creek—not across the creek to the rail corridor.

8

The Court's observations during the site visit reinforces this conclusion. Despite its name, Fishkill Creek is a substantial waterway separating the Provet property from the rail corridor. Although the centerline presumption extends the Provet property's boundary to the midpoint of the creek, Plaintiffs offered no evidence that their ownership extends beyond that point.

At trial, Plaintiffs insisted that they were unaware that the extent of the Provet property's boundaries remained in dispute. (Tr. Pls.' Counsel 318:7–16 ("[F]or the United States to say that . . . this was always up in the air with respect to Provet . . . is simply not true.")). But this is not supported by the record. In its Reply brief, the United States expressly contested whether the Provet property extended to the rail corridor. (*See* Def.'s Reply at 17 n.2 ("As for the Provet claim . . . Fishkill Creek rests between the property and the railroad tracks. . . . [T]herefore, Plaintiffs do not own to the centerline of the corridor."), ECF No. 47). Plaintiffs offered no evidence to refute that argument. Nonetheless, the Court did not dismiss the Provet property from this case. Even still, the United States raised this issue again at trial, (Tr. Def.'s Counsel, 324:15–21), and Plaintiffs, despite a substantial reduction in the properties at issue in this matter, were still unprepared to refute the United States arguments. When questioned as to why they chose not to gather additional chain of title evidence, Plaintiffs stated that "[i]t would have been a complete waste of time to even try[.]" (Tr. Pls.' Counsel, 322:22–23, 323:3–6 (Pls.' Counsel: "If I would have called up a title examiner . . . they would have laughed at me.")).

While the Court determined that the centerline presumption applied to the Provet property, that ruling was limited to the legal effect of the deed language. It did not, by itself, establish that the Provet property was adjacent to the rail corridor or that its boundary extended beyond the centerline of Fishkill Creek. Success on the centerline presumption is not synonymous with proving ownership of the land underlying the rail corridor, and Plaintiffs failed to present evidence establishing that additional fact. To the extent Plaintiffs allege confusion over the Court's ruling, such confusion does not override the Plaintiffs' own decision not to obtain the evidence necessary to prosecute their own case. Accordingly, the Court finds that the Provet property failed to demonstrate an interest in the land underlying the rail corridor and consequently cannot establish a compensable taking.

### B.      *Just Compensation*

Based on the Court's findings, the Court's analysis of valuation applies only to the Greene and Morales properties. The evidence presented, however, is insufficient to permit the Court to determine just compensation. *Laviolette v. United States*, 179 F.4th 1334, 1341–42 (Fed. Cir. 2026) ("If the landowner fails to meet that burden, the court may award no compensation.") (citing *Gadsden Indus. Park, LLC v. United States*, 956 F.3d 1362, 1370, 1373–74 (Fed. Cir. 2020)).

The proper measure of just compensation is that which will put the owner "in as good a position pecuniarily as he would have occupied if his property had not been taken." *Yuba Nat. Res., Inc. v. United States*, 821 F.2d 638, 640 (Fed. Cir. 1987) (quoting *United States v. Miller*, 317 U.S. 369, 373 (1943)). Where a taking has been established, property owners bear "the burden of proving an actual loss has occurred" to determine just compensation. *Otay Mesa Prop., L.P. v. United States*, 779 F.3d 1315, 1323 (Fed. Cir. 2015). To do so, landowners must establish the value of the railway corridor. *Hyatt v. United States*, 170 Fed. Cl. 417, 432 (2024)

(internal citations omitted). Property owners meet this burden if they show actual damages "with reasonable certainty." *Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005). This "requires more than a guess, but less than absolute exactness." *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 833 (Fed. Cir. 2010).

The Federal Circuit has held that traditional compensation methods are not exclusive; for example, there may be appropriate alternative valuation methods for the taking of an easement. *See Vaizburd v. United States*, 384 F.3d 1278, 1285–87 (Fed. Cir. 2004); *see also Yaist v. United States*, 17 Cl. Ct. 246, 257 (1989) ("[t]he court may use its judgment in selecting the method to determine fair market value."). In ruling on the disputes over valuation standards in takings cases, the Court is cognizant of the guiding principle that "just compensation should be carefully tailored to the circumstances of each particular case." *Otay Mesa Prop., L.P. v. United States*, 670 F.3d 1358, 1368 (Fed. Cir. 2012). The Court seeks "the full monetary equivalent" of the property interest taken to ensure that property owners receive just compensation under the Fifth Amendment. *Almota Farmers Elevator & Whse. Co. v. United States*, 409 U.S. 470, 473–74 (1973).

Just compensation turns significantly on the duration of the taking: a permanent taking typically merits the fair market value of the property, whereas a temporary taking generally warrants its rental value. *Bass Enters. Prod. Co. v. United States*, 133 F.3d 893, 895 (Fed. Cir. 1998) (citing *Yuba Nat. Res.*, 821 F.2d at 641). In rails-to-trails cases, the issuance of a NITU is the federal action that prevents state-law reversionary interests from vesting in the adjoining landowners. *Caldwell v. United States*, 391 F.3d 1226, 1233–34 (Fed. Cir. 2004). Accordingly, the NITU is the sine qua non of liability in rails-to-trails takings cases. *See Barclay v. United States*, 443 F.3d 1368, 1374 (Fed. Cir. 2006) ("The barrier to reversion is the NITU, not physical ouster from possession."). Once this event occurs, the Federal Circuit recently confirmed that the "NITU operates as a single trigger to several possible outcomes[:]" (1) "a permanent taking *in the event that a trail use agreement is reached* and abandonment of the right-of-way is effectively blocked, or (2) "a temporary taking *when negotiations fail* 'and the NITU . . . then convert[s] into a notice of abandonment.'" *Sauer West LLC v. United States*, 151 F.4th 1339, 1343 (Fed. Cir. 2025) (quoting *Caldwell*, 391 F.3d at 1234) (emphasis added).

The distinction between a permanent and temporary taking has been a recurring issue throughout this litigation. The Court concludes that, in the absence of a trail use agreement, the most Plaintiffs can establish is a temporary taking. In case there remains any uncertainty, the Federal Circuit has repeatedly recognized this distinction. *Ladd*, 630 F.3d at 1025; *see also Caldwell*, 391 F.3d at 1234 ("[N]egotiations may fail, and . . . [i]n these circumstances, a temporary taking may have occurred."). Conversely, the Federal Circuit has consistently described a permanent taking as arising only when a trail use agreement is consummated. *Sauer West LLC*, 151 F.4th at 1343. Stated differently, the NITU triggers the possibility of a temporary taking, while the consummation of a trail use agreement is the event that gives rise to the possibility of a permanent taking. Because no trail use agreement was ever reached in this case, Plaintiffs cannot establish a permanent taking as a matter of law. At most, they may establish a temporary taking. *See Zanzarella*, 180 Fed. Cl. at 99.

Despite the Court's analysis approximately four months before trial, Plaintiffs rejected the Court's conclusions until the very end. *See Zanzarella*, 180 Fed. Cl. at 99 (Tr. Pls.' Counsel,

265:21–22 ("We believe that it's a permanent taking until it's not.")).[8] Plaintiffs' position appears to rest largely on the fact that the Maybrook Trail has already been constructed and physically occupies the properties at issue. Based on the apparent permanency of the Maybrook Trail, Plaintiffs assert that there is no way a reasonable person could consider it temporary. (*Id.*, 293:19–22). The Court is unpersuaded.

As already emphasized, the railroad constructed the Maybrook Trail well before the NITU and without federal government involvement. If Plaintiffs object to the construction of the Maybrook Trail, their remedy lies against the railroad in another court. *Rancho Vista Del Mar v. United States*, 169 Fed. Cl. 299, 306 (2024) (holding that the unlawful actions of third parties cannot constitute a compensable taking by the United States). Federal taxpayers are not liable for the railroad's independent act.

Also, as discussed above, the Federal Circuit has identified only two outcomes relevant to the nature of a taking under the Trails Act: a permanent taking upon consummation of a trail use agreement, or a temporary taking when negotiations fail and the NITU converts into a notice of abandonment. *Sauer West LLC*, 151 F.4th at 1343. Plaintiffs cite no authority suggesting that the physical construction of a trail, in this context, determines whether a taking is permanent or temporary. (Tr., 292:20–23 (The Court: "What case can the Plaintiffs point me to that says or even suggests . . . where there's no trail use agreement, it could still be a . . . permanent taking[?]" Pls.' Counsel: "I can't point you to a decision[.]")).

The issuance of the NITU is the government action that gives rise to a Trails Act takings claim. Plaintiffs have identified no authority directing the Court to depart from that framework or to determine the nature of the taking based on the presence of a physical trail constructed pre-NITU.[9] Instead, Plaintiffs simply asserted that the Court is not constrained by any "black or white" distinction between permanent and temporary takings. (Tr. Pls' Counsel, 292:8–11). The Court disagrees. Accordingly, the Court declines Plaintiffs' invitation to depart from well-established Federal Circuit precedent. Because no trail use agreement was ever consummated, Plaintiffs cannot establish a permanent taking as a matter of law. The Court therefore turns to the

---

[8] This proposition—if true—poses interesting, but unworkable, consequences. If a NITU is compensated as a permanent taking, but later expires without a trail use agreement, must the property owner refund a portion of the award?

[9] The parties stipulated that construction of the Maybrook Trail was completed in 2020, approximately four years before the STB issued the NITU in February 2024. (JSOF at ¶¶ 4, 15; JX 4). It is entirely possible that Plaintiffs could have separately litigated a claim premised on Metro-North's construction of the Maybrook Trail and entirely independent of the NITU. *See Lenoir v. United States*, 222 Ct. Cl. 499, 500 (1979) ("To hold the United States liable for a taking, a plaintiff must show that the federal government *or its authorized agency or agent* had done some affirmative act that deprives that plaintiff of property." (emphasis added)). Plaintiffs did not plead or litigate such a theory, instead electing to premise their claims on the issuance of the NITU. Accordingly, the Court need not decide whether that affirmative conduct, if properly pleaded and proven, could have supported an independent takings claim.

11

evidence presented at trial to determine whether Plaintiffs established just compensation for the temporary taking at issue.

Plaintiffs failed to present evidence of the value of a temporary taking. The only valuation testimony came from Plaintiffs' appraisal expert, Mr. Nordine, who employed a before-and-after methodology to measure the alleged diminution in market value caused by the recreational trail easements. (Tr. Nordine, 77:17–19, 88:25–89:2). Mr. Nordine expressly testified, however, that he did not value a temporary easement for any of the properties at issue. (*Id.*, 170:14–16). When asked whether the existing record nevertheless permitted valuation of a temporary taking, Mr. Nordine testified that doing so would require "a valuation specialist." (*Id.*, 257:13–14).

The parties likewise agreed that the evidentiary record does not support an award for a temporary taking. Plaintiffs acknowledged that, if the Court concluded the taking was temporary, the record contained no evidence from which just compensation could be calculated. (Tr., 297:9–16, 297:16–17 (The Court: "It's a permanent taking or it's nothing at all." Pls.' Counsel: "Yes, Your Honor.")). The United States similarly agreed that the evidence presented did not permit valuation of a temporary taking. (Tr. Def.'s Counsel, 299:5–10). The Court nevertheless considered whether it could derive an appropriate award from the existing record. It cannot. Courts may not speculate as to just compensation or devise a valuation methodology unsupported by evidence. Here, Plaintiffs failed to present evidence of fair rental value or any other measure of the value of the temporary property interest taken. Moreover, the only valuation expert and both parties agreed that the existing record did not permit such a calculation. Under these circumstances, the Court has no evidentiary basis upon which to determine just compensation.

Because Plaintiffs bore the burden of proving just compensation, the absence of competent valuation evidence is dispositive. Although the Court concludes that the Greene and Morales Plaintiffs established a temporary taking, they failed to present evidence from which the Court could determine the value of that temporary property interest. Having failed to do so, Plaintiffs cannot recover.

## IV.    Decision and Order of Judgment

Based on the foregoing, the United States is liable for a taking, specifically for the Greene and Morales properties. However, Plaintiffs have failed to carry their burden of proof as to just compensation. Pursuant to RCFC 58, the Clerk is **DIRECTED** to enter final judgment in favor of the United States.

**IT IS SO ORDERED.**



s/  David A. Tapp
DAVID A. TAPP, Judge